## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **BLUE VALLEY APARTMENTS, INC.,** ) | |
| ) | |
|    **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | **CASE NO.:** _____ |
| **CITY OF ATLANTA, GEORGIA** ) | |
| **and URBAN RESIDENTIAL FINANCE** ) | |
| **AUTHORITY OF THE CITY OF** ) | |
| **ATLANTA, GEORGIA,** ) | |
| ) | |
|    **Defendants.** ) | |
| ) | |
| _____ ) | |

## COMPLAINT

Blue Valley Blue Valley Apartments, Inc. ("Blue Valley") hereby files its Complaint as follows:

### PARTIES

1.    Blue Valley is a corporation incorporated in the State of Florida with its principal office also located there. Blue Valley is therefore a citizen of the State of Florida for purposes of diversity jurisdiction.

2.    Defendant City of Atlanta, Georgia ("City") is a municipality of the State of Georgia and may be served at Atlanta City Hall, 55 Trinity Avenue SW, Suite 2400, Atlanta, Georgia 30303 upon Mayor Kasim Reed.

3.      Defendant Urban Residential Finance Authority of the City of Atlanta, Georgia ("URFA") is public body corporate and instrumentality of the State of Georgia, existing by virtue of the Urban Residential Finance Authorities Act for Large Municipalities (O.C.G.A. § 36-41-1 *et seq.*) and may be served at Atlanta City Hall, 55 Trinity Avenue SW, Suite 2400, Atlanta, Georgia 30303 upon the Chairman of the Board of Directors, Mayor Kasim Reed.

## JURISDICTION AND VENUE

4.      Pursuant to 28 U.S.C. § 1332 (a), this Court has jurisdiction over this action because there is a complete diversity of citizenship between the parties, and the amount in controversy, excluding interest, costs or attorneys' fees, exceeds $75,000.00.

5.      Pursuant to 28 U.S.C. § 1391 (b), venue is proper in this District as a substantial part of the events giving rise to the claim occurred in this District, and the property that is the subject of this action is located in this District.

## FACTS

6.      On or about May 12, 1995, the City and URFA entered into a Ground Lease Agreement ("Lease"), wherein the City leased to URFA that certain tract of land lying in Land Lot 77, 14th District, City of Atlanta, Fulton County, Georgia, being more particularly described as follows:

2

BEGINNING AT A POINT, located at the intersection of the southern right-of-way line of Mitchell Street and the western right-of-way line of Central Avenue: running thence in a southerly direction along the western right-of-way line of Central Avenue, South 11 degrees 06 minutes 59 seconds West, a distance of 420.59 feet to a point located at the intersection of the western right-of-way line of Central Avenue and the northern right-of-way line of Trinity Avenue; running thence in a westerly direction along the northern right-of-way line of Trinity Avenue, North 79 degrees 13 minutes 32 seconds West, a distance of 369.34 feet to a point located at the intersection of the northern right-of-way line of Trinity Avenue and the eastern right-of-way line of Pryor Street; running thence in a northerly direction along the eastern right-of-way line of Pryor Street, North 10 degrees 52 minutes 27 seconds East, a distance of 144.76 feet to a point located on the eastern right-of-way line of Pryor Street; thence leaving the eastern right-of-way line of Pryor Street and running South 79 degrees 03 minutes 53 seconds East, a distance of 140.15 feet to a point; running thence North 10 degrees 56 minutes 07 seconds East, a distance of 45.04 feet to a point; running thence North 79 degrees 01 minutes 21 seconds West, a distance of 140.20 feet to a point located on the eastern right-of-way line of Pryor Street; running thence in a northerly direction along the eastern right-of-way line of Pryor Street, North 10 degrees 52 minutes 27 seconds East, a distance of 135.87 feet to a point located on the eastern right-of-way line of Pryor Street; thence leaving the eastern right-of-way line of Pryor Street and running South 79 degrees 17 minutes 20 seconds East, a distance of 140.35 feet to a point; running thence North 10 degrees 56 minutes 06 seconds East, a distance of 95.11 feet to a point located on the southern right-of-way line of Mitchell Street; running thence in a easterly direction along the southern right-of-way line of Mitchell Street South 79 degrees 06 minutes 48 seconds East, a distance of 230.67 feet to a point located at the intersection of the southern right-of-way line of Mitchell Street and the western right-of-way line of Central Avenue, and the POINT OF BEGINNING.

("Property").

3

7.     A true and correct copy of the Lease is attached hereto as Exhibit "1" and incorporated herein by reference.

8.     On or about May 12, 1995, URFA entered into a Ground Sublease Agreement ("Sublease") with Atlanta West Block Redevelopment, LLC ("Atlanta West") wherein URFA subleased the Property to Atlanta West.

9.     A true and correct copy of the Sublease is attached hereto as Exhibit "2" and incorporated herein by reference.

10.     Atlanta West thereafter developed a project on the Property known as "City Plaza" (the "Project").

11.     The terms of the Lease and Sublease are virtually identical except for the identification of the parties to each document.

12.     On July 5, 2011, the Project, along with Atlanta West's leasehold interest in the Property, was conveyed to Fannie Mae by that certain Deed Under Power recorded July 11, 2011, in Deed Book 50203, Page 540, Fulton County, Georgia records ("DUP").

13.     A true and correct copy of the DUP is attached hereto as Exhibit "3" and incorporated herein by reference.

14.     Fannie Mae assigned its interest in the Project and the Property to Blue Valley by that certain Assignment and Assumption of Ground Lease Agreement ("Sublease Assignment") dated July 5, 2011, and recorded July 12, 2011, in Deed Book 50207, Page 100, Fulton County, Georgia records.

15.     A true and correct copy of the Sublease Assignment is attached hereto as Exhibit "4" and incorporated herein by reference.

16.     Beginning July 5, 2011, Blue Valley paid to URFA all Ground Rent due under Sections 3.1.1 and 3.1.2 of Sublease to URFA or the City, and URFA or the City accepted tender of same until 2014.

17.     In early 2014, Blue Valley commenced marketing the Project and its leasehold interest in the Property for sale and, incident to such marketing efforts, on or about September 29, 2014, Blue Valley and CG Investments, LLC ("CGI") entered into an Agreement of Purchase and Sale for Blue Valley's leasehold interest in the Property ("Purchase Agreement").

18.     As a condition of closing, CGI required certain estoppel certificates to be obtained from the City and URFA certifying that the Lease and Sublease had not been modified and remained in full force and effect, that rents had been paid, and that there was no default, set-off, defense or other claim against the City or URFA under the provisions of the Lease or Sublease ("Estoppel Certificates").

5

19.  By letter dated November 20, 2014 ("Request Letter"), counsel for CGI requested that the City and URFA issue the Estoppel Certificates and consent to the assignment of the Sublease.

20.  A true and correct copy of the Request Letter is attached hereto as Exhibit "5" and incorporated herein by reference.

21.  Pursuant to Article VI, Section 6.5 of the Lease and Sublease, the City and URFA were required by contract to execute and deliver the Estoppel Certificates.

22.  The City and URFA are related entities acting as one in relation to the Lease and Sublease.

23.  By letter dated December 9, 2014 ("Refusal Letter"), the City and URFA refused to execute and deliver the Estoppel Certificates due to, *inter alia*, a claim that Blue Valley owed the City or URFA certain "Cash Flow" payments under the Sublease.

24.  A true and correct copy of the Refusal Letter is attached hereto as Exhibit "6" and incorporated herein by reference.

25.  At no time has Blue Valley or any person or entity acting on behalf of Blue Valley entered into any agreement with the City or URFA to make any "Cash Flow" payments.

6

26.     The City and URFA have refused to provide their written consent for the assignment of Sublease from Blue Valley to CGI.

27.     This written consent has been unreasonably withheld in contravention of Article XVIII, Section 18.1.1 of the Lease and Sublease.

28.     As a direct and proximate result of the City's and URFA's failure to provide the both the Estoppel Certificates and their written consent to the assignment of the Sublease as required by the Lease and Sublease, CGI terminated the Purchase Agreement on December 8, 2014.

29.     As a direct result of the City's and URFA's acts or omissions, Blue Valley has suffered damages in an amount of at least Fifteen Million, Seven Hundred Thousand and 00/100 Dollars ($15,700,000.00), which represents the purchase price under the Purchase Agreement less Blue Valley's estimated expenses associated with the sale of the Property.

## COUNT I:  BREACH OF CONTRACT

30.     Blue Valley re-alleges and incorporates by reference the foregoing Paragraphs 1 through 29 of this Complaint as if fully restated herein.

31.     Pursuant to Article VI, Section 6.5 of the Lease and Sublease, the City and URFA each have a contractual obligation to provide Estoppel Certificates within twenty (20) days of the request for same.

32.     Pursuant to Article XVIII, Section 18.1.1 of the Lease and Sublease, the City and URFA each have a contractual obligation to provide their timely written consent for the assignment of the Sublease.

33.     The City and URFA have breached the terms of the Lease and Sublease by refusing to provide the Estoppel Certificates and their written consent to the assignment of the Sublease as and when requested.

34.     Due to the breach of the City and URFA, Blue Valley suffered damages upon termination of the Purchase Agreement with the potential purchaser.

35.     Blue Valley, as a third-party beneficiary to the Lease and a party to the Sublease, is therefore entitled to an award of all allowable damages from the City and URFA due to their breach of contract.

## COUNT II:  BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

36.     Blue Valley re-alleges and incorporates by reference the foregoing Paragraphs 1 through 35 of this Complaint as if fully restated herein.

37.     The failure of the City and URFA to provide the Estoppel Certificates and their written consent to the assignment of the Sublease as required by the terms of the Lease and Sublease is a breach of the covenant of good faith and fair dealing making the City and URFA liable to Blue Valley.

8

38.    Blue Valley, as a third-party beneficiary to the Lease and a party to the Sublease, is therefore entitled an award of all allowable damages from the City and URFA due to their breach of the covenant of good faith and fair dealing.

## COUNT III:  BAD FAITH

39.    Blue Valley re-alleges and incorporates by reference the foregoing Paragraphs 1 through 38 of this Complaint as if fully restated herein.

40.    The City and URFA have refused to provide the Estoppel Certificates, even if the issuance of said Estoppel Certificates would fall squarely within the scope of Article VI, Section 6.5 of the Lease and Sublease. *See* Exhibit 6.

41.    The refusal of the City and URFA to issue any Estoppel Certificates amount to acts of bad faith for which the City and URFA are liable to Blue Valley.

42.    Blue Valley, as a third-party beneficiary to the Lease and a party to the Sublease, is therefore entitled an award of all allowable damages, including punitive damages, from the City and URFA due to their bad faith.

## COUNT IV: SPECIFIC PERFORMANCE

43.    Blue Valley re-alleges and incorporates by reference the foregoing Paragraphs 1 through 42 of this Complaint as if fully restated herein.

9

44.     Blue Valley and CGI entered into a Purchase Agreement wherein Blue Valley was to obtain Estoppel Certificates from the City and URFA as provided for in Article VI, Section 6.5 of the Lease and Sublease.

45.     The City and URFA were to also provide their written consent to the assignment of the Sublease as provided for by Article XVIII, Section 18.1.1 of the Lease and Sublease.

46.     Though the City and URFA each had a contractual obligation to provide Estoppel Certificates within twenty (20) days of the request for same, both the City and URFA refused to issue the Estoppel Certificates.

47.     The City and URFA also refused to provide their written consent to the assignment of the Sublease.

48.     Blue Valley, as a third-party beneficiary to the Lease and a party to the Sublease, is entitled to specific performance of their obligations under Lease and Sublease by Order of this Court requiring the City and URFA to issue the Estoppel Certificates and their written consent to the assignment of the Sublease.

## COUNT V:  INVERSE CONDEMNATION

49.     Blue Valley re-alleges and incorporates by reference the foregoing Paragraphs 1 through 38 of this Complaint as if fully restated herein.

50.    The City and URFA's failure to issue the Estoppel Certificates and their written consent to the assignment of the Sublease as required by contract constitutes an unlawful interference with Blue Valley's property rights, has impaired Blue Valley's ability to dispose of its Property, and has otherwise impaired Blue Valley's ability to use and enjoy its Property.

51.    The City and URFA's conduct constitutes a taking and damaging of Blue Valley's Property for public purpose without just and adequate compensation in violation of Blue Valley's rights under the Constitution of the State of Georgia.

52.    The City and URFA's conduct gives rise to liability for inverse condemnation of Blue Valley's property.

53.  Blue Valley is, therefore, entitled to an award of in an amount of at least Fifteen Million, Seven Hundred Thousand and 00/100 Dollars ($15,700,000.00), which is the reduction in the fair market value of the Property caused by the actions of the City and URFA.

## COUNT VI: ATTORNEY FEES AND EXPENSES

54.    Blue Valley re-alleges and incorporates by reference the foregoing Paragraphs 1 through 53 of this Complaint as if fully restated herein.

55.    Throughout the events leading up to suit, The City and URFA and their agents have acted in bad faith, have been stubbornly litigious and have caused Blue Valley unnecessary trouble and expense.

56.    Because of the City and URFA's bad faith, stubborn litigiousness, and the causing of unnecessary trouble and expense, Blue Valley is entitled to recover all expenses of litigation from the City and URFA, including Blue Valley's reasonable attorney fees and expenses.

**WHEREFORE**, Blue Valley prays for the following relief:

a)    As to Count I, entry of a judgment against the City and URFA for all allowable damages in an amount not less than Fifteen Million, Seven Hundred Thousand and 00/100 Dollars ($15, 700,000.00);

b)    As to Count II,  entry of a judgment against the City and URFA for all allowable damages in an amount not less than Fifteen Million, Seven Hundred Thousand and 00/100 Dollars ($15,700,000.00);

c)    As to County III, entry of a judgment against the City and URFA for all allowable damages, including punitive damages, in an amount not less than Fifteen Million, Seven Hundred Thousand and 00/100 Dollars ($15,700,000.00);

d)    As to Count IV, entry of a judgment against the City and URFA for specific performance of the Lease and Sublease and an Order requiring that the

City and URFA issue the Estoppel Certificates to Blue Valley and provide their written consent to the assignment of the Sublease;

e)   As to Count V, for an award for damages for inverse condemnation against the City and URFA in an amount not less than Fifteen Million, Seven Hundred Thousand and 00/100 Dollars ($15,700,000.00);

f)   As to Count VI, for an award of Blue Valley's reasonable attorney fees and costs against the City and UFRA; and,

f)   For any such other and further relief as this Court deems just and proper.

**RESPECTIFULLY SUBMITTED**, this 5<u>th</u> day of March, 2015.

**ALDRIDGE CONNORS LLP**

By: ___ */s/ Teresa L. Bailey* _____
**TERESA L. BAILEY**
Georgia Bar No. 572516
**T. MATTHEW MASHBURN**
Georgia Bar No. 475380
**JENNIFER A. JAMES**
Georgia Bar No. 233018
*Counsel for Blue Valley*

3575 Piedmont Road NE
Fifteen Piedmont Center, Suite 500
Atlanta, Georgia 30305
Phone: (404) 994-7661
Fax: (888) 344- 9638
tbailey@aclawllp.com

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this pleading has been prepared in compliance with

Northern District of Georgia Local Rule 5.1(C). Specifically, this pleading has

been prepared in Times New Roman 14- point font.

**RESPECTIFULLY SUBMITTED**, this $\underline{5^{th}}$ day of March, 2015.

### **ALDRIDGE CONNORS LLP**

By: _/s/ Teresa L. Bailey_
     **TERESA L. BAILEY**
     Georgia Bar No. 572516
     **T. MATTHEW MASHBURN**
     Georgia Bar No. 475380
     **JENNIFER A. JAMES**
     Georgia Bar No. 233018
     *Counsel for Blue Valley*

3575 Piedmont Road NE
Fifteen Piedmont Center, Suite 500
Atlanta, Georgia 30305
Phone: (404) 994-7661
Fax: (888) 344- 9638
tbailey@aclawllp.com



# GROUND LEASE
# AGREEMENT

Between

## CITY OF ATLANTA

as Lessor

and

## URBAN RESIDENTIAL FINANCE AUTHORITY OF THE CITY OF ATLANTA

as Lessee



EXHIBIT

1

TABLE OF CONTENTS

PAGE

ARTICLE I - THE LEASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

   1.1   Leased Premises . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
   1.2   Estates Defined . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
   1.3   Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
   1.4   Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   1.5   Permits, Licenses and Easements . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   1.6   Affirmative Action Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   1.7   Possession . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   1.8   Demolition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   1.9   Site Restoration and Cost Recoupment . . . . . . . . . . . . . . . . . . . . . . . 3

ARTICLE II - THE IMPROVEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

   2.1   Improvements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   2.2   No Liens . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   2.3   Redevelopment of Land . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   2.4   Title to Improvements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   2.5   Tax Benefits of Improvements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   2.6   Parking Facilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   2.7   Reservation of Residential Units . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARTICLE III - RENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

   3.1   Ground Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
   3.2   Additional Rents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   3.3   Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   3.4   Lessor Audit Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARTICLE IV - TAXES AND OTHER IMPOSITIONS . . . . . . . . . . . . . . . . . . . . . 8

   4.1   Impositions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
   4.2   Property Tax Abatement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
   4.3   Allocation of Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   4.4   Separate Taxation of Parking Facilities . . . . . . . . . . . . . . . . . . . . . . . 9
   4.5   Payment of Impositions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   4.6   Contested Taxes and Other Impositions . . . . . . . . . . . . . . . . . . . . . . . 9
   4.7   Valuation Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   4.8   Failure to Pay Impositions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   4.9   Utilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

PAGE

ARTICLE V - INSURANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

   5.1    Types . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   5.2    Additional Insureds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
   5.3    Evidence of Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
   5.4    Waiver of Subrogation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
   5.5    Acceptable Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
   5.6    Insured Loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
   5.7    Sublessee Indemnity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARTICLE VI - PERMITTED MORTGAGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

   6.1    Right to Encumber . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
   6.2    Right of Leasehold Mortgagee to Cure . . . . . . . . . . . . . . . . . . . . . . . . . . 12
   6.3    Notice to Leasehold Mortgagee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
   6.4    Effective Date of Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
   6.5    Estoppel Certificates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
   6.6    Mortgage of Lessor's Estate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
   6.7    Limitation on Permitted Mortgages . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
   6.8    Non-Disturbance Agreement with Commercial Tenants . . . . . . . . . . . . . . 14

ARTICLE VII - REPRESENTATIONS AND WARRANTIES . . . . . . . . . . . . . . . . . . . . 15

   7.1    Representations and Warranties of Lessor . . . . . . . . . . . . . . . . . . . . . . . . 15
   7.2    Representations and Warranties of Lessee . . . . . . . . . . . . . . . . . . . . . . . . 16

ARTICLE VIII - ENVIRONMENTAL INDEMNITY . . . . . . . . . . . . . . . . . . . . . . . . . . 17

ARTICLE IX - MAINTENANCE, ALTERATIONS, REPAIRS AND REPLACEMENTS . . . 17

   9.1    Maintenance of Leased Premises . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
   9.2    Alterations to Leased Premises . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

ARTICLE X - EMINENT DOMAIN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

   10.1   Substantial Taking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
   10.2   Partial Taking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
   10.3   Temporary Taking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
   10.4   Joinder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
   10.5   Division of Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

PAGE

ARTICLE XI - DAMAGE OR DESTRUCTION ................................... 19

    11.1   Damage to Leased Premises ......................................... 19
    11.2   Payment of Insurance Proceeds ..................................... 20

ARTICLE XII - EVENTS OF DEFAULT ...................................... 20

    12.1   Events of Default ................................................ 20
    12.2   Rights and Remedies ............................................. 21

ARTICLE XIII - QUIET ENJOYMENT AND POSSESSION ...................... 21

ARTICLE XIV - INSPECTIONS ............................................ 22

ARTICLE XV - VACATION OF LEASED PREMISES ........................... 22

ARTICLE XVI - DEFICIENCY JUDGMENTS ................................. 22

ARTICLE XVII - NON-MERGER .......................................... 23

ARTICLE XVIII - ASSIGNMENTS ......................................... 23

    18.1   Permitted Leases and Assignments. ................................. 23
    18.2   Assignment by Lessor ........................................... 24

ARTICLE XIX - RIGHT OF FIRST OFFER ................................... 24

    19.1   Lessor's Intent to Market Leased Premises ........................... 24
    19.2   Right of First Refusal ............................................ 25

ARTICLE XX - MISCELLANEOUS ........................................ 25

    20.1   Entire Agreement; Modification .................................... 25
    20.2   Governing Law ................................................. 25
    20.3   Binding Effect ................................................. 25
    20.4   Severability ................................................... 25
    20.5   Further Assurances ............................................. 25
    20.6   Captions ..................................................... 26
    20.7   Gender ...................................................... 26
    20.8   Exhibits ..................................................... 26
    20.9   References ................................................... 26
    20.10  Rights Cumulative ............................................. 26
    20.11  Notices ..................................................... 26

PAGE

20.12  Counterparts ........................................................ 27
20.13  Time of Essence ..................................................... 27
20.14  Relationship of Parties ............................................. 27

GROUND LEASE AGREEMENT

THIS GROUND LEASE AGREEMENT ("Lease") entered into as of the 12th day of May, 1995 ("Date of this Lease"), between CITY OF ATLANTA ("Lessor"), a Georgia municipal corporation, and URBAN RESIDENTIAL FINANCE AUTHORITY OF THE CITY OF ATLANTA ("Lessee").

ARTICLE I

THE LEASE

Section 1.1     Leased Premises.  Subject to the terms hereof and in consideration of the covenants of payment and performance stipulated herein, Lessor has leased, demised and let, and by these presents does hereby lease, demise and let, unto Lessee, and Lessee hereby leases and takes from Lessor, that tract of land ("Land") being located in Land Lot 77, 14th District, City of Atlanta, Fulton County, Georgia, being known as the West City Hall Lot and being more particularly described in Exhibit A attached hereto and made a part hereof, together with all improvements owned now or hereafter located thereon, together with all and singular the rights, easements, licenses, privileges, both subterranean and vertical, and appurtenances thereunto attaching or in any way belonging ("Leased Premises").

TO HAVE AND TO HOLD the Leased Premises unto Lessee, and its successors in interest, subtenants and permitted assigns, for and during the term hereinafter set forth.

Section 1.2     Estates Defined.  Lessor's fee estate in the Leased Premises is referred to in this Lease as "Lessor's Estate." Lessee's leasehold interest in the Leased Premises acquired pursuant to this Lease and any fee or other interest in the Land and the Leased Premises hereinafter acquired by Lessee is herein referred to as "Lessee's Estate."

Section 1.3     Term.  Unless sooner terminated under the provisions hereof, this Lease shall continue in full force and effect for a term ("Lease Term") commencing on the date hereof and expiring on May 7, 2045, which is fifty (50) years hereafter. If (i) Sublessee (as hereinafter defined in Section 1.5) desires to lease the Leased Premises directly from Lessor after expiration of the Lease Term; or (ii) Sublessee desires to have Lessee lease the Leased Premises from Lessor and to sublease the Leased Premises from Lessee after expiration of the Lease Term for an additional term, Sublessee, during the Lease Term, may notify Lessor, Lessee and any Leasehold Mortgagee of such desire.  Upon receipt of such notice, Lessor shall consider such a request in good faith, and shall promptly notify Lessee, Sublessee and any Leasehold Mortgagee whether Lessor is willing to extend the Lease or to enter into a direct lease with Sublessee for an additional term and if so, the terms and conditions upon which Lessor will grant such an additional term.

During the Lease Term if Lessor receives a written offer from a third party ("Third Party Lease Offer") to lease the Leased Premises after expiration of the Lease Term and Lessor desires to accept the Third Party Lease Offer, Lessor agrees first to offer Lessee an opportunity to match such an offer. Lessor shall promptly notify Lessee thereof and provide Lessee with the opportunity to extend the Lease or to enter into a new lease after expiration of the Lease Term on the terms and conditions contained in the Third Party Lease Offer. After receipt of such notice, Lessee shall have sixty (60) days within which to notify Lessor of Lessee's decision. If Lessee affirmatively responds to such offer on a timely basis, Lessor and Lessee shall proceed promptly using best efforts to finalize such Lease extension or such entry into a new lease. If Lessee negatively responds to such offer or does not respond to such offer on a timely basis, Lessor shall be entitled to accept the Third Party Lease Offer.

Section 1.4    Use. Subject to the provisions hereof, Lessee shall have the right to and shall sublease the Land and the Leased Premises for redevelopment and for construction and operation thereon of a mixed use facility known as the "City Plaza Project" generally in accordance with City of Atlanta Ordinance approved by the Mayor of Atlanta on March 10, 1995 ("Ordinance"). The City Plaza Project shall be developed generally in accordance with the site plan and building elevations which accompanied the Ordinance and shall contain approximately (i) one hundred sixty-four (164) apartments, (ii) twenty-three thousand two hundred (23,200) square feet of retail space in a retail structure and eight hundred (800) square feet composed of service area, garden space, outdoor vendor and sidewalk space; and (iii) three hundred forty-nine (349) striped parking spaces and thirty-eight attendant parking spaces. Lessee agrees to cause Sublessee to incorporate the exterior facade design and other changes reasonably recommended by the Urban Design Commission and the Department of Planning and Development of the City of Atlanta.

Section 1.5    Permits, Licenses and Easements. Lessor agrees to use Lessor's best efforts to assist Lessee and any party to which the Leased Premises is subleased by Lessee ("Sublessee") in obtaining any and all permits, licenses, easements and other authorizations required by any governmental or other body claiming jurisdiction with respect to any construction or other work on the Leased Premises and to grant or cause to be granted all permits, licenses, easements and other governmental authorizations which are necessary or helpful for electric, telephone, gas, water, sewer, drainage, access and such other public or private utilities or facilities as may be reasonably necessary or desirable in connection with redevelopment of the Leased Premises. Lessor shall use Lessor's best efforts to cause relocation or termination of easements currently encumbering the Leased Premises. Lessee or the Sublessee shall be entitled to tap into existing water and sewer lines and treatment facilities serving the Leased Premises. The Leased Premises shall comply with all Federal, State, County and City laws and ordinances applicable thereto.

Section 1.6    Affirmative Action Requirements. Lessee agrees to and shall cause the Sublessee to meet or exceed a minimum thirty-six percent (36%) MBE/WBE affirmative action participation in connection with the City Plaza Project.

Section 1.7    Possession. Lessor agrees to and shall provide possession to Lessee and Sublessee of the Leased Premises immediately following the Date of this Lease free and clear of all rights to possession or use by any tenants or other individuals or entities other than Lessee and Sublessee.

Section 1.8    Demolition. Lessee and Sublessee shall be entitled to commence demolition of the existing buildings and other improvements on the Leased Premises together with necessary or desirable excavation, grading and site mobilization for construction of the City Plaza Project immediately following execution of the Lease. In connection with demolition and the construction of the City Plaza Project, Lessor agrees that Lessee and Sublessee shall be entitled to fence all areas of the Leased Premises, including, without limitation, sidewalks and parking meters abutting the Leased Premises, and shall be entitled to remove all parking meters therefrom without any liability to Lessor or any other individual or entity. Also in connection with demolition, Lessee and Sublessee shall be entitled to remove all fixtures and equipment, including parking gates, from the Leased Premises immediately following execution of this Lease without any liability to Lessor or Lessor's former tenants and, in connection therewith, Lessor agrees to indemnify and hold harmless Lessee and Sublessee from all claims, losses, damages, costs and expenses arising out of or relating to removal of such fixtures and equipment by Lessee or Sublessee.

Section 1.9    Site Restoration and Cost Recoupment. If Sublessee for any reason whatsoever is unable to close its construction financing for the City Plaza Project on or before August 1, 1995, Sublessee, at Sublessee's sole cost and expense, shall cause its general contractor to fill any excavated portions of the Leased Premises, grade and pave the Leased Premises where appropriate and stripe parking spaces on the paved portions of the Leased Premises. Upon completion of such fill, grading, paving and striping, possession of the Leased Premises shall be delivered to Lessor, and the Lease and the Sublease shall be deemed terminated. Thereafter, Lessor shall operate a parking facility on the Leased Premises with certain of the revenues net of ordinary and reasonable operating expenses used to reimburse Sublessee for certain costs and expenses incurred by Sublessee in connection with the City Plaza Project. Lessor agrees that Sublessee is entitled to recoupment of the costs and expenses incurred for demolition, asbestos abatement, site excavation, grading, paving, parking space striping, any and all interest charged by the construction lender and an amount equal to fifty percent (50%) of the architectural and engineering fees incurred in connection with the City Plaza Project. These costs and expenses shall be reimbursed by Lessor paying to Sublessee fifty percent (50%) of all revenues net of ordinary and reasonable operating expenses generated from the operation of a parking facility on the Leased Premises until all such reimbursable costs and expenses have been paid in full. If Sublessee is unable to close its construction financing for the City Plaza Project on or before August 1, 1995, Sublessee agrees to and shall provide to Lessor on or after August 1, 1995, copies of all plans and specifications for the City Plaza Project. Neither Lessee nor Sublessee shall have any liability or obligation to rebuild any improvements located on the Leased Premises which are demolished or removed during the demolition and site mobilization process, except as otherwise provided hereinabove in this Section 1.9.

ARTICLE II

THE IMPROVEMENTS

Section 2.1    Improvements.  Subject to the terms of the sublease ("Sublease") between Lessee and the Sublessee, Lessor agrees that the Sublessee shall be entitled to redevelop the Land and the Leased Premises and to develop and construct improvements (together with all replacements and substitutions collectively "Improvements") thereon.  Lessee shall require in the Sublease that the Improvements shall be constructed in a good and workmanlike manner and in compliance with the building codes and other development and construction regulations of the City of Atlanta and of Fulton County, Georgia.

Section 2.2    No Liens.  Neither Lessee nor the Sublessee shall have any right, authority or power to bind Lessor, or any interest of Lessor in the Leased Premises, for any claim for labor or material or for any other charge or expense, lien or security interest incurred in connection with the development, construction or operation of the Improvements or any change, alteration or addition thereto, or replacement or substitution therefor, nor to render the Leased Premises liable for any lien, security interest or right of lien for any labor or material or any other charge or expense incurred in connection therewith.  Neither Lessee nor the Sublessee shall in any way be considered as the agents of Lessor in connection with the development, construction or operation of the Improvements or any replacements or substitutions therefor.

Section 2.3    Redevelopment of Land.  In connection with the redevelopment of the Leased Premises and with the development and construction of the Improvements, Lessor agrees that, subject to the terms of the Sublease between Lessee and Sublessee, the Sublessee, in Sublessee's sole discretion, shall be entitled to remove and dispose of all buildings, fixtures, equipment and other improvements located upon the Leased Premises subject to compliance with all applicable laws, ordinances, rules and regulations ("Governmental Requirements") of any applicable Federal, State or Local governmental entity, subdivision, agency or instrumentality having jurisdiction over the Land, the Leased Premises, the Improvements, Lessee or the Sublessee or in any way affecting financing for the City Plaza Project ("Governmental Authorities").  Title to all existing improvements located on the Leased Premises shall remain in the Lessor, and shall not pass to Lessee in connection with this Lease.

Section 2.4    Title to Improvements.

2.4.1    During the Lease Term.  Notwithstanding any provision in this Lease to the contrary, the Improvements and all alterations, additions, equipment and fixtures, built, made or installed by the Sublessee in, on, under or to the Land or Improvements or elsewhere on the Leased Premises shall be the sole property of the Sublessee until the expiration or other termination of the Lease Term.

34160-1  3708.2                                     4

2.4.2   After the Lease Term.  The Improvements and all alterations, additions, and fixtures (including, without limitation, such items as air conditioning units, boilers, furnaces, ducts, elevators and escalators) shall be deemed to be and shall automatically become the property of Lessor, without cost or charge to Lessor, upon the expiration or the termination of the Lease Term.  Lessor agrees that the Sublessee may, at any time prior to the expiration or other termination of this Lease, or within thirty (30) days thereafter, remove from the Leased Premises any and all equipment which the Sublessee has furnished or installed together with all personal and other property in which the Sublessee has an interest, provided that Lessee shall require in the Sublease that the Sublessee shall repair any physical damage to the Leased Premises caused by the removal of such equipment and property.

Section 2.5   Tax Benefits of Improvements.  Lessor acknowledges and agrees that any and all depreciation, amortization and tax credits for federal or state tax purposes relating to the Improvements located on the Leased Premises and any and all additions thereto, substitutions therefor, fixtures therein, and other property relating thereto, shall be deducted or credited exclusively by the Sublessee during the Lease Term.  In addition, Lessor acknowledges that redevelopment of the Leased Premises depends upon, in material part, the Sublessee obtaining appropriate financing, Federal tax credits and enterprise zone status.  Lessor further acknowledges that the ability of the Sublessee to obtain appropriate financing, Federal tax credits and enterprise zone status depends upon the Sublessee being able to cause the fee interest in the Land and the Leased Premises to be subject to restrictive covenants in accordance with applicable Governmental Requirements of applicable Governmental Authorities.  Lessor agrees, upon request of Lessee or the Sublessee, that the Commissioner of the Department of Housing and Community Development of the City of Atlanta in concurrence with the City Attorney and Chief Financial Officer for the City of Atlanta, shall subject the fee interest of any portion of the Land or the Leased Premises which Lessor owns to such restrictive covenants as may be required for Sublessee to obtain such appropriate financing, Federal Tax credits and enterprise zone status.  Lessor agrees to and shall use its best efforts to assist the Sublessee in obtaining federal tax credits and, in connection therewith, to execute all documents or instruments which shall be necessary or helpful.  Lessor agrees that in the event these tax credits ever revert to Lessor, the Lessor will negotiate with the Sublessee or Sublessee's first mortgage lender, in good faith, to sell the federal tax credits to the Sublessee or the Sublessee's first mortgage lender.

Section 2.6   Parking Facilities.  Lessor acknowledges that parking facilities ("Parking Facilities") will be developed upon the Leased Premises, and Lessee agrees, during the Lease Term, to cause the Sublessee to provide to Lessor forty (40) parking access cards ("Parking Cards") entitling the holders thereof to entry into the Parking Facilities and to temporary parking of their motor vehicles.  Lessor acknowledges and agrees that use of the Parking Cards shall be subject to the rules and regulations promulgated by the operator of the Parking Facilities generally governing the use thereof.  The Parking Cards shall be provided to Lessor at no cost or expense and without the requirement of any deposit for the Parking Cards, provided that if any of the Parking Cards are lost, the operator of the Parking Facilities shall be entitled to charge a reasonable fee for each replacement card.

34160-1  3708.2                                     5

Section 2.7    Reservation of Residential Units.  Lessee agrees to and shall cause the Sublessee to set aside no more than twenty percent (20%) of residential units for persons of low income in connection with obtaining tax-exempt bond financing, Federal tax credits and enterprise zone status for the City Plaza Project.

## ARTICLE III

## RENTS

Section 3.1    Ground Rent.

3.1.1    Initial Ground Rent.  Lessee shall pay to Lessor on the Date of this Lease and on the 1st day of May of each year thereafter during the Lease Term, ground rent ("Ground Rent") in the amount of One Dollar ($1) per year.  In addition, Lessee shall pay to Lessor annually in arrears an amount equal to ninety-eight percent (98%) of the net cash flow ("Cash Flow") of the City Plaza Project which Lessee receives under the Sublease from the Sublessee.  Cash Flow shall be defined as all project revenues actually collected by the Sublessee (which shall exclude expenses of any refinancing) less (1) all project expenses (including all management fees); (2) all property taxes levied or assessed against the Leased Premises; and (3) Debt Service (as hereinafter defined).  Cash Flow which Lessor is entitled to receive from Lessee shall be referred to in this Lease as "Lessor's Cash Flow."  The first payment of Lessor's Cash Flow shall be due and payable sixty (60) days after expiration of the first twelve (12) month period for which Lessor's Cash Flow is due.  Subsequent payments of Lessor's Cash Flow shall be due sixty (60) days after each succeeding twelve (12) month period during the Lease Term.  "Debt Service" shall be defined as (1) all scheduled or required debt service due to any lender, whether principal amortization or interest, and related expenses, including, without limitation, commitment fees, bond fees, credit enhancement fees payable to any guarantor of any Permitted Mortgage or otherwise, interest and principal; (2) reserves required by a lender holding a leasehold or other mortgage against the Leased Premises, including, without limitation, reserves for maintenance, repairs and replacements of the Improvements and interest rate reserves in an amount necessary to satisfy all lenders' loan requirements; and (3) all supplemental equity contributions whenever made by or on behalf of Sublessee, including deferred development fees, and any preferred returns thereon ("Supplemental Equity Contributions").  In no event can Sublessee take out tax credit sale proceeds and up to One Million Six Hundred Thousand Dollars ($1,600,000) received in connection with the State of Georgia Lease without the concurrence of the Leasehold Mortgagee and Lessor.  The Supplemental Equity Contributions will be repaid to Sublessee over a five (5) year period to the extent of available revenues from the City Plaza Project, provided that no Supplemental Equity Contributions may be repaid until the date twelve (12) months after the City Plaza Project first achieves a stablized debt service coverage ratio of 1.2.  Developer may continue to be repaid each year over the five (5) year period so long as the debt service coverage ratio of 1.2 is maintained.  Lessor and Lessee acknowledge that the attractiveness and utility of the Leased Premises as a location for parking is important to the

feasibility of the City Plaza Project. Lessor and Lessee acknowledge that any action by Governmental Authorities that would make the Leased Premises unsuitable or inconvenient, in whole or in part, for public parking (e.g. permanent closure of streets surrounding the Leased Premises, substantial alteration or restriction of traffic flow around the Leased Premises, or restrictions on use of the Leased Premises for parking) will significantly damage the project and reduce Rents payable under this Lease. Lessor agrees to use its best efforts to prevent any actions by Governmental Authorities which might cause such an adverse affect on use of the Leased Premises for parking.

        3.1.2   Waiver of Lessor's Cash Flow. Notwithstanding the foregoing Subsection 3.1.1, Lessor agrees to terminate the required payments of Lessor's Cash Flow from and after such time as the Leasehold Mortgagee shall acquire title to the estate of Sublessee, whether by foreclosure of the Permitted Mortgage, by assignment in lieu of foreclosure, under a new lease pursuant to Section 6.4 of this Lease or otherwise, and whether in the Leasehold Mortgagee's name or in the name of a nominee; and that from and after such time the Ground Rent and the Additional Rent shall be the only rental payments owing under this Lease. Notwithstanding the foregoing, Lessee agrees that the Sublease shall require the Sublessee, following the date of this Lease, to contact Sublessee's lender or lenders and request that such lender or lenders provide Lessor with an ongoing participation interest in the income of the City Plaza Project which is mutually agreeable to such lender or lenders and Lessor in the event any such lender shall acquire title to the estate of Sublessee in the Leased Premises whether by foreclosure of the Permitted Mortgage, by assignment in lieu of foreclosure, under a new lease pursuant to Section 6.4 of this Lease or otherwise.

     Section 3.2   Additional Rents. In addition to the rents specified in Section 3.1 hereof, any and all of the payments which Lessee is required to make hereunder to or for the benefit of Lessor shall be deemed to be "Additional Rents." The rents specified in Section 3.1 hereof and Additional Rents payable hereunder shall be deemed "Rents" reserved by Lessor, and any remedies now or hereafter given to Lessor under the laws of the State of Georgia for collection of the Rents shall exist in favor of Lessor, in addition to any and all other remedies specified in this Lease. All such Additional Rents shall be payable in accordance with the provisions of the Articles of this Lease specifying the payment of such Additional Rents.

     Section 3.3   Payments. All Rents or other sums, if any, due Lessor hereunder shall be paid by Lessee to Lessor at the address of Lessor set forth hereinafter for notices, or to such other person and/or at such other address as Lessor may direct by notice to Lessee, without notice or demand, and without abatement, deduction or set off.

     Section 3.4   Lessor Audit Rights. Lessee agrees that Lessor, at its cost and expense, shall be entitled, upon reasonable prior notice to Lessee and the Sublessee, to inspect or cause the inspection of the books and records of Lessee relating to Cash Flow of the City Plaza Project to verify calculations of the Rents required to be made under this Lease by Lessee to Lessor.

34160-1  3708.2

7

Lessee further agrees to cause Sublessee to provide to Lessor and Lessee on a monthly basis operating statements, occupancy reports and leasing reports for the City Plaza Project.

## ARTICLE IV

## TAXES AND OTHER IMPOSITIONS

Section 4.1    Impositions. The term "Impositions" shall mean all taxes, assessments, use and occupancy taxes, water and sewer charges, rates and rents, charges for public utilities, excises, levies, license and permit fees and other charges by any Governmental Authorities, general and special, ordinary and extraordinary, foreseen and unforeseen, of any kind and nature whatsoever, which shall or may during the Lease Term be assessed, levied, charged, confirmed or imposed by any Governmental Authorities upon or accrued or become due or payable out of or on account of or become a lien or security interest on the Leased Premises or any part thereof, including the buildings or improvements now located thereon or hereafter comprising a part thereof, or the appurtenances thereto; but shall not include any income tax, capital levy, estate, succession, inheritance or transfer taxes or similar tax of Lessor, or any franchise tax imposed upon any owner of the fee of the Leased Premises, or any income, profits or revenue tax, assessment or charge imposed upon the rent or other benefit received by Lessor under this Lease, by any Governmental Authorities; provided, however, that if at any time during the Lease Term, the present method of taxation or assessment shall be so changed that the whole or any part of the taxes, assessments, levies, impositions or charges now levied, assessed or imposed on the Land, the Leased Premises and the Improvements shall be discontinued and as a substitute therefor, taxes, assessments, levies, impositions, or charges shall be levied, assessed and/or imposed wholly or partially as a capital levy or otherwise on the rents received from such real estate or the rents reserved herein or any part thereof, then such substitute taxes, assessments, levies, impositions or charges, to the extent so levied, assessed or imposed, shall be deemed to be included within the term "Impositions" to the extent that such substitute amount would be payable if the Leased Premises were the only property of Lessor subject to such tax. Notwithstanding anything contained in this Lease to the contrary, neither Lessee nor the Sublessee shall be obligated to pay any development impact fees to Lessor or any other Governmental Authority. Any development impact fees required in connection with redevelopment of the Leased Premises, or otherwise, shall be the responsibility of Lessor.

Section 4.2    Property Tax Abatement. Lessor agrees that the Sublessee shall be entitled to make application to have the Leased Premises classified as a commercial residential mixed use urban enterprise zone permitting five (5) years of full property tax abatement followed by abatement of (i) eighty percent (80%) for all property taxes due from the Sublessee during the next two (2) succeeding years; (ii) sixty percent (60%) of all property taxes due from the Sublessee during the next succeeding year; (iii) forty percent (40%) of all property taxes due from the Sublessee during the next succeeding year; and (iv) twenty percent (20%) of all property taxes due from the Sublessee during the next succeeding year. Lessor shall use its best

efforts to assist the Sublessee in connection with applying for and obtaining such enterprise zone classification.

Section 4.3    Allocation of Taxes. Notwithstanding anything contained in this Lease to the contrary, all Impositions for taxes and assessments charged against the value of the fee estate underlying Lessee's Estate shall be the responsibility and obligation of Lessor.

Section 4.4    Separate Taxation of Parking Facilities. Lessor agrees to and shall use its best efforts to assist Lessee and the Sublessee in persuading the appropriate Governmental Authorities to assess, tax and bill the Parking Facilities located on the Leased Premises as a separate tax parcel.

Section 4.5    Payment of Impositions. Lessee will pay or cause to be paid by the Sublessee, as and when the same shall become due, subject to the provisions of this Lease, all of the Impositions for which Lessee is responsible under this Lease except that where any Imposition which Lessee is obligated to pay in whole or in part is permitted by law to be paid in installments, Lessee may pay or cause to be paid such Imposition (or its proportionate part thereof) in installments as and when such installments become due. Upon the written request of Lessor, Lessee shall exhibit and deliver or cause the Sublessee to exhibit and deliver to Lessor evidence satisfactory to Lessor of payment when due of all Impositions. The certificate, advice, bill or statement issued or given by the appropriate officials authorized or designated by law to issue or give the same or to receive payment of any Imposition, of the existence, non-payment or amount of such Imposition shall be prima facie evidence for all purposes of the existence, nonpayment or amount of such Imposition. Notwithstanding anything contained in this Lease to the contrary, if Lessee is unable to pay or cause to be paid any such Impositions, Lessee shall be entitled to accrue such Impositions and pay them over time so long as such action does not permit the Leased Premises, or any part thereof, to be sold by any Governmental Authority for the non-payment of such Imposition.

Section 4.6    Contested Taxes and Other Impositions. Lessee or the Sublessee may, at their sole cost and expense, contest the validity or amount of any Imposition ("Contested Imposition") in which event the payment thereof may be deferred during the pendency of such contest, if diligently prosecuted. Nothing herein contained, however, shall be construed to allow any Contested Imposition to remain unpaid for a length of time which shall permit the Leased Premises, or any part thereof, to be sold by any Governmental Authorities for the non-payment of such Imposition. Lessee shall promptly furnish Lessor or shall promptly cause the Sublessee to furnish upon request copies of all pleadings, motions and orders in proceedings respecting any Contested Imposition.

Section 4.7    Valuation Assessment. Lessee or the Sublessee, at their expense, may endeavor to obtain a lowering of the assessed valuation of the Leased Premises for any year for the purpose of reducing taxes thereon. In such event, Lessee or the Sublessee may give Lessor

notice thereof following which Lessor shall use its best efforts to assist Lessee or the Sublessee in such endeavor.

Section 4.8   Failure to Pay Impositions. If Lessee shall fail to pay or to cause to be paid any Impositions before the same becomes delinquent, or fails to notify Lessor of Lessee's or the Sublessee's intention to contest the same prior to such delinquency, or fails to pay any Contested Impositions as required, Lessor may, at its election (but shall not be obligated to), pay such Impositions, together with any interest and penalties due thereon, as Additional Rent and the amount paid by Lessor shall be repayable by Lessee or the Sublessee, as appropriate.

Section 4.9   Utilities. Lessee shall pay or shall cause to be paid by the Sublessee all utilities used, rendered or supplied upon or in connection with the City Plaza Project including, but not limited to, all charges for gas, electricity, light, heat or power, and telephone and other communication services, and all water rents and sewer service charges levied or charged against the City Plaza Project during the Lease Term.

## ARTICLE V

## INSURANCE

Section 5.1   Types. During the Lease Term, Lessee shall keep and maintain in force or cause to be kept and maintained in force by the Sublessee, at no cost or expense to Lessor, the following insurance:

(1)   Property Insurance. Insurance on all Improvements on, in or about the Leased Premises (and all replacements or substitutions therefor) against all physical loss or damage in amounts sufficient to provide coverage for the full replacement value. Perils customarily excluded from all risk insurance, e.g., earthquake and flood, may be excluded. The term "replacement value" shall exclude the cost of excavation, foundations and footings, landscaping, and paving.

(2)   Public Liability Insurance. Comprehensive general liability insurance including personal injury, broad form property damage and contractual liability, independent contractors, products/completed operations, host liquor liability, and gross liability endorsement, with a minimum of $1,000,000.00 combined single limit for personal injury and property damage.

(3)   Umbrella Catastrophe Liability Insurance. Insurance providing umbrella liability coverage with a minimum limit of $1,000,000.00 in respect of personal injury, bodily injury, death and property damage arising out of the one occurrence and per policy term.

Section 5.2   Additional Insureds. All of the above policies shall include Lessor, Lessee and the Sublessee as named insureds, as their respective interests may appear.

Section 5.3   Evidence of Insurance. The original or a duplicate original of all property, insurance and other policies of which Lessor is an additional insured shall be furnished to Lessor. Certificates of insurance shall be furnished to the Lessor and shall provide for a minimum of thirty (30) day's notice to Lessor before cancellation.

Section 5.4   Waiver of Subrogation. All property insurance to be obtained hereunder shall contain provisions whereby the insurer releases all rights of subrogation against Lessor, Lessee and the Sublessee. The tenant leases entered into by the Sublessee following development of the Improvements shall also include a waiver of subrogation to the extent reasonably possible..

Section 5.5   Acceptable Insurance. All insurance shall be maintained in companies and agencies reasonably satisfactory to Lessor and the holders of any Permitted Mortgages. If Lessee fails to maintain or to cause the Sublessee to maintain such insurance, Lessor may, at its election (but shall not be obligated to), procure such insurance as may be necessary to comply with the above requirements, and Lessee agrees to repay or to cause the Sublessee to repay immediately as Additional Rent the cost of such insurance to Lessor.

Section 5.6   Insured Loss. Any insurance policies must provide that any loss covered by insurance may be adjusted with the Lessor, Lessee and the Sublessee, but shall be payable to the holder of any Permitted Mortgage, who shall agree to receive and disburse all proceeds of such insurance.

Section 5.7   Sublessee Indemnity. Lessee agrees that Lessee shall cause Sublessee to provide to Lessor and Lessee in the Sublease an indemnity pursuant to which Sublessee agrees, at Sublessee's sole cost and expense, to indemnify, protect and save Lessor and Lessee harmless against and from any and all liens, damages, losses, liabilities, obligations, penalties, claims, litigation, demands, defenses, judgments, suits, proceedings, costs, disbursements or expenses of any kind or of any nature whatsoever (including, without limitation, actual attorneys' fees and experts' fees and expenses reasonably incurred) which may at any time be imposed upon, incurred by or asserted or awarded against Lessor or Lessee which arise out of or are related to negligent or international acts or omissions of Sublessee or Sublessee's members, agents, employees, independent contractors, tenants, invitees or licensees, but only to the extent the same are not subject to insurance coverage. Notwithstanding the foregoing, in the event the Leasehold Mortgagee comes into possession of the Leased Premises by foreclosure or by deed-in-lieu of foreclosure, the Leasehold Mortgagee shall have no liability for any amounts for which the Sublessee is liable under this Section 5.7.

ARTICLE VI

PERMITTED MORTGAGES

Section 6.1    Right to Encumber. Lessee and the Sublessee shall have the right during the Lease Term to encumber by deeds to secure debt, mortgages, deed of trusts, or other instruments in the nature thereof as security for any debt ("Permitted Mortgage" or "Permitted Mortgages"), all of Lessee's and the Sublessee's right, title and interest in the Land and the Leased Premises which shall be in all respects, however, subordinate and inferior to Lessor's rights, title, privileges, liens, and interest as provided in this Lease; provided, however, that each deed to secure debt, mortgage, deed of trust or other instrument in the nature thereof shall contain a clause or clauses to the effect that it conveys to the mortgagee, trustee or grantee ("Leasehold Mortgagee"), as the case may be, and to the holder of any security issued thereunder, no rights in the Leased Premises greater than or extending beyond the rights of Lessee under this Lease or the Sublessee under the Sublease, and that such deed to secure debt, mortgage, deed of trust or other instrument in the nature thereof shall be subject to all and each of the rights of Lessor herein and to all and each of the conditions, covenants, agreements, and obligations contained in this Lease. Lessor and Lessee acknowledge the right of the Leasehold Mortgagee to acquire the estate of the Sublessee in the Leased Premises in its own name or in the name of a nominee upon foreclosure or assignment in lieu of foreclosure under the Permitted Mortgage.

Section 6.2    Right of Leasehold Mortgagee to Cure.  To the extent that Lessee or the Sublessee may grant the right to any such Leasehold Mortgagee, such Leasehold Mortgagee may, at its option at any time within thirty (30) days following expiration of the rights of Lessee or the Sublessee to cure any default under this Lease, pay any amount or do any act or thing required of the Lessee by the terms of this Lease; and all payments so made and all acts or things so done and performed by any such Leasehold Mortgagee shall be as effective to prevent a forfeiture of the rights of the Lessee as if done or performed by Lessee instead of by such Leasehold Mortgagee.

Section 6.3    Notice to Leasehold Mortgagee.  While any Permitted Mortgage is in effect, Lessor shall give any such Leasehold Mortgagee a duplicate copy of all notices of default or other notices which Lessor may give or serve in writing, pursuant to the terms of this Lease. No notice by Lessor to Lessee or to the Sublessee under this Lease shall be effective unless and until a copy of such notice has been provided to the Leasehold Mortgagee.  The address of the Leasehold Mortgagee originally designated in the Permitted Mortgage may be changed upon written notice delivered to Lessor from time to time.  Any Leasehold Mortgagee may, at its option, at any time before the Lease has been cancelled and terminated by Lessor as provided herein, pay all Rents which have accrued here under and all other sums required to be paid by Lessee or do any other act required of Lessee by the terms of this Lease.  All payments made and all acts performed by such Leasehold Mortgagee shall be effective to prevent a termination of the rights of Lessee hereunder as the same would have been if performed by Lessee. Any Permitted Mortgage given by Lessee or the Sublessee may, if Lessee or the Sublessee desire,  provide that,

as between the Leasehold Mortgagee and Lessee or the Sublessee, such Leasehold Mortgagee, upon curing the default, shall be subrogated thereby to any all of the rights of the person or persons to whom any payment is made by such Leasehold Mortgagee, and all of the rights of Lessee under the terms of this Lease or to all the rights of the Sublessee under the terms of the Sublease. No Leasehold Mortgagee shall be liable to Lessor as an assignee of this Lease until such Leasehold Mortgagee shall, by foreclosure or other appropriate proceedings, or as the result of any other action or remedy provided by the Permitted Mortgage, or by proper conveyance from Lessee, either acquire the rights and interests of Lessee under the terms of this Lease or actually take possession of the Leased Premises, and such liability of the Leasehold Mortgagee shall terminate upon such Leasehold Mortgagee assigning such rights and interests to another party or relinquishing such possession, as the case may be. Lessee agrees not to accept a voluntary surrender of the Sublease so long as the estate of the Sublessee in the Leased Premises is encumbered by a Permitted Mortgage.

Section 6.4    Effective Date of Termination. Notwithstanding anything to the contrary contained herein, no termination of this Lease shall become effective until each Leasehold Mortgagee shall have had the option, exercisable by giving Lessor written notice no more than thirty (30) days after Lessor has given such Leasehold Mortgagee notice of the occurrence of any event of default by Lessee hereunder, to elect to receive from Lessor a new lease to such Leasehold Mortgagee or its nominee covering the Leased Premises for the then unexpired balance of the term hereof, and otherwise on the same terms as set forth in this Lease, and Lessor agrees to execute upon termination hereof such new lease with such Leasehold Mortgagee or its nominee, if (but only if) such Leasehold Mortgagee:

(1)    shall immediately cure any default of Lessee hereunder involving the payment of money;

(2)    shall undertake immediately to remedy any default of Lessee occasioned by other than the failure to pay any money owing hereunder, excluding those which by their very nature are incapable of cure by any person other than Lessee, and thereafter proceed with reasonable diligence to cure such default; and

(3)    shall thereafter perform all covenants and conditions contained in this Lease to be observed and performed by Lessee.

Section 6.5    Estoppel Certificates. Lessor and Lessee agree that any time and from time to time upon not less than twenty (20) days' prior written notice by the other, or upon request from any Leasehold Mortgagee, Lessor or Lessee will execute, acknowledge, and deliver to the other or to such Leasehold Mortgagee a statement in writing certifying (a) that this Lease is unmodified and in full force and effect (except for modifications which have been approved by the Leasehold Mortgagee); (b) the date to which the Rents have been paid; and (c) that, so far as the certifier knows, if such be the case, there is no default, set-off, defense or other claim against Lessor (or if so, specify the nature of same) under the provisions of this Lease. It is intended that

any such statement may be relied upon by and person proposing to acquire Lessor's, Lessee's or Leasehold Mortgagee's interest, as the case may be, in this Lease or any prospective mortgagee or assignee of any mortgage, deed to secure debt, deed of trust, or other, instrument in the nature thereof upon such interest.

Section 6.6    Mortgage of Lessor's Estate.  During this Lease Term Lessor agrees not to encumber Lessor's Estate with, and Lessee agrees not to subordinate Lessee's Estate to, any deed to secure debt, mortgage, deed of trust, or other instrument in the nature thereof as security for any debt which is not expressly subordinate to Sublessee's Estate under the Sublease and to the Permitted Mortgage.

Section 6.7    Limitation on Permitted Mortgages.  Notwithstanding anything to the contrary in this Section 6 or elsewhere in this Lease, the only Permitted Mortgages under this Lease and the Sublease shall be (i) the first lien deed to secure debt conveying first security title to the construction lender (currently anticipated to be First Union) during construction of the City Plaza Project and, thereafter, (ii) the first lien deed to secure debt conveying first security title to the permanent lender (currently anticipated to be the Urban Residential Finance Authority of the City of Atlanta, its successors and assigns).  As used herein "Leasehold Mortgagee" shall refer to the secured party under the current Permitted Mortgage.  Lessee shall provide written notice to Lessor of the name and address of the Leasehold Mortgagee under this Lease.  There shall be no other Permitted Mortgages under the Lease or the Sublease without the prior written consent of the current Leasehold Mortgagee.  Furthermore, Lessor agrees that, to the extent there are any conflicts between the terms of this Lease and the terms of any current Permitted Mortgage regarding the Leased Premises, including but not limited to the provisions governing condemnation, casualty, liens or alterations, the terms of the current Permitted Mortgage shall govern and control.

Section 6.8    Non-Disturbance Agreement with Commercial Tenants.  Lessor agrees, upon receipt of a written request signed by the Leasehold Mortgagee and Lessee, to enter into a non-disturbance and attornment agreement with each sublessee with whom the Leasehold Mortgagee enters into a non-disturbance and attornment agreement, on substantially the same form of agreement as that used by the Leasehold Mortgagee.  Such form of agreement shall provide that, so long as such sublessee complies with all the terms, covenants and conditions of its sublease, the sublessee's sublease shall not be terminated, Lessor shall be bound by the terms and provisions of the sublease, and Lessor, in the exercise of any of its rights or remedies under this Lease, shall not deprive the sublessee of possession of its subleased portion of the Lessee's Premises during the term of such sublease, or join the sublessee as an adverse or defendant party in any action or proceeding to enforce or terminate this Lease or to obtain possession of the premises demised in such sublease.

ARTICLE VII

REPRESENTATIONS AND WARRANTIES

Section 7.1    Representations and Warranties of Lessor.  As an inducement to Lessee to enter into and to proceed under this Agreement, Lessor warrants and represents to Lessee as follows, which warranties and representations are true and correct on the Date of this Lease:

7.1.1    Lessor has the right, power and authority to enter into this Lease, and the right, power and authority to sublease the Leased Premises to Lessee in accordance with the terms, provisions and conditions contained in this Lease.

7.1.2    To the best knowledge and belief of Lessor, there is no litigation, pending or threatened, affecting the Leased Premises or any streets or other public rights-of-way abutting or serving the Leased Premises;

7.1.3    Lessor has received no written notice and has no knowledge, nor has Lessor been otherwise advised, of any pending or threatened condemnation proceedings relating to all or any part of the Leased Premises;

7.1.4    Lessor has received no written notice and has no knowledge of the intention of any party holding an easement affecting the Leased Premises or any part thereof to expand the exercise of any such easement beyond the scope of the present exercise thereof (as by replacing or expanding existing sewers, adding underground or overhead wiring, cables or conduits to those now in existence, or the like);

7.1.5    The entry by Lessor into this Lease with Lessee does not violate any other agreement relating to the Leased Premises, regardless of whether Lessor is a party thereto, and Lessor is capable of complying with all of the terms, provisions and conditions contained in this Agreement;

7.1.6    There is no tenant, lessee or other occupant of the Leased Premises having any right or claim to possession or use of the Leased Premises; and possession of the Leased Premises shall be delivered free of the rights or claims of any tenants, occupants or other parties in possession of, or claiming any right to possession or use of the Leased Premises;

7.1.7    To the best knowledge and belief of Lessor, except for asbestos in buildings currently located on the Leased Premises and for other Hazardous Materials identified in the environmental assessments caused to be performed by Lessee ("Environmental Assessments"), there presently does not exist and there has never existed on, above or under the Leased Premises and any improvements located on the Leased Premises any Hazardous Materials, and Lessor has never caused or permitted any Hazardous Materials to be placed, held, located or disposed of, on, under or at the Leased Premises or any part thereof.  To the best of

34160-1  3708.2                                          15

Lessor's knowledge and belief, no part of the Leased Premises or any improvements constructed thereon has ever been has ever been used as a manufacturing, storage or dump site for Hazardous Materials, nor, except as identified in the Environmental Assessments, is any part of the Leased Premises affected by any Hazardous Materials Contamination;

7.1.8   Lessor agrees that "Hazardous Materials" shall mean: (a) any "hazardous waste" as defined by the Resource Conservation and Recovery Act of 1976 (42 U.S.C. Section 6901 et. seq.), as amended from time to time, and regulations promulgated thereunder; (b) any "hazardous substance" as defined by the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. Section 9601 et. seq.) ("CERCLA"), as amended from time to time, and the Superfund Amendments and Reorganization Act of 1986, as amended and regulations promulgated thereunder; (c) asbestos; (d) polychlorinated biphenyls; (e) petroleum, petroleum byproducts or petroleum constituents; (f) any substance the presence of which is prohibited by any governmental requirement; and (g) any other substance which by any governmental requirement requires special handling in its collection, storage, treatment, or disposal; and

7.1.9   Lessor agrees that "Hazardous Materials Contamination" shall mean the contamination (whether presently existing or hereafter occurring) of any improvements, facilities, soil, subsurface strata, ground water, ambient air, biota or other elements on, or of, the Leased Premises by Hazardous Materials, or the contamination of the buildings, facilities, soil, subsurface strata, ground water, ambient air, biota or other elements on, or of, any other Leased Premises as a result of Hazardous Materials emanating from the Leased Premises.

Section 7.2   Representations and Warranties of Lessee. As an inducement to Lessor to enter into and to proceed under this Agreement, Lessee warrants and represents to Lessor as follows, which warranties and representations are true and correct on the Date of this Lease:

7.2.1   Lessee has the right, power and authority to enter into this Lease;

7.2.2   Lessee has the right, power and authority to comply with the terms, provisions and conditions contained in this Lease; and

7.2.3   The entry by Lessee into this Lease does not violate any other agreements to which Lessee is a party.

7.2.4   Lessee shall not (i) cause or, to its actual knowledge, permit any Hazardous Materials to be placed, held, located or disposed of on, under or at the Leased Premises or any part thereof, or (ii) cause or, to its actual knowledge, permit any Hazardous Materials Contamination of the Leased Premises or any part thereof.

7.2.5   Lessee shall cause Sublessee to represent to Lessor and Lessee in the Sublease that the financial statements submitted to Lessor by Sublessee were true and correct in all material respects to the best knowledge and belief of Sublessee.

7.2.6   Lessee shall cause Sublessee to represent to Lessor and Lessee that CPMG, LLC is a subsidiary of Harold A. Dawson Company, Inc., and is the party of interest in an agreement with the Department of Public Safety of the State of Georgia for the purpose of leasing the Improvements to the Department of Public Safety during the XXVI Olympiad, and that One Million Six Hundred Thousand Dollars ($1,600,000) from that Agreement will be provided to Sublessee to finance the construction of the Improvements.

## ARTICLE VIII

### ENVIRONMENTAL INDEMNITY

Lessor agrees, at Lessor's sole cost and expense, to indemnify, protect and save Lessee harmless against and from any and all liens, damages, losses, liabilities, obligations, penalties, claims, litigation, demands, defenses, judgments, suits, proceedings, costs, disbursements or expenses of any kind or of any nature whatsoever (including, without limitation, actual attorneys' and experts' fees and expenses reasonably incurred) which may at any time be imposed upon, incurred by or asserted or awarded against Lessee, Sublessee or the Leased Premises, directly or indirectly from or out of any Hazardous Materials or Hazardous Materials Contamination on, in, under or affecting all or any portion of the Leased Premises, any surrounding areas, or any Leased Premises owned by Lessor, regardless of whether or not caused by or within the control of Lessor.  This indemnification shall not apply to any Hazardous Materials or Hazardous Materials Contamination introduced or caused to be introduced to the Leased Premises by Lessee.  The obligation of Lessor under this Article shall survive the expiration or termination of this Lease.

## ARTICLE IX

### MAINTENANCE, ALTERATIONS, REPAIRS AND REPLACEMENTS

Section 9.1   Maintenance of Leased Premises.  During the Lease Term, Lessee, at Lessee's sole cost and expense, shall keep or cause to be kept the Improvements, whether now existing or hereafter erected, and all appurtenances thereunto belonging, in good and safe condition and in good and workmanlike order and repair, and Lessee shall conform to and comply with all Governmental Requirements affecting the Land and the Leased Premises, and shall indemnify and hold Lessor harmless from any and all penalties, damages and charges imposed or incurred for any violation thereof, whether caused by the neglect of Lessee, the Sublessee or by any sublessee, agent, tenant, contractor or licensee then upon or using the Leased

Premises or any part thereof. Lessor covenants and agrees that Lessee shall have the right to contest any asserted or alleged violation of any kind or character and by whomsoever asserted or alleged in the name of Lessee or Lessor, as Lessee may deem appropriate, provided that the expenses thereof shall be paid by Lessee, or Lessee shall cause the same to be paid by its insurer. Lessee shall be relieved of its aforesaid obligation of indemnity to the extent of the amount actually recovered from one or more of the insurance carriers of either Lessee or Lessor, and (1) paid to Lessor, or (2) paid for Lessor's benefit in reduction of any such liability, penalties, damages, expense or charges imposed upon Lessor.

Section 9.2   Alterations to Leased Premises.  Lessee may make any additions, alterations or changes (sometimes collectively"Alterations") in or to the Improvements (which term shall include any replacement or substitution therefor) subject, however, to the following:

>   (1)   No Alterations shall be made which would tend to:
>
>>   (a)   impair the structural soundness of the Improvements; or
>>
>>   (b)   modify the basic utility and function of the Improvements;

>   (2)   No Alterations shall be undertaken until Lessee shall have procured, so far as the same may be required from time to time, all permits and authorizations of all Governmental Authorities and all required consents of any Leasehold Mortgagee. Lessor shall join in the application for such permits or authorizations whenever such action is necessary or helpful and is requested by Lessee and shall use Lessor's best efforts to obtain such permits or authorizations. Lessee shall have no obligation to pay any permit or other fees or changes in connection with the Alterations; and

>   (3)   Any Alterations shall be made within a reasonable time and in a good and workmanlike manner and in compliance with all Governmental Requirements, in accordance with the orders, rules and regulations of the National Board of Fire Underwriters, or any other body or bodies hereafter exercising similar functions.

## ARTICLE X

### EMINENT DOMAIN

Section 10.1   Substantial Taking.  Lessor and Lessee agree that should all or substantially all of the Leased Premises be taken (which term when used in this Article X shall include any conveyance in avoidance or settlement of condemnation or eminent domain proceedings) by any Governmental Authority under the right of eminent domain or other similar proceeding, then this Lease shall terminate as of the date of taking of possession by the condemning authorities and the payment of the award pursuant thereto.

Section 10.2   Partial Taking. Lessor and Lessee agree that if less than all or substantially all of the Leased Premises be taken by any Governmental Authority or other power under the right of eminent domain or other similar proceeding, then this Lease shall nevertheless continue in effect as to the remainder of the Leased Premises, and the Award (as defined below) will be disbursed and used for restoration of the Leased Premises to the extent feasible provided that if there is a Permitted Mortgage on the Leased Premises, it shall be in the discretion of the Leasehold Mortgagee to determine whether restoration of the Leased Premises is feasible.

Section 10.3   Temporary Taking. If the whole or any part of the Leased Premises or of Lessee's interest in this Lease shall be temporarily taken by any right of eminent domain, the Lease Term shall not be reduced in any way, and Lessee shall continue to pay in full all Rents, Impositions and other charges required herein, without reduction or abatement thereof at the times herein specified and, except only to the extent that Lessee is prevented from so doing, Lessee shall continue to perform all of the other terms and covenants of this Lease as though such taking had not occurred.

Section 10.4   Joinder. If a Permitted Mortgage exists, the Leasehold Mortgagee shall, to the extent permitted by law, be made a party to any condemnation proceeding.

Section 10.5   Division of Award. Any award made by any Governmental Authority under the right of eminent domain or other similar proceedings ("Award") shall be held by Lessor, provided that if a Permitted Mortgage exists against the estate of Sublessee in the Leased Premises any such Award shall be deposited with the Leasehold Mortgagee, and distributed in the following order or priority:

(1) First, to all indebtedness then owing on the Permitted Mortgages; and

(2) Then, to Lessor and Lessee, equally.

## ARTICLE XI

## DAMAGE OR DESTRUCTION

Section 11.1   Damage to Leased Premises. If, during the Lease Term, any buildings or other Improvements now or hereafter situated on the Leased Premises, are wholly or partially destroyed or damaged by fire, or any other casualty whatsoever (collectively "Casualty"), Lessee shall promptly repair, replace, restore and reconstruct or cause to be repaired, replaced, restored and reconstructed the damaged Leased Premises in a good and workmanlike manner to the extent of the insurance proceeds and provided the Leasehold Mortgagee permits Lessee to use or cause to be used insurance proceeds for such purpose.

Section 11.2    Payment of Insurance Proceeds. So long as there exists a Permitted Mortgage against the Leased Premises, all insurance proceeds shall be deposited with the holder of the Permitted Mortgage. Subject to the terms of the Permitted Mortgages, the insurance proceeds shall be held and paid out and shall be disbursed for restoration of the Casualty as follows:

11.2.1    Lessee must first obtain or cause to be obtained each Leasehold Mortgagee's approval of (a) the plans and specifications for the proposed restorative work and (b) the architect who prepared such plans and specifications. After delivery of evidence satisfactory to any Leasehold Mortgagee that such repairs, restoration or rebuilding ("Restoration") can be completed and effected in compliance with this Lease as to the quality and workmanship standards imposed herein, the insurance proceeds shall be disbursed or such proceeds may be advanced in reasonable installments; and

11.2.2    Upon any Casualty, the Rents and other payments provided for herein shall be abated and the occurrence of any Casualty shall not cause a termination of this Lease unless Lessee or the Sublessee (or, if a Leasehold Mortgagee exists, the Leasehold Mortgagee) determines that to restore the Improvements would be economically unsound as hereinabove provided, in which event, if a Leasehold Mortgagee exists, the insurance proceeds shall be applied first to pay the indebtedness owing under the Permitted Mortgage.

## ARTICLE XII

## EVENTS OF DEFAULT

Section 12.1    Events of Default. Each of the following shall be an event of default by Lessee and a material breach of this Lease:

12.1.1    Failure by Lessee to pay or to cause to be paid any Rents when due or to pay or to cause to be paid any Impositions, insurance premiums or other liquidated sums of money herein stipulated to be paid or cause to be paid by Lessee if such failure shall continue for a period of thirty (30) days after notice thereof has been given to Lessee and the Sublessee; or

12.1.2    Failure by Lessee to perform or observe or to cause to be performed or observed any of the provisions of this Lease (other than provisions requiring the payment of Rents, Impositions, insurance premiums or other liquidated sums of money) stipulated in this Lease to be observed and performed or to be caused to be observed or performed by Lessee if such failure shall continue for a period of thirty (30) days after notice thereof has been given to Lessee and the Sublessee; provided, however, that if any such failure (other than a failure involving payment of liquidated sums of money) cannot reasonably be cured within such thirty (30) day period, then Lessor shall not have the right to terminate this Lease or Lessee's right to possession for so long as Lessee proceeds in good faith and with due diligence to remedy and

correct or to cause to be remedied and corrected such failure, provided that Lessee has promptly commenced to cure or caused commencement to cure such failure after the effective date of such notice.

Section 12.2    Rights and Remedies.

12.2.1  If an event of default occurs hereunder, Lessor may, at any time thereafter as Lessor's sole and exclusive remedy and subject to the provisions of this Lease with respect to the rights of any Leasehold Mortgagee and rights of Lessor in Article XVI, terminate this Lease by giving Lessee and the Sublessee written notice thereof (with a copy of such notice to the Leasehold Mortgagee), in which event this Lease and Lessee's Estate created hereby and all interest of Lessee and all parties claiming by, through or under Lessee shall automatically terminate upon the effective date of such notice with the same force and effect and to the same extent as if the effective date of such notice had been the date originally fixed in Article I hereof for the expiration of the Lease Term, and Lessor, its agents or representatives, shall have the right, without further demand or notice, to re-enter and take possession of the Leased Premises (including all buildings and other Improvements comprising any part thereof) without being deemed guilty of any manner of trespass and without prejudice to any remedies for arrears of rent or existing breaches of covenants; provided that Lessor shall not be entitled to disturb possession of the Sublessee or any subtenants or others in possession pursuant to leases with the Sublessee so long as the Sublessee or such subtenants or others are not in default thereunder and attorn to Lessor as their lessor.

12.2.2  Upon the exercise of Lessor's remedies pursuant to this Paragraph, Lessee shall execute such releases, deeds and other instruments in recordable form as Lessor shall reasonably request to accurately set forth of record the status of the Lessee's Estate and Lessee's rights hereunder.

12.2.3  As a matter of information for Lessor, Lessee agrees to cause Sublessee to agree in the Sublease to provide Lessor and Lessee written notice promptly following receipt by Sublessee from a Leasehold Mortgagee of a notice of default under a Permitted Mortgage.

ARTICLE XIII

QUIET ENJOYMENT AND POSSESSION

Lessor covenants and warrants that Lessee, on paying all payments herein provided and performing and observing all of its covenants herein contained, shall peaceably and quietly have, hold, occupy, use and enjoy, and shall have the full, exclusive and unrestricted use and enjoyment of, all of the Leased Premises during the Lease Term, subject only to the provisions of

this Lease and all applicable rules and regulations of Governmental Authorities. Lessor agrees to warrant and forever defend the title to the Leased Premises against the claims of any and all persons whomsoever lawfully claiming or to claim the same, or any part thereof, by, through or under Lessor, but not otherwise, subject only to the provisions of this Lease and all applicable rules and regulations of Governmental Authorities.

## ARTICLE XIV

### INSPECTIONS

Lessor, in person or by its agents and upon reasonable prior written notice to Lessee, shall have the right to enter upon the Leased Premises for purposes of inspection during reasonable hours.

## ARTICLE XV

### VACATION OF LEASED PREMISES

Lessee covenants and agrees to and with Lessor that upon any termination of this Lease, whether by lapse of time or because of any of the conditions or provisions contained herein, Lessee will peaceably and quietly yield up and surrender possession of the Leased Premises to Lessor, subject to the rights of the Sublessee and subtenants and others in possession pursuant to the Sublease or leases with the Sublessee provided the Sublessee or such subtenants or others are not in default thereunder and attorn to Lessor as their lessor. An action of forcible detainer shall lie if Lessee holds over after a demand for possession is made by Lessor.

## ARTICLE XVI

### DEFICIENCY JUDGMENTS

Lessor, for itself and for each and every succeeding owner of Lessor's Estate, agrees that it shall never by entitled to or seek a personal judgment against Lessee or the Sublessee but in the event of a default hereunder, the rights of Lessor hereunder to enforce the obligations of Lessee, its successors or assigns, or to collect the judgment, shall be limited to the termination of this Lease and the enforcement of any other rights and remedies granted to Lessor hereunder; provided however, that the limitations hereinbefore set forth in this Article shall not be applicable to, and Lessee shall be fully liable for, (1) fraud, (2) misapplication of Cash Flow, (3) misapplication of proceeds paid under any insurance policies by reason of damage, loss or destruction of any part of the Improvements, (4) misapplication of amounts and damages awarded in condemnation proceedings or amounts paid in lieu thereof for any portion of the

Leased Premises taken for public use under the power of eminent domain, and (5) misapplication of any other funds which Lessee holds or controls for the benefit of or belonging to Lessor.

## ARTICLE XVII

### NON-MERGER

Except upon expiration of the Lease Term or upon termination of this Lease pursuant to express right to do so as set forth herein, there shall be no merger of this Lease nor of Lessee's Estate created by this Lease with the fee estate in the Leased Premises or any part thereof by reason of the fact that the same person may acquire or own or hold, directly or indirectly, (a) this Lease or Lessee's Estate created by this Lease or any interest in this Lease or in any such interest in Lessee's Estate (including the Improvements), and (b) the fee estate in the Leased Premises or any part thereof or any interest in such fee estate (including the Improvements), unless and until all persons, including any assignee of Lessor, having any interest in (i) this Lease or Lessee's Estate created by this Lease, and (ii) the fee estate in the Leased Premises or any part thereof, shall join in a written instrument effecting such merger and shall duly record the same.

## ARTICLE XVIII

### ASSIGNMENTS

Section 18.1    Permitted Leases and Assignments.

18.1.1 Lessee shall have no right to assign its interest (legal or beneficial) hereunder without Lessor's written consent which shall not be unreasonably withheld or delayed provided that Lessor is deemed to have consented to an assignment by Sublessee to the Leasehold Mortgagee, and to an assignment or transfer by the Leasehold Mortgagee to a third party purchaser following a foreclosure sale or acceptance by the Leasehold Mortgagee of a deed-in-lieu of foreclosure. Upon such consent, this Lease shall be binding upon and shall inure to the benefit of Lessor and Lessee and their respective heirs, successors, assigns and legal representatives, it being expressly understood that, subject to the terms, provisions and conditions of this Lease, Lessor may assign, sell, pledge, hypothecate or transfer all or any part of its rights or interest hereunder at any time provided such assignment, sale, pledge, hypothecation or transfer is subject and subordinate to this Lease, the Sublease and any Permitted Mortgage.

18.1.2 Lessee shall have the right, at any time during the term hereof, to sublet all or any portion of the Leased Premises to the Sublessee. Sublessee shall be entitled to sublease all or any part of the Leased Premises without the prior written approval of Lessor or Lessee except where a sublease by Sublessee will be to a nightclub, a package alcoholic beverage

store, an adult bookstore, an adult motion picture theater, an adult cabaret or an adult entertainment establishment as such terms are defined in Section 16-29.001 of the City of Atlanta Code in effect on May 8, 1995 (which expressly does not include a restaurant permitted to serve alcoholic beverages), in which event the approval of the Commissioner of the Department of Housing and Community Development must first be obtained with respect to such sublease, such approval not to be unreasonably withheld or delayed.

18.1.3  If an event of default, as defined in this Lease, shall occur while the Leased Premises or any part thereof be subleased to the Sublessee, Lessor, in addition to any other remedies herein provided and subject to the rights of the Sublessee provided in this Lease, shall have the right (while such event of default remains uncured) to collect directly from the Sublessee all rents becoming due to Lessee under the Sublease and apply such rent against any sums due to Lessor by Lessee hereunder; unless Lessee has assigned to the Leasehold Mortgagee the prior right to collect such rent, in which case Lessor shall exercise such right to collect rent from the Sublessee only to the extent not exercised by the Leasehold Mortgagee. No direct collection by Lessor from the Sublessee shall be construed to constitute a novation or release of Lessee from the further performance of any of Lessee's obligations hereunder.

Section 18.2   Assignment by Lessor.  Lessor shall not hypothecate, encumber or assign (as security or otherwise) its interests in the Lessor's Estate, including the Land, the Leased Premises or any portion thereof without the prior written consent of the Leasehold Mortgagee.

## ARTICLE XIX

### RIGHT OF FIRST OFFER

Section 19.1   Lessor's Intent to Market Leased Premises.  If Lessor, in its sole discretion, decides to sell its interest in the Leased Premises, Lessor shall give written notice of such intent to Lessee, the Sublessee and any Leasehold Mortgagee setting the terms and conditions thereof ("Notice"). The Sublessee shall thereafter have sixty (60) days within which to notify Lessor of its intent to purchase the Leased Premises offered for sale upon such terms and conditions, and if such Notice is timely given, the Closing shall be sixty (60) days thereafter. The status of title to be delivered and the instruments to be executed pursuant thereto shall be as stated in the Notice and the amount of earnest money that the Sublessee shall be required to deposit with the notification of intent to purchase by matching the offer shall be as stated in the Notice. Failure of the Sublessee to so notify Lessor in a timely manner shall be deemed an election not to purchase. In the event the Sublessee does not so timely notify Lessor of its intent to purchase the offered property upon the terms and conditions stated in the Notice, Lessor shall be free to market such property on its own or through a broker and thereafter may sell such property but only on the same terms and conditions as set forth in the Notice.

Section 19.2   Right of First Refusal.  If Lessor is not marketing the property as provided in Section 19.1 above, but receives a written offer in acceptable form from an unrelated third party that Lessor is willing to accept for the purchase of the Leased Premises, Lessor shall notify Lessee and the Sublessee of the terms and conditions of such offer.  The Sublessee shall then have sixty (60) days within which to notify Lessor of its intent to purchase such property by matching said offer and in the event of such timely response, the closing of the purchase and sale of such property shall be in accordance with the terms of such offer.  In the event that timely notice is not given by the Sublessee to Lessor, the Sublessee shall be deemed to have elected not to match said offer, and Lessor shall be free to sell the property to such unrelated third party on the terms and conditions set forth in the offer.  If Lessor fails to sell such property to such third party in accordance with the terms and conditions of the offer within sixty (60) days after Lessor is entitled to sell the Property to such unrelated third party, the right of first refusal created in this Section 19.2 shall be revived and again be enforceable.

## ARTICLE XX

### MISCELLANEOUS PROVISIONS

20.1   Entire Agreement: Modification.  This Lease supersedes all prior discussions and agreements between the parties with respect to the Leased Premises.  This Lease contains the sole and entire understanding between the parties with respect to the transactions contemplated by this Lease, and all promises, inducements, offers, solicitations, agreements, representations and warranties heretofore made between the parties, if any, are merged into this Lease.  This Lease shall not be modified or amended in any respect  except by written instrument specifically referencing such a modification or amendment which is executed by or on behalf of the parties in the same manner as this Lease is executed and to which each Leasehold Mortgagee has consented in writing.

20.2   Governing Law.  This Lease, and the rights and obligations of the parties hereunder, shall be governed by and construed in accordance with the substantive laws of the State of Georgia.

20.3   Binding Effect.  This Lease shall inure to the benefit of and be binding upon the parties hereto, their heirs, successors, administrators, executors and assigns.

20.4   Severability.  In the event any provision or portion of this Lease is held by any Court of competent jurisdiction to be invalid or unenforceable, such holdings shall not affect the remainder hereof, and the remaining provisions shall continue in full force and effect to the same extent as would have been the case had such invalid or unenforceable provision or portion never been a part hereof.

20.5   Further Assurances. On and after the date of this Lease, Lessor and Lessee shall, at the request of the other, make, execute and deliver or obtain and deliver all such affidavits, deeds, certificates, resolutions and other instruments and documents, and shall do or cause to be done all such other things which either party may reasonably require to effectuate the provisions and the intention of this Lease.

20.6   Captions. All captions, headings, paragraphs, subparagraphs, letters and other reference captions are solely for the purpose of facilitating convenient reference to this Lease, shall not supplement, limit or otherwise vary the text of this Lease in any respect, and shall be wholly disregarded when interpreting the meaning of any terms or provisions hereof. All references to particular paragraphs and subparagraphs by number refer to the text of the paragraphs or subparagraphs so numbered in this Lease.

20.7   Gender. Words of any gender used in this Lease shall be held and construed to include any other gender, and words of a singular number shall be held to include the plural, and vice-versa, unless the context requires otherwise.

20.8   Exhibits. Each and every exhibit referred to or otherwise mentioned in this Lease is attached to this Lease and is and shall be construed to be made a part of this Lease by such reference or other mention at each point at which such reference or other mention occurs, in the same manner and with the same effect as if each exhibit were set forth in full at length every time it is referred to or otherwise mentioned.

20.9   References. All references to paragraphs or subparagraphs shall be deemed to refer to the appropriate paragraph or subparagraph of this Lease. Unless otherwise specified in this Lease, the terms "herein," "hereof," "hereinafter," "hereunder" and other terms of like or similar import, shall be deemed to refer to this Lease as a whole, and not to any particular paragraph or subparagraph hereof.

20.10   Rights Cumulative. Except as expressly limited by the terms of this Lease, all rights, powers and privileges conferred hereunder shall be cumulative and not restrictive of those provided at law or in equity.

20.11   Notices. All notices, requests, demands or other communications required or permitted to be given hereunder shall be in writing and shall be addressed and delivered by hand or by certified mail, return receipt requested, or by Federal Express, or by hand delivery by reputable courier, to each party at the addresses set forth below. Any such notice, request, demand or other communication shall be considered given or delivered, as the case may be, on the date of receipt. Rejection or other refusal to accept or inability to deliver because of changed address of which proper notice was not given shall be deemed to be receipt of the notice, request, demand or other communication. By giving prior written notice thereof, any party may from time to time and at any time change its address for notices hereunder. Legal counsel for the respective parties may send to the other party any notices, requests, demands or other communications required or permitted to be given hereunder by such party.

| a. | To Lessor: | City of Atlanta<br>68 Mitchell Street, S.W., Suite 1200<br>Atlanta, Georgia 30335-0332<br>Attn: Carl R. Hartrampf, III, Housing Commissioner<br>Department of Housing |
|----|-----------|--------------------------------------------|
| b. | With a copy to: | Law Department, City of Atlanta<br>68 Mitchell Street, S.W., Suite 4100<br>Atlanta, Georgia 30335-0032<br>Attn: Bernard R. Thomas, Esq. and<br>Clifford E. Hardwick, IV, Esq. |
| c. | To Lessee: | Urban Residential Finance Authority of the<br>City of Atlanta<br>100 Peachtree St., N.W., Suite 400<br>Atlanta, GA 30303<br>Attn: Mr. Marty Nance, Executive Director |
| d. | With a copy to: | Raymond A. Sales, Esq.<br>Sales, Goodloe & Golden<br>One Peachtree Center, Suite 4320<br>Atlanta, Georgia 30308 |
| e. | To Sublessee: | Atlanta West Block Redevelopment, L.L.C.<br>c/o Harold A. Dawson Company, Inc.<br>NationsBank Plaza, Suite 3700<br>Atlanta, Georgia 30308<br>Attn: Harold A. Dawson, Jr. |
| f. | With a copy to: | Frank L. Wilson, III, Esq.<br>Wilson Brock & Irby, L.L.C.<br>999 Peachtree Street, N.E., Suite 2000<br>Atlanta, Georgia 30309 |

20.12  Counterparts. This Lease may be executed in several counterparts, each of which shall be deemed an original, and all such counterparts together shall constitute one and the same agreement.

20.13  Time of Essence. Time is and shall be of the essence in this Lease.

20.14  Relationship of Parties. No relationship exists between Lessor and Lessee other than landlord and tenant. This Lease is intended to create a usufruct and not in an estate for years. The parties hereto expressly declare that, in connection with the activities and operations contemplated by this Lease, they are neither partners nor joint venturers, nor does a debtor-creditor, principal-agent or any other relationship, except as aforesaid, exists between them.

IN WITNESS WHEREOF, this Lease is made and entered into in multiple original counterparts, on the day and year first above written.

"LESSOR"

Attest:                                          CITY OF ATLANTA

_Rhonda Dauphin Johnson_             By: _____
Municipal Clerk                                    Mayor
  DEPUTY CLERK

                                                              [CITY SEAL]

Approved as to Form:                        Recommended:

_____              _____
City Attorney                                       Chief Operating Officer

                                                      _____
                                                      Housing Commissioner

                                                      _____
                                                      Deputy Chief Financial Officer

                                                      "LESSEE"

_____              URBAN RESIDENTIAL FINANCE
Unofficial Witness                              AUTHORITY OF THE CITY OF ATLANTA

                                                      By: _____

                                                      Title: _VICE CHAIRMAN_

                                                              [AUTHORITY SEAL]

EXHIBIT A

CITY HALL WEST LOT LEGAL DESCRIPTION

All that tract or parcel of land lying and being in Land Lot 77, 14th District, City of Atlanta, Fulton County, Georgia, and being more particularly described as follows:

BEGINNING AT A POINT located at the intersection of the southern right-of-way line of Mitchell Street and the western right-of-way line of Central Avenue; running thence in a southerly direction along the western right-of-way line of Central Avenue, South 11 degrees 06 minutes 59 seconds West, a distance of 420.59 feet to a point located at the intersection of the western right-of-way line of Central Avenue and the northern right-of-way line of Trinity Avenue; running thence in a westerly direction along the northern right-of-way line of Trinity Avenue, North 79 degrees 13 minutes 32 seconds West, a distance of 369.34 feet to a point located at the intersection of the northern right-of-way line of Trinity Avenue and the eastern right-of-way line of Pryor Street; running thence in a northerly direction along the eastern right-of-way line of Pryor Street, North 10 degrees, 52 minutes 27 seconds East, a distance of 144.76 feet to a point located on the eastern right-of-way line of Pryor Street; thence leaving the eastern right-of-way line of Pryor Street and running South 79 degrees 03 minutes 53 seconds East, a distance of 140.15 feet to a point; running thence North 10 degrees 56 minute 07 seconds East, a distance of 45.04 feet to a point; running thence North 79 degrees 01 minutes 21 seconds West, a distance of 140.20 feet to a point located on the eastern right-of-way line of Pryor Street; running thence in a northerly direction along the eastern right-of-way line of Pryor Street, North 10 degrees 52 minutes 27 seconds East, a distance of 135.87 feet to a point located on the eastern right-of-way line of Pryor Street; thence leaving the eastern right-of-way line of Pryor Street and running South 79 degrees 17 minutes 20 seconds East, a distance of 140.35 feet to a point; running thence North 10 degrees 56 minutes 06 seconds East, a distance of 95.11 feet to a point located on the southern right-of-way line of Mitchell Street; running thence in a easterly direction along the southern right-of-way line of Mitchell Street South 79 degrees 06 minutes 48 seconds East, a distance of 230.67 feet to a point located at the intersection of the southern right-of-way line of Mitchell Street and the western right-of-way line of Central Avenue, and the POINT OF BEGINNING, all as more particularly shown on that Topographic and Boundary Survey prepared by John Evan North, Georgia Registered Land Surveyor No. 1848, for Atlanta West Block Redevelopment Company, dated December 21, 1994.

ORIGINAL

GROUND SUBLEASE
AGREEMENT

Between

URBAN RESIDENTIAL FINANCE AUTHORITY OF THE CITY OF ATLANTA

as Sublessor

and

ATLANTA WEST BLOCK REDEVELOPMENT, L.L.C.

as Sublessee

EXHIBIT
2

## TABLE OF CONTENTS

PAGE

ARTICLE I - THE SUBLEASE ................................................... 1

    1.1     Subleased Premises ................................................. 1
    1.2     Estates Defined .................................................... 1
    1.3     Term ............................................................. 1
    1.4     Use .............................................................. 2
    1.5     Permits, Licenses and Easements .................................... 2
    1.6     Affirmative Action Requirements .................................... 3
    1.7     Possession ........................................................ 3
    1.8     Demolition ........................................................ 3
    1.9     Site Restoration and Cost Recoupment ................................ 3

ARTICLE II - THE IMPROVEMENTS .......................................... 4

    2.1     Improvements ...................................................... 4
    2.2     No Liens .......................................................... 4
    2.3     Redevelopment of Land ............................................. 4
    2.4     Title to Improvements .............................................. 5
    2.5     Tax Benefits of Improvements ....................................... 5
    2.6     Parking Facilities .................................................. 6
    2.7     Reservation of Residential Units ..................................... 6

ARTICLE III - RENTS ......................................................... 6

    3.1     Ground Rent ....................................................... 6
    3.2     Additional Rents ................................................... 7
    3.3     Payments ......................................................... 8
    3.4     Sublessor Audit Rights ............................................. 8

ARTICLE IV - TAXES AND OTHER IMPOSITIONS ............................. 8

    4.1     Impositions ....................................................... 8
    4.2     Property Tax Abatement ............................................ 9
    4.3     Allocation of Taxes ................................................ 9
    4.4     Separate Taxation of Parking Facilities ............................... 9
    4.5     Payment of Impositions ............................................. 9
    4.6     Contested Taxes and Other Impositions .............................. 10
    4.7     Valuation Assessment .............................................. 10
    4.8     Failure to Pay Impositions ......................................... 10
    4.9     Utilities .......................................................... 10

PAGE

ARTICLE V - INSURANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    5.1    Types . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    5.2    Additional Insureds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    5.3    Evidence of Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    5.4    Waiver of Subrogation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    5.5    Acceptable Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    5.6    Insured Loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    5.7    Sublessee Indemnity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARTICLE VI - PERMITTED MORTGAGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    6.1    Right to Encumber . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    6.2    Right of Leasehold Mortgagee to Cure . . . . . . . . . . . . . . . . . . . . . . 12
    6.3    Notice to Leasehold Mortgagee . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    6.4    Effective Date of Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    6.5    Estoppel Certificates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    6.6    Mortgage of Sublessor's Estate . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    6.7    Limitation on Permitted Mortgages . . . . . . . . . . . . . . . . . . . . . . . . 14
    6.8    Non-Disturbance Agreement with Commercial Tenants . . . . . . . . . 14

ARTICLE VII - REPRESENTATIONS AND WARRANTIES . . . . . . . . . . . . . . . . . . . 15

    7.1    Representations and Warranties of Sublessor . . . . . . . . . . . . . . . . . 15
    7.2    Representations and Warranties of Sublessee . . . . . . . . . . . . . . . . . 16

ARTICLE VIII - ENVIRONMENTAL INDEMNITY . . . . . . . . . . . . . . . . . . . . . . . . . 17

ARTICLE IX - MAINTENANCE, ALTERATIONS, REPAIRS AND REPLACEMENTS . . . 18

    9.1    Maintenance of Subleased Premises . . . . . . . . . . . . . . . . . . . . . . . . 18
    9.2    Alterations to Subleased Premises . . . . . . . . . . . . . . . . . . . . . . . . . 18

ARTICLE X - EMINENT DOMAIN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    10.1    Substantial Taking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    10.2    Partial Taking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    10.3    Temporary Taking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    10.4    Joinder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    10.5    Division of Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

PAGE

ARTICLE XI - DAMAGE OR DESTRUCTION ................................... 20

    11.1    Damage to Subleased Premises ....................................... 20
    11.2    Payment of Insurance Proceeds ...................................... 20

ARTICLE XII - EVENTS OF DEFAULT ...................................... 20

    12.1    Events of Default .................................................. 20
    12.2    Rights and Remedies ............................................... 21

ARTICLE XIII - QUIET ENJOYMENT AND POSSESSION ........................ 22

ARTICLE XIV - INSPECTIONS ............................................ 22

ARTICLE XV - VACATION OF SUBLEASED PREMISES .......................... 22

ARTICLE XVI - DEFICIENCY JUDGMENTS ................................... 22

ARTICLE XVII - NON-MERGER ............................................ 23

ARTICLE XVIII - ASSIGNMENTS .......................................... 23

    18.1    Permitted Subleases and Assignments. ............................... 23
    18.2    Assignment by Sublessor ........................................... 24

ARTICLE XIX - RIGHT OF FIRST OFFER ................................... 24

    19.1    Sublessor's Intent to Market Subleased Premises .................... 24
    19.2    Right of First Refusal ............................................ 25

ARTICLE XX - MISCELLANEOUS PROVISIONS ................................ 25

    20.1    Entire Agreement; Modification ..................................... 25
    20.2    Governing Law ..................................................... 25
    20.3    Binding Effect .................................................... 26
    20.4    Severability ...................................................... 26
    20.5    Further Assurances ................................................ 26
    20.6    Captions .......................................................... 26
    20.7    Gender ............................................................ 26
    20.8    Exhibits .......................................................... 26
    20.9    References ........................................................ 26
    20.10  Rights Cumulative ................................................. 26
    20.11  Notices ........................................................... 27

PAGE

20.12   Counterparts ........................................................ 28
20.13   Time of Essence ..................................................... 28
20.14   Relationship of Parties ............................................. 28

GROUND SUBLEASE AGREEMENT

THIS GROUND SUBLEASE AGREEMENT ("Sublease") entered into as of the 12th day of May, 1995 ("Date of this Sublease"), between URBAN RESIDENTIAL FINANCE AUTHORITY OF THE CITY OF ATLANTA ("Sublessor") and ATLANTA WEST BLOCK REDEVELOPMENT, L.L.C., a Georgia limited liability company ("Sublessee").

ARTICLE I

THE SUBLEASE

Section 1.1     Subleased Premises.  Subject to the terms hereof and in consideration of the covenants of payment and performance stipulated herein, Sublessor has leased, demised and let, and by these presents does hereby lease, demise and let, unto Sublessee, and Sublessee hereby leases and takes from Sublessor, that tract of land ("Land") being located in Land Lot 77, 14th District, City of Atlanta, Fulton County, Georgia, being known as the West City Hall Lot and being more particularly described in Exhibit A attached hereto and made a part hereof, together with all improvements owned now or hereafter located thereon, together with all and singular the rights, easements, licenses, privileges, both subterranean and vertical, and appurtenances thereunto attaching or in any way belonging ("Subleased Premises").

TO HAVE AND TO HOLD the Subleased Premises unto Sublessee, and its successors in interest, subtenants and permitted assigns, for and during the term hereinafter set forth.

Section 1.2     Estates Defined.  Sublessee acknowledges that Sublessor's interest in the Subleased Premises is a leasehold interest pursuant to a ground lease ("Ground Lease") between the City of Atlanta, as lessor, and Sublessor, as lessee. Sublessor acknowledges that Sublessor may hereafter acquire a fee interest in a portion of the Land or the Subleased Premises. Sublessor's leasehold estate in the Subleased Premises together with any fee or other interest hereafter acquired by Sublessor in the Land or the Subleased Premises is referred to in this Sublease as "Sublessor's Estate." Sublessee's leasehold interest in the Subleased Premises acquired pursuant to this Sublease and any fee or other interest in the Land and the Subleased Premises hereinafter acquired by Sublessee is herein referred to as "Sublessee's Estate."

Section 1.3     Term.  Unless sooner terminated under the provisions hereof, this Sublease shall continue in full force and effect for a term ("Sublease Term") commencing on the date hereof and expiring on May 6, 2045, which is fifty (50) years hereafter. If (i) Sublessee desires to lease the Subleased Premises directly from the City of Atlanta after expiration of the Sublease Term; or (ii) Sublessee desires to have Sublessor lease the Subleased Premises from the City of Atlanta and to sublease the Subleased Premises from Sublessor after expiration of the Sublease Term for an additional term, Sublessee, during the Sublease Term, may notify the City of Atlanta, Sublessor and any Leasehold Mortgagee of such desire. Upon receipt of such notice,

Sublessor shall cooperate in good faith and support Sublessee in connection with obtaining an agreement from the City of Atlanta to extend the lease with Sublessor or to enter into a direct lease with Sublessee for an additional term on terms and conditions acceptable to Sublessee.

During the Sublease Term, if the City of Atlanta offers Sublessor the right to extend the term of the Ground Lease or notifies Sublessor that the City of Atlanta desires to accept a written offer from a third party ("Third Party Lease Offer") to lease the Subleased Premises after expiration of the term of the Ground Lease and provides Sublessor with an opportunity to match such offer, Sublessor shall promptly notify Sublessee and any Leasehold Mortgagee thereof and provide Sublessee with the opportunity to extend the Sublease or to sublease the Subleased Premises after expiration of the Sublease Term on the terms and conditions contained in the Third Party Lease Offer. After receipt of such notice, Sublessee shall have sixty (60) days within which to notify Sublessor of Sublessee's decision. If Sublessee affirmatively responds to such offer on a timely basis, Sublessor and Sublessee shall proceed promptly using best efforts to finalize such Sublease extension or new sublease. If Sublessee negatively responds to such offer or does not respond to such offer on a timely basis, Sublessor shall be entitled to reject any such offer from the City of Atlanta.

Section 1.4    Use. Subject to the provisions hereof, Sublessee shall have the right to redevelop the Subleased Premises and to construct and operate thereon a mixed use facility known as the "City Plaza Project" generally in accordance with the City of Atlanta Ordinance approved by the Mayor of Atlanta on March 10, 1995 ("Ordinance"). The City Plaza Project shall be developed generally in accordance with the site plan and building elevations which accompanied the Ordinance and shall contain approximately (i) one hundred sixty-four (164) apartments, (ii) twenty-three thousand two hundred (23,200) square feet of retail space in a retail structure and eight hundred (800) square feet composed of service area, garden space, outdoor vendor space and sidewalk space; and (iii) three hundred forty-nine (349) striped parking spaces and thirty-eight (38) attendant parking spaces. Sublessee agrees to incorporate the exterior facade design and other changes reasonably recommended by the Urban Design Commission and the Department of Planning and Development of the City of Atlanta.

Section 1.5    Permits, Licenses and Easements. Sublessor agrees to use Sublessor's best efforts to assist Sublessee in obtaining any and all permits, licenses, easements and other authorizations required by any governmental or other body claiming jurisdiction with respect to any construction or other work on the Subleased Premises and to grant or cause to be granted all permits, licenses, easements and other governmental authorizations which are necessary or helpful for electric, telephone, gas, water, sewer, drainage, access and such other public or private utilities or facilities as may be reasonably necessary or desirable in connection with redevelopment of the Subleased Premises. Sublessor shall use Sublessor's best efforts to cause relocation or termination of easements currently encumbering the Subleased Premises. Sublessee shall be entitled to tap into existing water and sewer lines and treatment facilities serving the Subleased Premises. The Subleased Premises shall comply with all Federal, State, County and City laws and ordinances applicable thereto.

Section 1.6   <u>Affirmative Action Requirements</u>. Sublessee agrees to and shall meet or exceed a minimum thirty-six percent (36%) MBE/WBE affirmative action participation in connection with the City Plaza Project.

Section 1.7   <u>Possession</u>. Sublessor agrees to and shall provide possession to Sublessee of the Subleased Premises immediately following the Date of this Sublease free and clear of all rights to possession or use by any tenants or other individuals or entities other than Sublessee.

Section 1.8   <u>Demolition</u>. Sublessee shall be entitled to commence demolition of the existing buildings and other improvements on the Subleased Premises together with necessary or desirable excavation, grading and site mobilization for construction of the City Plaza Project immediately following execution of the Sublease. In connection with demolition and the construction of the City Plaza Project, Sublessor agrees that Sublessee shall be entitled to fence all areas of the Subleased Premises, including, without limitation, sidewalks and parking meters abutting the Subleased Premises, and shall be entitled to remove all parking meters therefrom without any liability to the City of Atlanta, Sublessor or any other individual or entity. Also in connection with demolition, Sublessee shall be entitled to remove all fixtures and equipment, including parking gates, from the Subleased Premises immediately following execution of this Lease without any liability to the City of Atlanta, Sublessor or the City of Atlanta's former tenants and, in connection therewith, Sublessor agrees to indemnify and hold harmless Sublessee from all claims, losses, damages, costs and expenses arising out of or relating to removal of such fixtures and equipment by Sublessee.

Section 1.9   <u>Site Restoration and Cost Recoupment</u>. If Sublessee for any reason whatsoever is unable to close its construction financing for the City Plaza Project on or before August 1, 1995, Sublessee, at Sublessee's sole cost and expense, shall cause its general contractor to fill any excavated portions of the Subleased Premises, grade and pave the Subleased Premises where appropriate and stripe parking spaces on the paved portions of the Subleased Premises. Upon completion of such fill, grading, paving and striping, possession of the Subleased Premises shall be delivered to the City of Atlanta, and the Sublease shall be deemed terminated. Sublessor shall cause the City of Atlanta to agree in the Ground Lease that the City of Atlanta shall operate a parking facility on the Subleased Premises with certain of the revenues net of ordinary and reasonable operating expenses to be used to reimburse Sublessee for certain costs and expenses incurred by Sublessee in connection with the City Plaza Project. Sublessor shall cause the City of Atlanta to agree in the Ground Lease that Sublessee is entitled to recoupment of the costs and expenses incurred for demolition, asbestos abatement, site excavation, grading, paving, parking space striping, any and all interest charged by the construction lender and an amount equal to fifty percent (50%) of the architectural and engineering fees incurred in connection with the City Plaza Project. Sublessor shall cause the City of Atlanta to agree in the Ground Lease that these costs and expenses shall be reimbursed by the City of Atlanta paying to Sublessee fifty percent (50%) of all revenues net of ordinary and reasonable operating expenses generated from the operation of a parking facility on the Subleased Premises until all such reimbursable costs and expenses have been paid in full. If

Sublessee is unable to close its construction financing for the City Plaza Project on or before August 1, 1995, Sublessee agrees to and shall provide to the City of Atlanta on or after August 1, 1995, copies of all plans and specifications for the City Plaza Project. Sublessee shall have no liability or obligation to rebuild any improvements located on the Subleased Premises which are demolished or removed during the demolition and site mobilization process, except as otherwise expressly provided hereinabove in this Section 1.9.

ARTICLE II

THE IMPROVEMENTS

Section 2.1    Improvements. Sublessee shall be entitled to redevelop the Land and the Subleased Premises and to develop and construct improvements (together with all replacements and substitutions collectively "Improvements") thereon. Sublessee represents that the Improvements shall be constructed in a good and workmanlike manner and in compliance with the building codes and other development and construction regulations of the City of Atlanta and of Fulton County, Georgia.

Section 2.2    No Liens. Sublessee shall have no right, authority or power to bind Sublessor, or any interest of Sublessor in the Subleased Premises, for any claim for labor or material or for any other charge or expense, lien or security interest incurred in connection with the development, construction or operation of the Improvements or any change, alteration or addition thereto, or replacement or substitution therefor, nor to render the Subleased Premises liable for any lien, security interest or right of lien for any labor or material or any other charge or expense incurred in connection therewith. Sublessee shall in no way be considered as the agent of Sublessor in connection with the development, construction or operation of the Improvements or any replacements or substitutions therefor.

Section 2.3    Redevelopment of Land. In connection with the redevelopment of the Subleased Premises and with the development and construction of the Improvements, Sublessee, in Sublessee's sole discretion, shall be entitled to remove and dispose of all buildings, fixtures, equipment and other improvements located upon the Subleased Premises subject to compliance with all applicable laws, ordinances, rules and regulations ("Governmental Requirements") of any applicable Federal, State or Local governmental entity, subdivision, agency or instrumentality having jurisdiction over the Land, the Subleased Premises, the Improvements or Sublessee or in any way affecting financing for the City Plaza Project ("Governmental Authorities"). Title to all existing improvements located on the Subleased Premises shall remain in the City of Atlanta or Sublessor to the extent Sublessor acquires fee title to all or part of the Subleased Premises, and shall not pass to Sublessee in connection with this Sublease.

Section 2.4   Title to Improvements.

2.4.1   During the Sublease Term.   Notwithstanding any provision in this Sublease to the contrary, the Improvements and all alterations, additions, equipment and fixtures, built, made or installed by Sublessee in, on, under or to the Land or Improvements or elsewhere on the Subleased Premises shall be the sole property of Sublessee until the expiration or other termination of the Sublease Term.

2.4.2   After the Sublease Term.   The Improvements and all alterations, additions, and fixtures (including, without limitation, such items as air conditioning units, boilers, furnaces, ducts, elevators and escalators) shall be deemed to be and shall automatically become the property of Sublessor, without cost or charge to Sublessor, upon the expiration or the termination of the Sublease term. Sublessee may, at any time prior to the expiration or other termination of this Sublease, or within thirty (30) days thereafter, remove from the Subleased Premises any and all equipment which Sublessee has furnished or installed together with all personal and other property in which Sublessee has an interest, provided that Sublessee shall repair any physical damage to the Subleased Premises caused by the removal of such equipment and property.

Section 2.5   Tax Benefits of Improvements.   Sublessor acknowledges and agrees that any and all depreciation, amortization and tax credits for federal or state tax purpos :: :-lating to the Improvements located on the Subleased Premises and any and all additions thereto, substitutions therefor, fixtures therein, and other property relating thereto, shall be deducted or credited exclusively by Sublessee during the Sublease Term. In addition, Sublessor acknowledges that redevelopment of the Subleased Premises depends upon, in material part, Sublessee obtaining appropriate financing, Federal tax credits, and enterprise zone status. Sublessor further acknowledges that the ability of Sublessee to obtain appropriate financing, Federal tax credits and enterprise zone status depends upon Sublessee being able to cause the fee interest in the Land and the Subleased Premises to be subject to restrictive covenants in accordance with applicable Governmental Requirements of applicable Governmental Authorities. Sublessor agrees, upon request of Sublessee, Sublessor shall cause the Commissioner of the Department of Housing and Community Development of the City of Atlanta in concurrence with the City Attorney and Chief Financial Officer for the City of Atlanta, to subject the fee of any portion of the Land and the Subleased Premises which it owns to such restrictive covenants as may be required for Sublessee to obtain such appropriate financing, Federal tax credits and enterprise zone status and to cause the City of Atlanta to subject the fee interest of any portion of the Land or the Leased Premises which the City of Atlanta owns to such restrictive covenants. Sublessor agrees to and shall use its best efforts to assist Sublessee in obtaining federal tax credits and, in connection therewith, to execute all documents or instruments which shall be necessary or helpful in obtaining such federal tax credits. Sublessor agrees that in the event these tax credits ever revert to the City of Atlanta or Sublessor, Sublessor will negotiate with Sublessee or Sublessee's first mortgage lender, in good faith, and will use its best efforts to cause the City

of Atlanta to negotiate with Sublessor or Sublessor's first mortgage lender, in good faith, to sell the federal tax credits to Sublessee or Sublessee's first mortgage lender.

Section 2.6    Parking Facilities. Sublessee acknowledges that parking facilities ("Parking Facilities") will be developed upon the Subleased Premises and agrees, during the Sublease Term, to provide to Sublessor forty (40) parking access cards ("Parking Cards") entitling the holders thereof to entry into the Parking Facilities and temporary parking of their motor vehicles. The Sublessor acknowledges and agrees that use of the Parking Cards shall be subject to the rules and regulations promulgated by the operator of the Parking Facilities generally governing the use thereof. The Parking Cards shall be provided to Sublessor at no cost or expense and without the requirement of any deposit for the Parking Cards, provided that if any of the Parking Cards are lost, the operator of the Parking Facilities shall be entitled to charge a reasonable fee for each replacement card.

Section 2.7    Reservation of Residential Units. Sublessee agrees to and shall set aside no more than twenty (20%) of the residential units for persons of low income in connection with obtaining tax-exempt bond financing, Federal tax credits and enterprise zone status for the City Plaza Project.

## ARTICLE III

### RENTS

Section 3.1    Ground Rent.

3.1.1    Initial Ground Rent. Sublessee shall pay to Sublessor on the Date of this Sublease and on the 1st day of May of each year thereafter during the Sublease Term, ground rent ("Ground Rent") in the amount of One Dollar ($1) per year. In addition, Sublessee shall pay to Sublessor annually in arrears an amount equal to thirty percent (30%) of the net cash flow ("Cash Flow") of the City Plaza Project. Cash Flow shall be defined as all project revenues actually collected by Sublessee (which shall exclude expenses of any refinancing) less (1) all project expenses (including all management fees); (2) all property taxes levied or assessed against the Subleased Premises; and (3) Debt Service (as hereinafter defined). Cash Flow which Sublessor is entitled to receive from Sublessee shall be referred to in this Sublease as "Sublessor's Cash Flow." The first payment of Sublessor's Cash Flow shall be due and payable sixty (60) days after expiration of the first twelve (12) month period for which Sublessor's Cash Flow is due. Subsequent payments of Sublessor's Cash Flow shall be due sixty (60) days after each succeeding twelve (12) month period during the Subleased Term. "Debt Service" shall be defined as (1) all scheduled or required debt service due to any lender, whether principal amortization or interest, and related expenses, including, without limitation, commitment fees, bond fees, and credit enhancement fees payable to any guarantor of any Permitted Mortgage or otherwise, interest and principal; (2) reserves required by a lender holding a leasehold or other

mortgage against the Subleased Premises, including, without limitation, reserves for maintenance, repairs and replacements of the Improvements and interest rate reserves in an amount necessary to satisfy all lenders' loan requirements; and (3) all supplemental equity contributions, whenever made, by or on behalf of Sublessee, including deferred development fees, and any preferred returns thereon ("Supplemental Equity Contributions"). In no event can Sublessee take out tax credit sale proceeds and up to One Million Six Hundred Thousand Dollars ($1,600,000) received in connection with the State of Georgia Lease without the concurrence of the Leasehold Mortgagee and City of Atlanta. The Supplemental Equity Contributions will be repaid to Sublessee over a five (5) year or longer period to the extent of available revenues from the City Plaza Project, provided that no Supplemental Equity Contributions may be repaid until the date twelve (12) months after the City Plaza Project first achieves a stabilized debt service coverage ratio of 1.2. Sublessee may continue to be repaid each year over the five (5) year or longer period so long as the debt service coverage ratio of 1.2 is maintained. Sublessor and Sublessee acknowledge that the attractiveness and utility of the Subleased Premises as a location for parking is important to the feasibility of the City Plaza Project. Sublessor and Sublessee acknowledge that any action by Governmental Authorities that would make the Subleased Premises unsuitable or inconvenient, in whole or in part, for public parking (e.g. permanent closure of streets surrounding the Subleased Premises, substantial alteration or restriction of traffic flow around the Subleased Premises, or restrictions on use of the Subleased Premises for parking) will significantly damage the project and reduce Rents payable under this Sublease. Sublessor agrees to use its best efforts to prevent any actions by Governmental Authorities which might cause such an adverse affect on use of the Subleased Premises for parking.

          3.1.2   <u>Waiver of Sublessor's Cash Flow</u>.  Notwithstanding the foregoing Subsection 3.1.1, Sublessor agrees to terminate the required payments of Sublessor's Cash Flow from and after such time as the Leasehold Mortgagee shall acquire title to Sublessee's Estate, whether by foreclosure of the Permitted Mortgage, by assignment in lieu of foreclosure, under a new Lease pursuant to Section 6.4 of this Sublease or otherwise, and whether in the Leasehold Mortgagee's name or in the name of a nominee; and that from and after such time, the Ground Rent and the Additional Rent shall be the only rental payments owing under this Sublease. Notwithstanding the foregoing, Sublessee agrees that, following the Date of this Sublease, Sublessee will contact Sublessee's lender or lenders and request that such lender or lenders provide the City of Atlanta and Sublessor with an ongoing participation interest in the income of the City Plaza Project which is mutually agreeable to such lender or lenders and the City of Atlanta or Sublessor, as the case may be, in the event any such lender shall acquire title to Sublessee's Estate in the Subleased Premises whether by foreclosure of the Permitted Mortgage, by assignment in lieu of foreclosure, under a new lease pursuant to Section 6.4 of this Sublease or otherwise.

     Section 3.2   <u>Additional Rents</u>.  In addition to the rents specified in Section 3.1 hereof, any and all of the payments which Sublessee is required to make hereunder to or for the benefit of Sublessor shall be deemed to be "Additional Rents." The rents specified in Section 3.1 hereof and Additional Rents payable hereunder shall be deemed "Rents" reserved by Sublessor, and any

remedies now or hereafter given to Sublessor under the laws of the State of Georgia for collection of the Rents shall exist in favor of Sublessor, in addition to any and all other remedies specified in this Sublease. All such Additional Rents shall be payable in accordance with the provisions of the Articles of this Sublease specifying the payment of such Additional Rents.

Section 3.3  Payments. All Rents or other sums, if any, due Sublessor hereunder shall be paid by Sublessee to Sublessor at the address of Sublessor set forth hereinafter for notices, or to such other person and/or at such other address as Sublessor may direct by notice to Sublessee, without notice or demand, and without abatement, deduction or set off.

Section 3.4  Sublessor Audit Rights. Sublessee agrees that Sublessor and the City of Atlanta, at their cost and expense, shall be entitled, upon reasonable prior notice to Sublessee, to inspect or cause the inspection of the books and records of Sublessee relating to Cash Flow of the City Plaza Project to verify calculations of the Rents required to be made under this Sublease by Sublessee to Sublessor. Sublessee agrees to provide the City of Atlanta and Sublessor on a monthly basis operating statements, occupancy reports and leasing reports for the City Plaza Project.

ARTICLE IV

TAXES AND OTHER IMPOSITIONS

Section 4.1  Impositions. The term "Impositions" shall mean all taxes, assessments, use and occupancy taxes, water and sewer charges, rates and rents, charges for public utilities, excises, levies, license and permit fees and other charges by any Governmental Authorities, general and special, ordinary and extraordinary, foreseen and unforeseen, of any kind and nature whatsoever, which shall or may during the Sublease Term be assessed, levied, charged, confirmed or imposed by any Governmental Authorities upon or accrued or become due or payable out of or on account of or become a lien or security interest on the Subleased Premises or any part thereof, including the buildings or improvements now located thereon or hereafter comprising a part thereof, or the appurtenances thereto; but shall not include any income tax, capital levy, estate, succession, inheritance or transfer taxes or similar tax of Sublessor, or any franchise tax imposed upon any owner of the fee of the Subleased Premises, or any income, profits or revenue tax, assessment or charge imposed upon the rent or other benefit received by Sublessor under this Sublease, by any Governmental Authorities; provided, however, that if at any time during the Sublease Term, the present method of taxation or assessment shall be so changed that the whole or any part of the taxes, assessments, levies, impositions or charges now levied, assessed or imposed on the Land, the Subleased Premises and the Improvements shall be discontinued and as a substitute therefor, taxes, assessments, levies, impositions, or charges shall be levied, assessed and/or imposed wholly or partially as a capital levy or otherwise on the rents received from such real estate or the rents reserved herein or any part thereof, then such substitute taxes, assessments, levies, impositions or charges, to the extent so levied, assessed or

imposed, shall be deemed to be included within the term "Impositions" to the extent that such substitute amount would be payable if the Subleased Premises were the only property of Sublessor subject to such tax. Notwithstanding anything contained in this Sublease to the contrary, Sublessee shall not be obligated to pay any development impact fees to the City of Atlanta or any other Governmental Authority. Any development impact fees required in connection with redevelopment of the Subleased Premises, or otherwise shall be the responsibility of Sublessor.

Section 4.2    Property Tax Abatement. Sublessee shall make application to have the Subleased Premises classified as a commercial residential mixed use urban enterprise zone permitting five (5) years of full property tax abatement followed by abatement of (i) eighty percent (80%) for all property taxes due from Sublessee during the next two (2) succeeding years; (ii) sixty percent (60%) of all property taxes due from Sublessee during the next succeeding year; (iii) forty percent (40%) of all property taxes due from Sublessee during the next succeeding year; and (iv) twenty percent (20%) of all property taxes due from Sublessee during the next succeeding year. Sublessor shall use its best efforts to assist Sublessee in connection with applying for and obtaining such enterprise zone classification, and Sublessor shall further use its best efforts to cause the City of Atlanta to support Sublessee's enterprise zone application.

Section 4.3    Allocation of Taxes. Notwithstanding anything contained in this Sublease to the contrary, all Impositions for taxes and assessments charged against the value of the fee estate underlying Sublessee's Estate shall be the responsibility and obligation of Sublessor.

Section 4.4    Separate Taxation of Parking Facilities. Sublessor agrees to and shall use its best efforts to assist Sublessee in persuading the appropriate Governmental Authorities assess, tax and bill the Parking Facilities located on the Subleased Premises as a separate tax parcel.

Section 4.5    Payment of Impositions. Sublessee will pay or cause to be paid, as and when the same shall become due, subject to the provisions of this Sublease, all of the Impositions for which Sublessee is responsible under this Sublease except that where any Imposition which Sublessee is obligated to pay in whole or in part is permitted by law to be paid in installments, Sublessee may pay or cause to be paid such Imposition (or its proportionate part thereof) in installments as and when such installments become due. Upon the written request of Sublessor, Sublessee shall exhibit and deliver to Sublessor and the City of Atlanta evidence satisfactory to Sublessor of payment when due of all Impositions. The certificate, advice, bill or statement issued or given by the appropriate officials authorized or designated by law to issue or give the same or to receive payment of any Imposition, of the existence, non-payment or amount of such Imposition shall be prima facie evidence for all purposes of the existence, nonpayment or amount of such Imposition. Notwithstanding anything contained in this Sublease to the contrary, if Sublessee is unable to pay or cause to be paid any such Impositions, Sublessee shall be entitled to accrue such Impositions and pay them over time so long as such action does not permit the

Subleased Premises, or any part thereof, to be sold by any Governmental Authority for the non-payment of such Imposition.

Section 4.6 _Contested Taxes and Other Impositions_. Sublessee may, at its sole cost and expense, contest the validity or amount of any Imposition ("Contested Imposition") in which event the payment thereof may be deferred during the pendency of such contest, if diligently prosecuted. Nothing herein contained, however, shall be construed to allow any Contested Imposition to remain unpaid for a length of time which shall permit the Subleased Premises, or any part thereof, to be sold by any Governmental Authorities for the non-payment of such Imposition. Sublessee shall promptly furnish Sublessor upon request with copies of all pleadings, motions and orders in proceedings respecting any Contested Imposition.

Section 4.7 _Valuation Assessment_. Sublessee, at Sublessee's expense, may endeavor to obtain a lowering of the assessed valuation of the Subleased Premises for any year for the purpose of reducing taxes thereon. In such event, Sublessee may give Sublessor notice thereof following which Sublessor shall use its best efforts to assist Sublessee in such endeavor.

Section 4.8 _Failure to Pay Impositions_. If Sublessee shall fail to pay any Impositions before the same becomes delinquent, or fails to notify Sublessor of Sublessee's intention to contest the same prior to such delinquency, or fails to pay any Contested Impositions as required, Sublessor may, at its election (but shall not be obligated to), pay such Impositions, together with any interest and penalties due thereon, as Additional Rent and the amount paid by Sublessor shall be repayable by Sublessee.

Section 4.9 _Utilities_. Sublessee shall pay, or shall cause to be paid all utilities used, rendered or supplied upon or in connection with the City Plaza Project including, but not limited to, all charges for gas, electricity, light, heat or power, and telephone and other communication services, and all water rents and sewer service charges levied or charged against the City Plaza Project during the Sublease Term.

## ARTICLE V

## INSURANCE

Section 5.1 _Types_. During the Sublease Term, Sublessee shall keep and maintain in force or cause to be kept and maintained in force, at no cost or expense to Sublessor, the following insurance:

(1) _Property Insurance_. Insurance on all Improvements on, in or about the Subleased Premises (and all replacements or substitutions therefor) against all physical loss or damage in amounts sufficient to provide coverage for the full replacement value. Perils customarily excluded from all risk insurance, e.g., earthquake and flood, may be excluded.

The term "replacement value" shall exclude the cost of excavation, foundations and footings, landscaping, and paving.

(2)     Public Liability Insurance. Comprehensive general liability insurance including personal injury, broad form property damage and contractual liability, independent contractors, products/completed operations, host liquor liability, and gross liability endorsement, with a minimum of $1,000,000.00 combined single limit for personal injury and property damage.

(3)     Umbrella Catastrophe Liability Insurance. Insurance providing umbrella liability coverage with a minimum limit of $1,000,000.00 in respect of personal injury, bodily injury, death and property damage arising out of the one occurrence and per policy term.

Section 5.2     Additional Insureds. All of the above policies shall include Sublessor, Sublessee and the City of Atlanta as named insureds, as their respective interests may appear.

Section 5.3     Evidence of Insurance. The original or a duplicate original of all property, insurance and other policies of which Sublessor is an additional insured shall be furnished to Sublessor. Certificates of insurance shall be furnished to the Sublessor and shall provide for a minimum of thirty (30) day's notice to Sublessor before cancellation.

Section 5.4     Waiver of Subrogation. All property insurance to be obtained hereunder shall contain provisions whereby the insurer releases all rights of subrogation against the City of Atlanta, Sublessor and Sublessee. The tenant leases entered into by Sublessee following development of the Improvements shall also include a waiver of subrogation to the extent reasonably possible..

Section 5.5     Acceptable Insurance. All insurance shall be maintained in companies and agencies reasonably satisfactory to Sublessor, the City of Atlanta and the holders of any Permitted Mortgages. If Sublessee fails to maintain such insurance, Sublessor may, at its election (but shall not be obligated to), procure such insurance as may be necessary to comply with the above requirements, and Sublessee agrees to repay immediately as Additional Rent the cost of such insurance to Sublessor.

Section 5.6     Insured Loss. Any insurance policies must provide that any loss covered by insurance may be adjusted with the City of Atlanta, Sublessee and Sublessor, but shall be payable to the holder of any Permitted Mortgage, who shall agree to receive and disburse all proceeds of such insurance.

Section 5.7     Sublessee Indemnity. Sublessee agrees, at Sublessee's sole cost and expense, to indemnify, protect and save the City of Atlanta and Sublessor harmless against and from any and all liens, damages, losses, liabilities, obligations, penalties, claims, litigation,

demands, defenses, judgments, suits, proceedings, costs, disbursements or expenses of any kind or of any nature whatsoever (including, without limitation, actual attorney's fees and experts' fees and expenses reasonably incurred) which may at any time be imposed upon, incurred by or asserted or awarded against the City of Atlanta or Sublessor which arise out of or are related to negligent or intentional acts or omissions of Sublessor or Sublessee's members, agents, employees, independent contractors, tenants, invitees or licensees, but only to the extent the same are not subject to insurance coverage.  Notwithstanding the foregoing, in the event the Leasehold Mortgagee comes into possession of the Subleased Premises by foreclosure or by deed-in-lieu of foreclosure, the Leasehold Mortgagee shall have no liability for any amounts for which the Sublessee is liable under this Section 5.7.

## ARTICLE VI

### PERMITTED MORTGAGES

Section 6.1    Right to Encumber. Sublessee shall have the right during the term hereof to encumber by deeds to secure debt, mortgages, deed of trusts, or other instrument in the nature thereof as security for any debt ("Permitted Mortgage" or "Permitted Mortgage "), all of Sublessee's right, title and interest in the Land and the Subleased Premises which shall be in all respects, however, subordinate and inferior to Sublessor's rights, title, privileges, liens, and interest as provided in this Sublease; provided, however, that each deed to secure debt, mortgage, deed of trust or other instrument in the nature thereof shall contain a clause or clauses to the effect that it conveys to the mortgagee, trustee or grantee ("Leasehold Mortgagee") as the case may be, and to the holder of any security issued thereunder, no rights in the Subleased Premises greater than or extending beyond the rights of Sublessee under this Sublease, and that such deed to secure debt, mortgage, deed of trust or other instrument in the nature thereof shall be subject to all and each of the rights of Sublessor herein and to all and each of the conditions, covenants, agreements, and obligations contained in this Sublease.  Sublessor acknowledges the right of the Leasehold Mortgagee to acquire the Sublessee's Estate in its own name or in the name of a nominee upon foreclosure or assignment in lieu of foreclosure under the Permitted Mortgage.

Section 6.2    Right of Leasehold Mortgagee to Cure. To the extent that Sublessee may grant the right to any such Leasehold Mortgagee, such Leasehold Mortgagee may, at its option at any time  within thirty (30) days following expiration of the rights of Sublessee to cure any default under this Sublease, pay any amount or do any act or thing required of the Sublessee by the terms of this Sublease; and all payments so made and all acts or things so done and performed by any such Leasehold Mortgagee shall be as effective to prevent a forfeiture of the rights of the Sublessee hereunder as if done or performed by Sublessee instead of by such Leasehold Mortgagee.

Section 6.3    Notice to Leasehold Mortgagee. While any Permitted Mortgage is in effect, Sublessor shall give any such Leasehold Mortgagee a duplicate copy of all notices of default or other notices which Sublessor may give or serve upon Sublessee in writing, pursuant to the terms

of this Sublease. No notice by Sublessor to Sublessee under this Sublease shall be effective unless and until a copy of such notice has been provided to the Leasehold Mortgagee. The address of the Leasehold Mortgagee originally designated in the Permitted Mortgage may be changed upon written notice delivered to Sublessor from time to time. Any Leasehold Mortgagee may, at its option, at any time before the Sublease has been cancelled and terminated by Sublessor as provided herein, pay all Rents which have accrued here under and all other sums required to be paid by Sublessee or do any other act required of Sublessee by the terms of this Sublease. All payments made and all acts performed by such Leasehold Mortgagee shall be effective to prevent a termination of the rights of Sublessee hereunder as the same would have been if performed by Sublessee. Any Permitted Mortgage given by Sublessee may, if Sublessee desires, provide that, as between the Leasehold Mortgagee and Sublessee, such Leasehold Mortgagee, upon curing Sublessee's default hereunder, shall be subrogated thereby to any all of the rights of the person or persons to whom any payment is made by such Leasehold Mortgagee, and all of the rights of Sublessee under the terms of this Sublease. No Leasehold Mortgagee shall be liable to Sublessor as an assignee of this Sublease until such Leasehold Mortgagee shall, by foreclosure or other appropriate proceedings, or as the result of any other action or remedy provided by the Permitted Mortgage, or by proper conveyance from Sublessee, either acquire the rights and interests of Sublessee under the terms of this Sublease or actually take possession of the Subleased Premises, and such liability of the Leasehold Mortgagee shall terminate upon such Leasehold Mortgagee assigning such rights and interests to another party or relinquishing such possession, as the case may be. Sublessor agrees not to accept a voluntary surrender of the Sublease so long as the Sublessee's Estate is encumbered by a Permitted Mortgage.

Section 6.4    Effective Date of Termination.  Notwithstanding anything to the contrary contained herein, no termination of this Sublease shall become effective until each Leasehold Mortgagee shall have had the option, exercisable by giving Sublessor written notice no more than thirty (30) days after Sublessor has given such Leasehold Mortgagee notice of the occurrence of any event of default by Sublessee hereunder, to elect to receive from Sublessor a new lease to such Leasehold Mortgagee or its nominee covering the Subleased Premises for the then unexpired balance of the term hereof, and otherwise on the same terms as set forth in this Sublease, and Sublessor agrees to execute upon termination hereof such new lease with such Leasehold Mortgagee or its nominee, if (but only if) such Leasehold Mortgagee:

(1)    shall immediately cure any default of Sublessee hereunder involving the payment of money;

(2)    shall undertake immediately to remedy any default of Sublessee occasioned by other than the failure to pay any money owing hereunder, excluding those which by their very nature are incapable of cure by any person other than Sublessee, and thereafter proceed with reasonable diligence to cure such default; and

(3)    shall thereafter perform all covenants and conditions contained in this Sublease to be observed and performed by Sublessee.

Section 6.5    Estoppel Certificates. Sublessor and Sublessee agree that any time and from time to time upon not less than twenty (20) days' prior written notice by the other, or upon request from any Leasehold Mortgagee, Sublessor or Sublessee will execute, acknowledge, and deliver to the other or to such Leasehold Mortgagee a statement in writing certifying (a) that this Sublease is unmodified and in full force and effect (except for modifications which have been approved by the Leasehold Mortgagee) and in full force and effect; (b) that the date to which the Rents have been paid; and (c) that, so far as the certifier knows, if such be the case, there is no default, set-off, defense or other claim against Sublessor (or if so, specify the nature of same) under the provisions of this Lease. It is intended that any such statement may be relied upon by and person proposing to acquire Sublessor's, Sublessee's or Leasehold Mortgagee's interest, as the case may be, in this Sublease or any prospective mortgagee or assignee of any mortgage, deed to secure debt, deed of trust, or other, instrument in the nature thereof upon such interest.

Section 6.6    Mortgage of Sublessor's Estate. During the Sublease Term Sublessor agrees not to encumber the fee interest of Sublessor's Estate with, and Sublessee agrees not to subordinate Sublessee's Estate to, any deed to secure debt, mortgage, deed of trust, or other instrument in the nature thereof as security for any debt which is not expressly subordinate to Sublessee's Estate under the Sublease and to the Permitted Mortgage.

Section 6.7    Limitation on Permitted Mortgages. Notwithstanding anything to the contrary in this Section 6 or elsewhere in this Sublease, the only Permitted Mortgages under this Sublease and the Ground Lease shall be (i) the first lien deed to secure debt conveying first security title to the construction lender (currently anticipated to be First Union) during construction of the City Plaza Project and, thereafter, (ii) the first lien deed to secure debt conveying first security title to the permanent lender (currently anticipated to be the Urban Residential Finance Authority of the City of Atlanta, its successors and assigns). As used herein "Leasehold Mortgagee" shall refer to the secured party under the current Permitted Mortgage. Sublessee shall provide written notice to the City of Atlanta and Sublessor of the name and address of the Leasehold Mortgagee under this Sublease. There shall be no other Permitted Mortgages under the Ground Lease or the Sublease without the prior written consent of the current Leasehold Mortgagee. Furthermore, Sublessor agrees that, to the extent there are any conflicts between the terms of this Sublease and the terms of any current Permitted Mortgage regarding the Subleased Premises, including but not limited to the provisions governing condemnation, casualty, liens or alterations, the terms of the current Permitted Mortgage shall govern and control.

Section 6.8    Non-Disturbance Agreement with Commercial Tenants. Sublessor agrees, upon receipt of a written request signed by the Leasehold Mortgagee and Sublessee, to enter into a non-disturbance and attornment agreement with each sublessee with whom the Leasehold Mortgagee enters into a non-disturbance and attornment agreement, on substantially the same form of agreement as that used by the Leasehold Mortgagee. Such form of agreement shall provide that, so long as such sublessee complies with all the terms, covenants and conditions of its sublease, the sublessee's sublease shall not be terminated, Sublessor shall be bound by the

33653-1  3708.2                                   14

terms and provisions of the sublease, and Sublessor, in the exercise of any of its rights or remedies under this Lease, shall not deprive the sublessee of possession of its subleased portion of the Sublessee's Premises during the term of such sublease, or join the sublessee as an adverse or defendant party in any action or proceeding to enforce or terminate this Lease or to obtain possession of the premises demised in such sublease.

## ARTICLE VII

### REPRESENTATIONS AND WARRANTIES

Section 7.1    Representations and Warranties of Sublessor. As an inducement to Sublessee to enter into and to proceed under this Agreement, Sublessor warrants and represents to Sublessee as follows, which warranties and representations are true and correct on the Date of this Sublease:

7.1.1    Sublessor has the right, power and authority to enter into this Sublease, and the right, power and authority to sublease the Subleased Premises to Sublessee in accordance with the terms, provisions and conditions contained in this Sublease.

7.1.2    To the best knowledge and belief of Sublessor, there is no litigation, pending or threatened, affecting the Subleased Premises or any streets or other public rights-of-way abutting or serving the Subleased Premises;

7.1.3    Sublessor has received no written notice and has no knowledge, nor has Sublessor been otherwise advised, of any pending or threatened condemnation proceedings relating to all or any part of the Subleased Premises;

7.1.4    Sublessor has received no written notice and has no knowledge of the intention of any party holding an easement affecting the Subleased Premises or any part thereof to expand the exercise of any such easement beyond the scope of the present exercise thereof (as by replacing or expanding existing sewers, adding underground or overhead wiring, cables or conduits to those now in existence, or the like);

7.1.5    The entry by Sublessor into this Sublease with Sublessee does not violate any other agreement relating to the Subleased Premises, regardless of whether Sublessor is a party thereto, and Sublessor is capable of complying with all of the terms, provisions and conditions contained in this Agreement;

7.1.6    There is no tenant, lessee or other occupant of the Subleased Premises having any right or claim to possession or use of the Subleased Premises; and possession of the Subleased Premises shall be delivered free of the rights or claims of any tenants, occupants or other parties in possession of, or claiming any right to possession or use of the Subleased Premises;

33653-1  3708.2                                                     15

7.1.7    To the best knowledge and belief of Sublessor, except for asbestos in buildings currently located on the Subleased Premises and for other Hazardous Materials identified in the environmental assessments caused to be performed by Sublessee ("Environmental Assessments"), there presently does not exist and there has never existed on, above or under the Subleased Premises and any improvements located on the Subleased Premises any Hazardous Materials, and Sublessor has never caused or permitted any Hazardous Materials to be placed, held, located or disposed of on, under or at the Subleased Premises or any part thereof. To the best of Sublessor's knowledge and belief, no part of the Subleased Premises or any improvements constructed thereon has ever been has ever been used as a manufacturing, storage or dump site for Hazardous Materials, nor, except as identified in the Environmental Assessments, is any part of the Subleased Premises affected by any Hazardous Materials Contamination;

7.1.8    Sublessor agrees that "Hazardous Materials" shall mean:  (a) any "hazardous waste" as defined by the Resource Conservation and Recovery Act of 1976 (42 U.S.C. Section 6901 et. seq.), as amended from time to time, and regulations promulgated thereunder; (b) any "hazardous substance" as defined by the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. Section 9601 et. seq.) ("CERCLA"), as amended from time to time, and the Superfund Amendments and Reorganization Act of 1986, as amended and regulations promulgated thereunder; (c) asbestos; (d) polychlorinated biphenyls; (e) petroleum, petroleum byproducts or petroleum constituents; (f) any substance the presence of which is prohibited by any governmental requirement; and (g) any other substance which by any governmental requirement requires special handling in its collection, storage, treatment, or disposal; and

7.1.9    Sublessor agrees that "Hazardous Materials Contamination" shall mean the contamination (whether presently existing or hereafter occurring) of any improvements, facilities, soil, subsurface strata, ground water, ambient,air, biota or other elements on, or of, the Subleased Premises by Hazardous Materials, or the contamination of the buildings, facilities, soil, subsurface strata, ground water, ambient air, biota or other elements on, or of, any other Subleased Premises as a result of Hazardous Materials emanating from the Subleased Premises.

Section 7.2    Representations and Warranties of Sublessee. As an inducement to Sublessor to enter into and to proceed under this Agreement, Sublessee warrants and represents to Sublessor as follows, which warranties and representations are true and correct on the Date of this Sublease:

7.2.1    Sublessee has the right, power and authority to enter into this Sublease;

7.2.2    Sublessee has the right, power and authority to comply with the terms, provisions and conditions contained in this Sublease; and

7.2.3    The entry by Sublessee into this Sublease does not violate any other agreements to which Sublessee is a party.

7.2.4    Sublessee shall not (i) cause or to its actual knowledge, permit any Hazardous Materials to be placed, held, located or disposed of on, under or at the Subleased Premises or any part thereof or (ii) cause or, to its actual knowledge, permit any Hazardous Materials Contamination of the Subleased Premises or any part thereof.

7.2.5    Sublessee represents to the City of Atlanta and Sublessor that the financial statements submitted to the City of Atlanta by Sublessee were true and correct in all material respects to the best knowledge and belief of Sublessee.

7.2.6    Sublessee represents to Sublessor and the City of Atlanta that CPMG, LLC is a subsidiary of Harold A. Dawson Company, Inc. and is the party of interest in an agreement with the Department of Public Safety of the State of Georgia for the purpose of leasing the Improvements to the Department of Public Safety during the XXVI Olympiad, and that One Million Six Hundred Thousand Dollars ($1,600,000) from that agree~~~ ··· ·vill be provided to Sublessee to finance the construction of the Improvements.

## ARTICLE VIII

### ENVIRONMENTAL INDEMNITY

Sublessor agrees, at Sublessor's sole cost and expense, to indemnify, protect and save Sublessee harmless against and from any and all liens, damages, losses, liabilities, obligations, penalties, claims, litigation, demands, defenses, judgments, suits, proceedings, costs, disbursements or expenses of any kind or of any nature whatsoever (including, without limitation, actual attorneys' and experts' fees and expenses reasonably incurred) which may at any time be imposed upon, incurred by or asserted or awarded against Sublessee or the Subleased Premises, directly or indirectly from or out of any Hazardous Materials or Hazardous Materials Contamination on, in, under or affecting all or any portion of the Subleased Premises, any surrounding areas, or any Subleased Premises owned by Sublessor, regardless of whether or not caused by or within the control of Sublessor. This indemnification shall not apply to any Hazardous Materials or Hazardous Materials Contamination introduced or caused to be introduced to the Subleased Premises by Sublessee. The obligation of Sublessor under this Article shall survive the expiration or termination of this Sublease.

## ARTICLE IX

MAINTENANCE, ALTERATIONS, REPAIRS AND REPLACEMENTS

Section 9.1   Maintenance of Subleased Premises. During the Sublease Term, Sublessee, at Sublessee's sole cost and expense, shall keep the Improvements, whether now existing or hereafter erected, and all appurtenances thereunto belonging, in good and safe condition and in good and workmanlike order and repair, and Sublessee shall conform to and comply with all Governmental Requirements affecting the Land and the Subleased Premises, and shall indemnify and hold Sublessor harmless from any and all penalties, damages and charges imposed or incurred for any violation thereof, whether caused by the neglect of Sublessee or by any sublessee, agent, tenant, contractor or licensee then upon or using the Subleased Premises or any part thereof. Sublessor covenants and agrees that Sublessee shall have the right to contest any asserted or alleged violation of any kind or character and by whomsoever asserted or alleged in the name of Sublessee or Sublessor, as Sublessee may deem appropriate, provided that the expenses thereof shall be paid by Sublessee, or Sublessee shall cause the same to be paid by its insurer. Sublessee shall be relieved of its aforesaid obligation of indemnity to the ext nt of the amount actually recovered from one or more of the insurance carrie .. of .... ur Subl ssee or Sublessor, and (1) paid to Sublessor, or (2) paid for Sublessor's benefit in reduction of any such liability, penalties, damages, expense or charges imposed upon Subic .

Section 9.2   Alterations to Subleased Premises. Sublessee may make any additions, alterations or changes (sometimes collectively "Alterations") in or to the Improvements (which term shall include any replacement or substitution therefor) subject, however, to the following:

    (1)   No Alterations shall be made which would tend to:

        (a)   impair the structural soundness of the Improvements; or

        (b)   modify the basic utility and function of the Improvements;

    (2)   No Alterations shall be undertaken until Sublessee shall have procured, so far as the same may be required from time to time, all permits and authorizations of all Governmental Authorities and all required consents of any Leasehold Mortgagee. Sublessor shall join in the application for such permits or authorizations whenever such action is necessary or helpful and is requested by Sublessee and shall use Sublessor's best efforts to obtain such permits or authorizations. Sublessee shall have no obligation to pay any permit or other fees or changes in connection with the Alterations; and

    (3)   Any Alterations shall be made within a reasonable time and in a good and workmanlike manner and in compliance with all Governmental Requirements, in accordance with the orders, rules and regulations of the National Board of Fire Underwriters, or any other body or bodies hereafter exercising similar functions.

ARTICLE X

EMINENT DOMAIN

Section 10.1    Substantial Taking. Sublessor and Sublessee agree that should all or substantially all of the Subleased Premises be taken (which term when used in this Article X shall include any conveyance in avoidance or settlement of condemnation or eminent domain proceedings) by any Governmental Authority under the right of eminent domain or other similar proceeding, then this Sublease shall terminate as of the date of taking of possession by the condemning authorities and the payment of the award pursuant thereto.

Section 10.2    Partial Taking. Sublessor and·Sublessee agree that if less than all or substantially all of the Subleased Premises be taken by any Governmental Authority or other power under the right of eminent domain or other similar proceeding, then this Sublease shall nevertheless continue in effect as to the remainder of the Subleased Premises, and the Award (as defined below) will be disbursed and used for restoration of the Subleased Premises to the extent feasible; provided that, if there is a Permitted Mortgage on the Subleased Premises, it shall be in the discretion of the Leasehold Mortgagee to determine whether restoration of the Subleased Premises is feasible.

Section 10.3    Temporary Taking. If the whole or any part of the Subleased Premises or of Sublessee's interest in this Sublease shall be temporarily taken by any right of eminent domain, the Sublease Term shall not be reduced in any way, and Sublessee shall continue to pay in full all Rents, Impositions and other charges required herein, without reduction or abatement thereof at the times herein specified and, except only to the extent that Sublessee is prevented from so doing, Sublessee shall continue to perform all of the other terms and covenants of this Sublease as though such taking had not occurred.

Section 10.4    Joinder. If a Permitted Mortgage exists, the Leasehold Mortgagee shall, to the extent permitted by law, be made a party to any condemnation proceeding.

Section 10.5    Division of Award. Any award made by any Governmental Authority under the right of eminent domain or other similar proceedings ("Award") shall be held by Sublessor, provided that if a Permitted Mortgage exists against Sublessee's Estate, any such Award shall be deposited with the Leasehold Mortgagee, and distributed in the following order or priority:

(1) First, to all indebtedness then owing on the Permitted Mortgages; and

(2) Then, to Sublessor and Sublessee, equally.

ARTICLE XI

DAMAGE OR DESTRUCTION

Section 11.1    Damage to Subleased Premises.  If, during the Sublease Term, any buildings or other Improvements now or hereafter situated on the Subleased Premises, are wholly or partially destroyed or damaged by fire, or any other casualty whatsoever (collectively "Casualty"), Sublessee shall promptly repair, replace, restore and reconstruct or cause to be repaired, replaced, restored and reconstructed the damaged Subleased Premises in a good and workmanlike manner to the extent of the insurance proceeds and provided the Leasehold Mortgagee permits Sublessee to use insurance proceeds for such purpose.

Section 11.2    Payment of Insurance Proceeds.  So long as there exists a Permitted Mortgage against Sublessee's Estate, all insurance proceeds shall be deposited with the holder of the Permitted Mortgage.  Subject to the terms of the Permitted Mortgages, the insurance proceeds shall be held and paid out and shall be disbursed for restoration of the Casualty as follows:

11.2.1  Sublessee must first obtain each Leasehold Mortgagee's approval of (a) the plans and specifications for the proposed restorative work and (b) the architect who prepared such plans and specifications.  After delivery of evidence satisfactory to any Leasehold Mortgagee that such repairs, restoration or rebuilding ("Restoration") can be completed and effected in compliance with this Sublease as to the quality and workmanship standards imposed herein,  the insurance proceeds shall be disbursed or such proceeds may be advanced in reasonable installments; and

11.2.2  Upon any Casualty, the Rents and other payments provided for herein shall be abated and the occurrence of any Casualty shall not cause a termination of this Sublease unless Sublessee (or, if a Leasehold Mortgagee exists, the Leasehold Mortgagee) determines that to restore the Improvements would be economically unsound as hereinabove provided, in which event, if a Leasehold Mortgagee exists, the insurance proceeds shall be applied first to pay the indebtedness owing under the Permitted Mortgage.

ARTICLE XII

EVENTS OF DEFAULT

Section 12.1    Events of Default.  Each of the following shall be an event of default by Sublessee and a material breach of this Sublease:

12.1.1  Failure by Sublessee to pay any Rents when due or to pay any Impositions, insurance premiums or other liquidated sums of money herein stipulated to be paid by Sublessee if such failure shall continue for a period of thirty (30) days after notice thereof has been given to Sublessee; or

12.1.2  Failure by Sublessee to perform or observe any of the provisions of this Sublease (other than provisions requiring the payment of Rents, Impositions, insurance premiums or other liquidated sums of money) stipulated in this Sublease to be observed and performed by Sublessee if such failure shall continue for a period of thirty (30) days after notice thereof has been given to Sublessee; provided, however, that if any such failure (other than a failure involving payment of liquidated sums of money) cannot reasonably be cured within such thirty (30) day period, then Sublessor shall not have the right to terminate this Sublease or Sublessee's right to possession for so long as Sublessee proceeds in good faith and with due diligence to remedy and correct such failure or to cause to be remedied and corrected such failure, provided that Sublessee has promptly commenced to cure or caused commencement to cure such failure after the effective date of such notice.

### Section 12.2   Rights and Remedies.

12.2.1  If an event of default occurs hereunder, Sublessor may, at any time thereafter as Sublessor's sole and exclusive remedy and subject to the provisions of this Sublease with respect to the rights of any Leasehold Mortgagee and rights of Sublessor in Article XVI, terminate this Sublease by giving Sublessee written notice thereof (with a copy of such notice to the Leasehold Mortgagee), in which event this Sublease and Sublessee's Estate created hereby and all interest of Sublessee and all parties claiming by, through or under Sublessee shall automatically terminate upon the effective date of such notice with the same force and effect and to the same extent as if the effective date of such notice had been the date originally fixed in Article I hereof for the expiration of the Sublease Term, and Sublessor, its agents or representatives, shall have the right, without further demand or notice, to re-enter and take possession of the Subleased Premises (including all buildings and other Improvements comprising any part thereof) without being deemed guilty of any manner of trespass and without prejudice to any remedies for arrears of rent or existing breaches of covenants; provided that Sublessor shall not be entitled to disturb possession of any subtenants or others in possession pursuant to leases with subtenants or others in possession pursuant to leases with Sublessee so long as such subtenants or others are not in default thereunder and attorn to Sublessor as their lessor.

12.2.2  Upon the exercise of Sublessor's remedies pursuant to this Paragraph, Sublessee shall execute such releases, deeds and other instruments in recordable form as Sublessor shall reasonably request to accurately set forth of record the status of the Sublessee's Estate and Sublessee's rights hereunder.

12.2.3  As a matter of information for the City of Atlanta and Sublessor, Sublessee agrees to provide the City of Atlanta and Sublessor written notice promptly following receipt by Sublessee from a Leasehold Mortgagee of a notice of default under a Permitted Mortgage.

## ARTICLE XIII

### QUIET ENJOYMENT AND POSSESSION

Sublessor covenants and warrants that Sublessee, on paying all payments herein provided and performing and observing all of its covenants herein contained, shall peaceably and quietly have, hold, occupy, use and enjoy, and shall have the full, exclusive and unrestricted use and enjoyment of, all of the Subleased Premises during the entire Sublease Term, subject only to the provisions of this Sublease and all applicable rules and regulations of Governmental Authorities; Sublessor agrees to warrant and forever defend the title to the Subleased Premises against the claims of any and all persons whomsoever lawfully claiming or to claim the same, or any part thereof, by, through or under Sublessor, but not otherwise, subject only to the provisions of this Sublease and all applicable rules and regulations of Governmental Authorities.

## ARTICLE XIV

### INSPECTIONS

Sublessor, in person or by its agents and upon reasonable prior written notice to Sublessee, shall have the right to enter upon the Subleased Premises for purposes of inspection during reasonable hours.

## ARTICLE XV

### VACATION OF SUBLEASED PREMISES

Sublessee covenants and agrees to and with Sublessor that upon any termination of this Sublease, whether by lapse of time or because of any of the conditions or provisions contained herein, Sublessee will peaceably and quietly yield up and surrender possession of the Subleased Premises to Sublessor, subject to the rights of subtenants and others in possession pursuant to leases with Sublessee provided such subtenants or others are not in default thereunder and attorn to Sublessor as their lessor. An action of forcible detainer shall lie if Sublessee holds over after a demand for possession is made by Sublessor.

## ARTICLE XVI

### DEFICIENCY JUDGMENTS

Sublessor, for itself and for each and every succeeding owner of Sublessor's Estate, agrees that it shall never by entitled to or seek a personal judgment against Sublessee or any of its members, but in the event of a default hereunder, the rights of Sublessor hereunder to enforce the

obligations of Sublessee, its successors or assigns, or to collect the judgment, shall be limited to the termination of this Sublease and the enforcement of any other rights and remedies granted to Sublessor hereunder; provided however, that the limitations hereinbefore set forth in this Article shall not be applicable to, and Sublessee shall be fully liable for, (1) fraud, (2) misapplication of Cash Flow, (3) misapplication of proceeds paid under any insurance policies by reason of damage, loss or destruction of any part of the Improvements, (4) misapplication of amounts and damages awarded in condemnation proceedings or amounts paid in lieu thereof for any portion of the Subleased Premises taken for public use under the power of eminent domain, and (5) misapplication of any other funds which Sublessee holds or controls for the benefit of or belonging to Sublessor.

## ARTICLE XVII

## NON-MERGER

Except upon expiration of the Sublease Term or upon termination of this ‾ ⁀ursuant to express right to do so as set forth herein, there shall be a. ‾‾‾‾ ⁀f ⁀‾‑ ⁀f Sublessee's Estate created by this Sublease with the Fee Est. ...ses or any part thereof by reason of the fact that the same pers‑ ‑ ‑ ‑‑‑‑ .⁀id, directly or indirectly, (a) this Sublease or Sublessee's Estate created ⁀y ...‑ ‑‑‑ ‑‑‑‑ or any interest in this Sublease or in any such interest in Sublessee's Estate (including the Improvements), and (b) the Fee Estate in the Subleased Premises or any part thereof or any interest in such Fee Estate (including the Improvements), unless and until all persons, including any assignee of Sublessor, having any interest in (i) this Sublease or Sublessee's Estate created by this Sublease, and (ii) the Fee Estate in the Subleased Premises or any part thereof, shall join in a written instrument effecting such merger and shall duly record the same.

## ARTICLE XVIII

## ASSIGNMENTS

Section 18.1   Permitted Subleases and Assignments.

18.1.1  Sublessee shall have no right to assign its interest (legal or beneficial) hereunder without Sublessor's written consent which shall not be unreasonably held or delayed provided that Sublessor is deemed to have consented to an assignment by Sublessee to the Leasehold Mortgagee, and to an assignment or transfer by the Leasehold Mortgagee to a third party purchaser following a foreclosure sale or acceptance by the Leasehold Mortgagee of a deed-in-lieu of foreclosure. Upon such consent, this Sublease shall be binding upon and shall inure to the benefit of the City of Atlanta and Sublessee and their respective heirs, successors, assigns and legal representatives, it being expressly understood that, subject to the terms,

provisions and conditions of this Sublease, Sublessor may assign, sell, pledge, hypothecate or transfer all or any part of its rights or interests hereunder at any time provided such assignment, sale, pledge, hypothecation or transfer is subject and subordinate to the Ground Lease, this Sublease and any Permitted Mortgage.

18.1.2  Sublessee shall be entitled to sublease all or any part of the Subleased Premises without the prior written approval of the City of Atlanta or Sublessor except where a sublease by Sublessee will be to a night club, a package alcoholic beverage store, an adult bookstore, an adult motion picture theater, an adult cabaret or an adult entertainment establishment as such terms are defined in Section 16-29.001 of the City of Atlanta Code in effect on May 8, 1995 (which expressly does not include a restaurant permitted to serve alcoholic beverages), in which event the approval of the Commissioner of the Department of Housing and Community Development must first be obtained with respect to such sublease, such approval not to be unreasonably withheld or delayed.

18.1.3  If an event of default, as defined in this Sublease, shall occur while the Subleased Premises or any part thereof be subleased to any subtenants, Sublessor, in addition to any other remedies herein provided and subject to the rights of the Subtenants provided in this Sublease, shall have the right (while such event of default remains uncured) to collect directly from any and all such subtenant all rents becoming due to Sublessee under such subleases and apply such rent against any sums due to Sublessor by Sublessee hereunder; unless Sublessee has assigned to the Leasehold Mortgagee the prior right to collect such rent, in which case Sublessor shall exercise such right to collect rent from such subtenants only to the extent not exercised by the Leasehold Mortgagee. No direct collection by Sublessor from any such subtenant shall be construed to constitute a novation or release of Sublessee from the further performance of any of Sublessee's obligations hereunder.

Section 18.2    Assignment by Sublessor. Sublessor shall not hypothecate, encumber or assign (as security or otherwise) its interests in Sublessor's Estate, including the Land, the Subleased Premises or any portion thereof without the prior written consent of the Leasehold Mortgagee.

## ARTICLE XIX

### RIGHT OF FIRST OFFER

Section 19.1    Sublessor's Intent to Market Subleased Premises. If Sublessor, in its sole discretion, decides to sell its interest in the Subleased Premises, Sublessor shall give written notice of such intent to Sublessee and any Leasehold Mortgagee setting the terms and conditions thereof ("Notice"). Sublessee shall thereafter have sixty (60) days within which to notify Sublessor of its intent to purchase the Subleased Premises offered for sale upon such terms and conditions, and if such Notice is timely given, the Closing shall be sixty (60) days thereafter.

The status of title to be delivered and the instruments to be executed pursuant thereto shall be as stated in the Notice and the amount of earnest money that Sublessee shall be required to deposit with the notification of intent to purchase by matching the offer shall be as stated in the Notice. Failure of Sublessee to so notify Sublessor in a timely manner shall be deemed an election not to purchase. In the event Sublessee does not so timely notify Sublessor of its intent to purchase the offered property upon the terms and conditions stated in the Notice, Sublessor shall be free to market such property on its own or through a broker and thereafter may sell such property but only on the same terms and conditions as set forth in the Notice.

     19.2   Right of First Refusal. If Sublessor is not marketing the property as provided in Section 19.1 above, but receives a written offer in acceptable form from an unrelated third party that Sublessor is willing to accept for the purchase of the Subleased Premises, Sublessor shall notify Sublessee of the terms and conditions of such offer. Sublessee shall then have sixty (60) days within which to notify Sublessor of its intent to purchase such property by matching said offer and in the event of such timely response, the closing of the purchase and sale of such property shall be in accordance with the terms of such offer. In the event that timely notice is not given by Sublessee to Sublessor, Sublessee shall be deemed to have elected not to match said offer, and Sublessor shall be free to sell the property to such unrelated third party on the terms and conditions set forth in the offer. If Sublessor fails to sell such property to such third party in accordance with the terms and conditions of the offer within sixty (60) days after Sublessor is entitled to sell the Property to such unrelated third party, the right of first refusal created in this Section 19.2 shall be revived and again be enforceable.

## ARTICLE XX

## MISCELLANEOUS PROVISIONS

     20.1  Entire Agreement; Modification. This Sublease supersedes all prior discussions and agreements between the parties with respect to the Subleased Premises. This Sublease contains the sole and entire understanding between the parties with respect to the transactions contemplated by this Sublease, and all promises, inducements, offers, solicitations, agreements, representations and warranties heretofore made between the parties, if any, are merged into this Sublease. This Sublease shall not be modified or amended in any respect except by written instrument specifically referencing such a modification or amendment which is executed by or on behalf of the parties in the same manner as this Sublease is executed and to which each Leasehold Mortgagee has consented in writing.

     20.2  Governing Law. This Sublease, and the rights and obligations of the parties hereunder, shall be governed by and construed in accordance with the substantive laws of the State of Georgia.

20.3   Binding Effect. This Sublease shall inure to the benefit of and be binding upon the parties hereto, their heirs, successors, administrators, executors and assigns.

20.4   Severability. In the event any provision or portion of this Sublease is held by any Court of competent jurisdiction to be invalid or unenforceable, such holdings shall not affect the remainder hereof, and the remaining provisions shall continue in full force and effect to the same extent as would have been the case had such invalid or unenforceable provision or portion never been a part hereof.

20.5   Further Assurances. On and after the date of this Sublease, Sublessor and Sublessee shall, at the request of the other, make, execute and deliver or obtain and deliver all such affidavits, deeds, certificates, resolutions and other instruments and documents, and shall do or cause to be done all such other things which either party may reasonably require to effectuate the provisions and the intention of this Sublease.

20.6   Captions. All captions, headings, paragraphs, subparagraphs, letters and other reference captions are solely for the purpose of facilitating convenient reference to this Sublease, shall not supplement, limit or otherwise vary the text of this Sublease in any respect, and shall be wholly disregarded when interpreting the meaning of any terms or provisions hereof. All references to particular paragraphs and subparagraphs by number refer to the text of the paragraphs or subparagraphs so numbered in this Sublease.

20.7   Gender. Words of any gender used in this Sublease shall be held and construed to include any other gender, and words of a singular number shall be held to include the plural, and vice-versa, unless the context requires otherwise.

20.8   Exhibits. Each and every exhibit referred to or otherwise mentioned in this Sublease is attached to this Sublease and is and shall be construed to be made a part of this Sublease by such reference or other mention at each point at which such reference or other mention occurs, in the same manner and with the same effect as if each exhibit were set forth in full at length every time it is referred to or otherwise mentioned.

20.9   References. All references to paragraphs or subparagraphs be deemed to refer to the appropriate paragraph or subparagraph of this Sublease. Unless otherwise specified in this Sublease, the terms "herein," "hereof," "hereinafter," "hereunder" and other terms of like or similar import, shall be deemed to refer to this Sublease as a whole and not to any particular paragraph or subparagraph hereof.

20.10   Rights Cumulative. Except as expressly limited by the terms of this Sublease, all rights, powers and privileges conferred hereunder shall be cumulative and not restrictive of those provided at law or in equity.

20.11  Notices. All notices, requests, demands or other communications required or permitted to be given hereunder shall be in writing and shall be addressed and delivered by hand or by certified mail, return receipt requested, or by Federal Express, or by hand delivery by reputable courier, to each party at the addresses set forth below. Any such notice, request, demand or other communication shall be considered given or delivered, as the case may be, on the date of receipt. Rejection or other refusal to accept or inability to deliver because of changed address of which proper notice was not given shall be deemed to be receipt of the notice, request, demand or other communication. By giving prior written notice thereof, any party may from time to time and at any time change its address for notices hereunder. Legal counsel for the respective parties may send to the other party any notices, requests, demands or other communications required or permitted to be given hereunder by such party.

| | | |
|---|---|---|
| a. | To City of Atlanta: | City of Atlanta<br>68 Mitchell Street, S.W., Suite 1200<br>Atlanta, Georgia 30335-0332<br>Attn: Carl R. Hartrampf, III, Housing Commissioner<br>    Department of Housing |
| b. | With a copy to: | Law Department, City of Atlanta<br>68 Mitchell Street, S.W., Suite 4100<br>Atlanta, Georgia 30335-0032<br>Attn: Bernard R. Thomas, Esq. and<br>    Clifford E. Hardwick, IV, Esq. |
| c. | To Lessee: | Urban Residential Finance Authority of the<br>City of Atlanta<br>100 Peachtree St., N.W., Suite 400<br>Atlanta, GA 30303<br>Attn: Mr. Marty Nance, Execut⋯    ⋯tor |
| d. | With a copy to: | Raymond A. Sales, Esq.<br>Sales, Goodloe & Gol⋯<br>One Peachtree Cent⋯          ⋯<br>Atlanta, Georgia ⋯ |
| e. | To Sublessee: | Atlanta W ⋯⋯    ⋯evelopment, L.L.C.<br>c/o Har ⋯⋯    ⋯ Company, Inc.<br>Nati⋯ ⋯Ban⋯⋯    ⋯, Suite 3700<br>A⋯ ⋯ta, Ger⋯ ⋯a 30308<br>Attn: ⋯⋯⋯ A. Dawson, Jr. |
| f. | With a copy to: | Frank L. Wilson, III, Esq.<br>Wilson Brock & Irby, L.L.C.<br>999 Peachtree Street, N.E., Suite 2000<br>Atlanta, Georgia  30309 |

IN WITNESS WHEREOF, this Sublease is made and entered into in multiple original counterparts, on the day and year first above written.

"SUBLESSOR"

URBAN RESIDENTIAL FINANCE
AUTHORITY OF THE CITY OF ATLANTA

By: _Paul Bolster_

Unofficial Witness

Title: _VICE Chairman_

[AUTHORITY SEAL]

"SUBLESSEE"

ATLANTA WEST BLOCK
REDEVELOPMENT, L.L.C.,
a Georgia limited liability company

BY: HAROLD A. DAWSON CO., INC.,
Managing Member

Unofficial Witness

By: _Harold G. Dawson_

Title: _Pres. /LEO_

.. Liability Company Seal]

EXHIBIT A

CITY HALL WEST LOT LEGAL DESCRIPTION

All that tract or parcel of land lying and being in Land Lot 77, 14th District, City of Atlanta, Fulton County, Georgia, and being more particularly described as follows:

BEGINNING AT A POINT located at the intersection of the southern right-of-way line of Mitchell Street and the western right-of-way line of Central Avenue; running thence in a southerly direction along the western right-of-way line of Central Avenue, South 11 degrees 06 minutes 59 seconds West, a distance of 420.59 feet to a point located at the intersection of the western right-of-way line of Central Avenue and the northern right-of-way line of Trinity Avenue; running thence in a westerly direction along the northern right-of-way line of Trinity Avenue, North 79 degrees 13 minutes 32 seconds West, a distance of 369.34 feet to a point located at the intersection of the northern right-of-way line of Trinity Avenue and the eastern right-of-way line of Pryor Street; running thence in a northerly direction along the eastern right-of-way line of Pryor Street, North 10 degrees, 52 minutes 27 seconds E      . distance of 144.76 feet to a point located on the eastern right-of-way line of Pryor S .; thence leaving the eastern right-of-way line of Pryor Street and running South 79 degrees 03 minutes 53 seconds East, a distance of 140.15 feet to a point; running thence North 10 degrees 56 minute 07 seconds East, a distance of 45.04 feet to a point; running thence North 79 degrees 01 minutes 21 seconds West, a distance of 140.20 feet to a point located on the eastern right-of-way line of Pryor Street; running thence in a northerly direction along the eastern right-of-way line of Pryor Street, North 10 degrees 52 minutes 27 seconds East, a distance of 135.87 feet to a point located on the eastern right-of-way line of Pryor Street; thence leaving the eastern right-of-way line of Pryor Street and running South 79 degrees 17 minutes 20 seconds East, a distance of 140.35 feet to a point; running thence North 10 degrees 56 minutes 06 seconds East, a distance of 95.11 feet to a point located on the southern right-of-way line of Mitchell Street; running thence in a easterly direction along the southern right-of-way line of Mitchell Street South 79 degrees 06 minutes 48 seconds East, a distance of 230.67 feet to a point located at the intersection of the southern right-of-way line of Mitchell Street and the western right-of-way line of Central Avenue, and the POINT OF BEGINNING, all as more particularly shown on that Topographic and Boundary Survey prepared by John Evan North, Georgia Registered Land Surveyor No. 1848, for Atlanta West Block Redevelopment Company, dated December 21, 1994.

20.12   Counterparts.  This Sublease may be executed in several counterparts, each of which shall be deemed an original, and all such counterparts together shall constitute one and the same agreement.

20.13   Time of Essence.  Time is and shall be of the essence in this Sublease.

20.14   Relationship of Parties.  No relationship exists between Sublessor and Sublessee other than landlord and tenant.  This Sublease is intended to create a usufruct and not in an estate for years. The parties hereto expressly declare that, in connection with the activities and operations contemplated by this Sublease, they are neither partners nor joint venturers, nor does a debtor-creditor, principal-agent or any other relationship, except as aforesaid, exists between them.

[SIC ... ... ]

Deed Book 50203 Pg 540
Filed and Recorded Jul-11-2011 05:00pm
2011-0173947
Real Estate Transfer Tax $0.00
Cathelene Robinson
Clerk of Superior Court
Fulton County, Georgia

<table>
<tr>
<td>

**When recorded return to:**
Linda C. Pitts, Esq.
Aldridge Connors, LLP
780 Johnson Ferry Road, NE
Suite 600
Atlanta, GA 30342

</td>
<td>

**CROSS REFERENCE TO: Multifamily Deed to Secure Debt, Assignment of Rents and Security Agreement recorded in Deed Book 25925, Page 221; Assignment of Deed to Secure Debt, recorded in Deed Book 25925, Page 248; and Assignment of Deed to Secure Debt, recorded in Deed Book 25925, Page 297**

</td>
</tr>
</table>

## DEED UNDER POWER

THIS INDENTURE, made as of this 5th day of July, 2011 by ATLANTA WEST BLOCK REDEVELOPMENT, L.L.C., a Georgia limited liability company (hereinafter referred to as "Borrower" or "Grantor"), acting through its duly appointed attorney in fact, Fannie Mae, a corporation organized and existing under the laws of the United States (hereinafter referred to as "Lender" or "Creditor"), as party of the first part, and Fannie Mae, a corporation organized and existing under the laws of the United States, 14221 Dallas Parkway, Suite 1000, Dallas, Texas 75254, as party of the second part:

WITNESSETH:

WHEREAS, Borrower did execute and deliver that certain Multifamily Deed to Secure Debt, Assignment of Rents and Security Agreement, dated as of December 1, 1998, in favor of Urban Residential Finance Authority of the City of Atlanta, Georgia, a public body corporate and instrumentality of the State of Georgia, recorded on December 23, 1998 in Deed Book 25925, Page 221 in Fulton County, Georgia Records; as assigned by that certain Assignment of Deed to Secure Debt from Urban Residential Finance Authority of the City of Atlanta to AMI Capital, Inc., a Delaware corporation, dated December 1, 1998, recorded December 23, 1998 in Deed Book 25925, Page 248, Fulton County, Georgia Records; as further assigned by that certain Assignment of Deed to Secure Debt from AMI Capital, Inc., a Delaware corporation, to Fannie Mae, dated as of December 1, 1998, recorded December 23, 1998 in Deed Book 25925, Page 297 in Fulton County, Georgia Records (hereinafter collectively, the "Deed to Secure Debt" or the "Security Deed"), conveying the after described property to secure a Multifamily Note, dated as of December 1, 1998, in the original principal amount of TWELVE MILLION THREE HUNDRED THOUSAND AND NO/100 DOLLARS ($12,300,000.00); and

1



**EXHIBIT**

**3**

Deed Book 50203 Pg 541

WHEREAS, default in the remarketing of the bonds as required under the Multifamily Note occurred and whereas, by reason of said default, Lender elected to, pursuant to the terms of the Deed to Secure Debt and Multifamily Note, declare the entire unpaid principal balance and interest thereon immediately due and payable; and

WHEREAS, said indebtedness still being in default, the said Lender on behalf of and as attorney-in-fact for said Borrower and according to the terms of the Deed to Secure Debt and Note, did advertise said property for sale once a week for four weeks in a newspaper in Fulton County, Georgia wherein the Sheriff carried his advertisements, namely the Fulton County Daily Report, said dates of publication being June 7, 2011, June 14, 2011, June 21, 2011, and June 28, 2011; and

WHEREAS, the Notice described in Georgia laws 1981, Volume I, page 834, codified as O.C.G.A. §§44-14-162.2 and 44-14-162.4 was not required to be given as no part of the after described property was to be used as a dwelling place by the "Debtors" (as that term is defined in O.C.G.A. §44-14-162) at the time the Deed to Secure Debt was entered into; and

WHEREAS, the said Lender did expose said land for sale to the highest bidder for cash on the first Tuesday in July, 2011, within the legal hours of sale at the usual place for conducting Sheriff sales in Fulton County, Georgia, before the Courthouse door in Atlanta, Georgia, in said County, and offered the after described property for sale at public outcry to the highest bidder for cash when and where the aforesaid party of the second part bid TEN MILLION SEVEN HUNDRED SEVENTY-FIVE THOUSAND SIX HUNDRED FIFTY-SEVEN AND 23/100 DOLLARS ($10,775,657.23); and

WHEREAS, the after described property was knocked off to the party of the second part for the aforementioned sum of money in cash.

NOW THEREFORE, for and in consideration of the premises and said sum of money and by virtue of and in the exercise of the power of sale contained in the aforesaid Deed to Secure Debt, the party of the first part has bargained, sold, granted and conveyed, and by these presents does hereby bargain, sell, grant and convey to the party of the second part, said party's representatives, successors and assigns, the following described property (hereinafter collectively called the "Property"):

A.   Borrower's interest in the leasehold estate pursuant to a ground sublease dated as of May 12, 1995 between Urban Residential Finance Authority of the City of Atlanta and Borrower, a Memorandum of which is recorded in Deed Book 19806, page 005, Fulton County, Georgia Records, with respect to the following property:

All that tract or parcel of land lying and being in Land Lot 77, 14th District, City of Atlanta, Fulton County, Georgia and being more particularly described as follows:

BEGINNING AT A POINT, located at the intersection of the southern right-of-way line of Mitchell Street and the western right-of-way line of Central Avenue: running thence in a southerly direction along the western right-of-way line of Central Avenue, South 11

2

degrees 06 minutes 59 seconds West, a distance of 420.59 feet to a point located at the intersection of the western right-of-way line of Central Avenue and the northern right-of-way line of Trinity Avenue; running thence in a westerly direction along the northern right-of-way line of Trinity Avenue, North 79 degrees 13 minutes 32 seconds West, a distance of 369.34 feet to a point located at the intersection of the northern right-of-way line of Trinity Avenue and the eastern right-of-way line of Pryor Street; running thence in a northerly direction along the eastern right-of-way line of Pryor Street, North 10 degrees 52 minutes 27 seconds East, a distance of 144.76 feet to a point located on the eastern right-of-way line of Pryor Street; thence leaving the eastern right-of-way line of Pryor Street and running South 79 degrees 03 minutes 53 seconds East, a distance of 140.15 feet to a point; running thence North 10 degrees 56 minutes 07 seconds East, a distance of 45.04 feet to a point; running thence North 79 degrees 01 minutes 21 seconds West, a distance of 140.20 feet to a point located on the eastern right-of-way line of Pryor Street; running thence in a northerly direction along the eastern right-of-way line of Pryor Street, North 10 degrees 52 minutes 27 seconds East, a distance of 135.87 feet to a point located on the eastern right-of-way line of Pryor Street; thence leaving the eastern right-of-way line of Pryor Street and running South 79 degrees 17 minutes 20 seconds East, a distance of 140.35 feet to a point; running thence North 10 degrees 56 minutes 06 seconds East, a distance of 95.11 feet to a point located on the southern right-of-way line of Mitchell Street; running thence in a easterly direction along the southern right-of-way line of Mitchell Street South 79 degrees 06 minutes 48 seconds East, a distance of 230.67 feet to a point located at the intersection of the southern right-of-way line of Mitchell Street and the western right-of-way line of Central Avenue, and the POINT OF BEGINNING.

TOGETHER WITH all rights granted in the following documents:

Easement for Light granted by deed dated April 15, 1911 to George W. Parrott conveyed in that deed recorded at Deed Book 274, Page 676, Fulton County, Georgia records; and

Party Wall Agreement, dated November 22, 1923, recorded at Deed Book 798, Page 512, Fulton County, Georgia records.

The above-described real estate is depicted on that certain Survey prepared by John Baingerield Roeser, Georgia Registered Land Surveyor No. 2073, for Atlanta West Block Redevelopment Company, L.L.C, Urban Residential Finance Authority of the City of Atlanta, Federal National Mortgage Association, AMI Capital, Inc., Old Republic National Title Insurance Company dated March 31, 1996, last revised December 18, 1998, and comprises approximately 3.125 acres according to said survey.

3

B.    TOGETHER WITH, the Property (as that term is defined in the Security Deed).

The debt secured by the Security Deed has been and is hereby declared due because of, among other possible events of default, failure to remarket the bonds and subsequent failure to pay the indebtedness when due as provided in the Multifamily Note and Security Deed. The debt remaining in default, this sale will be made for the purpose of paying the same and all expenses of this sale, as provided in the Security Deed and by law, including attorney's fees (notice of intent to collect attorney's fees having been given).

The Property will be sold subject to the following:

1.  All taxes and assessments outstanding, including those which are a lien not yet due and payable.

2.  Rights of tenants in possession, as tenants only, under unrecorded leases.

3.  Laws and regulations of governmental authorities applicable to the Property including, without limitation, zoning.

4.  The exact location of building lines, unrecorded easements, possible encroachments and other facts or conditions which would be disclosed by an accurate survey and inspection of the Property; and rights, if any, of persons who may be in possession under claims not appearing of record.

5.  Any other matters which might be disclosed by an accurate survey and inspection of the Property.

6.  Rights of upper and lower riparian owners in and to the waters of creeks and branches, crossing or adjoining the property, and the natural flow thereof, free from diminution or pollution.

7.  Party Wall Agreement, dated November 22, 1923, recorded at Deed Book 798, Page 512, Fulton County, Georgia records.

8.  Easement for light granted by deed dated April 15, 1911 to George W. Parrott conveyed in that deed recorded at Deed Book 274, Page 676, Fulton County, Georgia records.

9.  Memorandum of Ground Lease by City of Atlanta, Georgia, a municipal corporation organized and existing under the laws of the State of Georgia, as lessor ("Lessor"), and Urban Residential Finance Authority of the City of Atlanta, a public body corporate organized and existing under the laws of the State of Georgia, as lessee

4

("Lessee"), dated July 18, 1995, recorded at Deed Book 19806, Page 1, Fulton County, Georgia records.

10. Memorandum of Ground Sublease by Urban Residential Finance Authority of the City of Atlanta, a public body corporate organized and existing under the laws of the State of Georgia, as lessor ("Lessor") and Atlanta West Block Redevelopment, L.L.C., a Georgia limited liability company, as lessee ("Lessee") dated July 18, 1995, recorded at Deed Book 19806, Page 5, Fulton County, Georgia records.

11. Land Use Restriction Agreement among Urban Residential Finance Authority of the City of Atlanta (the "Issuer"), and Atlanta West Block Redevelopment, L.L.C., a limited liability company organized and existing under the laws of the State of Georgia (the "Borrower"), and First Union National Bank of Georgia, as trustee (the "Trustee"), dated July 1, 1995, recorded at Deed Book 19806, Page 9, Fulton County, Georgia records as the same is amended, modified and restated by that Amended and Restated Land Use Restriction Agreement dated as of December 1, 1998, recorded at Deed Book 25925, Page 184, Fulton County, Georgia records.

12. Rights and obligations contained in that Alley Agreement by and between Atlanta West Block Redevelopment, L.L.C., a Georgia limited liability company and American Lawyer Media, L.P., a Delaware limited partnership, successor by merger with Daily Report Company, dated July 1, 1995, recorded at Deed Book 19806, Page 44, Fulton County, Georgia records.

13. That survey for Atlanta West Block Redevelopment, L.L.C., AMI Capital, Inc., Urban Residential Finance Authority of The City of Atlanta, Fannie Mae and Old Republic National Title Insurance Company, by Roeser Consultants, Inc., certified by John Daingerfield Roeser, Georgia Registered Land Surveyor No. 2073, dated March 31, 1996, last revised December 18, 1998, discloses:

   a.  The southwestern wall of the building located upon property now or formerly owned by the Daily Report Company being subject to a Party Wall Agreement;

   b.  A portion of the southwestern wall of the building located upon property now or formerly owned by the Daily Report Company being subject to an easement for light and air;

   c.  A ten (10) foot alley (Access Easement No. 1) beginning on the eastern right-of-way of Trinity Avenue extending into captioned property. Exception is taken to the easement rights of others in and to said alley;

5

    d.   Ten (10) foot alley (Access Easement No. 2) located to the rear of adjacent property now or formerly owned by State Office Building Authority. Exception is taken to the rights of others for ingress and egress over the surface of said alley for access to said adjacent property;

    e.   Storm drain outlets and lines, light poles, concrete transformer pad located throughout captioned property;

    f.   Sanitary sewer line with manholes entering southeast corner of captioned property; and

    g.   Fifty-eight (58) by sixty-six (66) inch arch (abandoned) traversing the eastern portion of captioned property.

14.    Declaration of Land Use Restrictive Covenants for Low-Income Housing Credit by and between Atlanta West Block Redevelopment, L.L.C. and the Georgia Housing and Finance Authority, dated December 17, 1996, recorded at Deed Book 21972, Page 4, Fulton County, Georgia records, as may be amended.

15.    Any other assessments, liens, encumbrances, zoning ordinances, restrictions, covenants and matters of record superior to the Security Deed first set out above.

TO HAVE AND HOLD the said premises and every part thereof unto the said party of the second part, and said party's, representatives, successors and assigns, to their own proper use, benefit and behoof in FEE SIMPLE, in as full and ample a manner as the party of the first part or said party's, representatives, successors and assigns, did hold and enjoy the same.

[Signatures appear on next page.]

6

Deed Book 50203 Pg   546
Cathelene Robinson
Clerk of Superior Court
Fulton County, Georgia

IN WITNESS WHEREOF, the said Lender, as agent and attorney-in-fact for Grantor, has hereunto affixed its hand and seal as of the day and year first above written.

Signed, sealed and delivered
in the presence of:

Fannie Mae, a corporation organized and existing under the laws of the United States, as agent and attorney-in-fact for Grantor

_____
Witness

By: _____
Name: _____
Title: _____

_____
Notary Public

(NOTARY SEAL)

(CORPORATE SEAL)

MICOLE T. DALUISIO
Notary Public,
State of Texas
Comm. Exp. 05-05-14

7

Deed Book 50207 Pg 100
Filed and Recorded Jul-12-2011 08:45am
2011-0174640
Cathelene Robinson
Clerk of Superior Court
Fulton County, Georgia

**After recording return to:**
Douglas B. McDonald, Esq.
Venable LLP
8010 Towers Crescent Drive
Suite 300
Vienna, VA 22182

_____
SPACE ABOVE THIS LINE RESERVED FOR RECORDER'S USE

| Assignor's name and address: | Assignee's name and address: |
|---|---|
| FANNIE MAE, a corporation organized and existing under the laws of the United States, 14221 Dallas Parkway Suite 1000 Dallas, TX 75254 Attn: Director – Multifamily Loss Mitigation | BLUE VALLEY APARTMENTS, INC. 1661 Worthington Road West Palm Beach, Florida, 33409 Attn: Corporate Secretary |

### ASSIGNMENT AND ASSUMPTION OF GROUND SUBLEASE AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION OF GROUND SUBLEASE AGREEMENT ("**Assignment**") is made as of this 5th day of July, 2011, by and between FANNIE MAE, a corporation organized and existing under the laws of the United States, ("**Assignor**"), and BLUE VALLEY APARTMENTS, INC., a Florida corporation ("**Assignee**").

### WITNESSETH:

**WHEREAS,** Assignor acquired the leasehold estate in that certain Ground Sublease Agreement, dated May 12, 1995, by and between Urban Residential Finance Authority of the City of Atlanta and Atlanta West Block Redevelopment, L.L.C., a Georgia limited liability company (the "**Ground Sublease**," a memorandum of which is recorded in Deed Book 19806, Page 005, Fulton County, Georgia Records) at a foreclosure sale held on July 5, 2011 with respect to certain real property and improvements located in Fulton County, Georgia, more particularly described on **Exhibit A** attached hereto and incorporated herein by this reference (the "**Property**"), and Assignor has agreed to assign, transfer, sell, convey, grant and deliver all of its right, title and interest in and to the Ground SubLease to Assignee.

MCIDOCS1-#295052


EXHIBIT
4

NOW THEREFORE, for and in consideration of the sum of One Dollar ($1.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

1.      **Recitals**. The foregoing recitals are correct and complete and are incorporated herein by this reference.

2.      **Effective Date**. The "**Effective Date**" is defined to be the date hereof.

3.      **Assignment of Ground Sublease**. Effective on the Effective Date, Assignor hereby assigns, sells, transfers, grants, delivers and conveys to Assignee all of Assignor's right, title and interest as sublessee in, to and under the Ground Sublease.

4.      **Acceptance and Assumption by Assignee**. Effective on the Effective Date, Assignee hereby accepts said assignment, sale, transfer and conveyance and assumes and agrees to keep, perform and be bound by all of the terms, covenants, conditions and obligations which are required to be performed by the Assignor under the Ground Sublease from and after the Effective Date.

5.      **Further Assurances**. Assignor shall, upon request of Assignee, do, execute, acknowledge and deliver all such further acts, assignments, conveyances and assurances as may be reasonably requested for the better assigning, assuring and confirming the absolute conveyance of the Ground Sublease to Assignee.

6.      **Absolute Assignment**. This Assignment constitutes an absolute, unconditional and irrevocable conveyance of the Ground Sublease to Assignee by which Assignor completely divests itself of any and all rights, title or interest in and to the Ground Sublease (including, but not limited to, any right of any nature whatsoever to reacquire the Ground Sublease or any part thereof, or to set aside this conveyance). This Assignment is not intended as, and shall not constitute, an assignment for the purposes of security, a trust conveyance, or other security agreement of any kind or nature whatsoever. Assignor declares that this conveyance is freely and fairly made.

7.      **Miscellaneous**. This Assignment shall be binding upon and inure to the benefit of the parties hereto, and their respective successors and assigns. If any provisions of this Assignment or the application thereof to any persons, entities or circumstances shall to any extent be invalid or unenforceable, then such provisions shall be deemed to be replaced by the valid and enforceable provision which is substantively most similar to such invalid or unenforceable provision, and the remainder of the Assignment, or the application of such provisions to persons, entities or circumstances other than those as to which it is invalid or unenforceable shall not be affected thereby. The headings to sections of this Assignment are for convenient reference only, do not in any way limit or amplify the terms of this Assignment, and shall not be used in interpreting this Assignment. This Assignment shall be governed by and construed in accordance with the laws of the State of Georgia. This Assignment may be executed in any number of counterparts so long as each signatory hereto executes at least one such counterpart. Each such

-2-

counterpart shall constitute one original, but all such counterparts taken together shall constitute
one and the same instrument. Any counterpart may be executed by facsimile copy.

[Signature Pages Follow]

-3-

Deed Book 50207 Pg  103

WITNESS our signatures and seals.

ASSIGNOR:

Signed, sealed and delivered
in the presence of:

FANNIE MAE, a corporation organized and
existing under the laws of the United States

By: _____

Name: _____
LARRY LAGRONE
VP, MULTIFAMILY LOSS MITIGATION

Unofficial Witness

Its: _____

Notary Public

[NOTARY SEAL]                    [CORPORATE SEAL]

LESLIE D. RUBY
Notary Public,
State of Texas
Comm. Exp. 02-26-13

Signature Page to Assignment and Assumption of Ground Sublease Agreement
(City Plaza Apartments)

Deed Book 50207 Pg  104

ASSIGNEE:

Signed, sealed and delivered
in the presence of:

BLUE VALLEY APARTMENTS, INC., a
Florida corporation

Unofficial Witness

By: 

**RICHARD DELGADO**
Senior Vice President
and Treasurer

Notary Public

[CORPORATE SEAL]

[NOTARY SEAL]

**MARIA REYES**
MY COMMISSION # DD820658
EXPIRES September 08, 2012
(407) 398-0153   FloridaNotaryService.com

Signature Page to Assignment and Assumption of Ground Sublease Agreement
(City Plaza Apartments)

Deed Book 50207 Pg 105
Cathelene Robinson
Clerk of Superior Court
Fulton County, Georgia

## EXHIBIT A

### LEGAL DESCRIPTION

All that tract or parcel of land lying and being in Land Lot 77, 14th District, City of Atlanta, Fulton County, Georgia, and being more particularly described as follows:

BEGINNING AT A POINT located at the intersection of the southern right-of-way line of Mitchell Street and the western right-of-way line of Central Avenue; running thence in a southerly direction along the western right-of-way line of Central Avenue, South 11 degrees 06 minutes 59 seconds West, a distance of 420.59 feet to a point located at the intersection of the western right-of-way line of Central Avenue and the northern right-of-way line of Trinity Avenue; running thence in a westerly direction along the northern right-of-way line of Trinity Avenue, North 79 degrees 13 minutes 32 seconds West, a distance of 369.34 feet to a point located at the intersection of the northern right-of-way line of Trinity Avenue and the eastern right-of-way line of Pryor Street; running thence in a northerly direction along the eastern right-of-way line of Pryor Street, North 10 degrees 52 minutes 27 seconds East, a distance of 144.76 feet to a point located on the eastern right-of-way line of Pryor Street; thence leaving the eastern right-of-way line of Pryor Street and running South 79 degrees 03 minutes 53 seconds East, a distance of 140.15 feet to a point; running thence North 10 degrees 56 minutes 07 seconds East, a distance of 45.04 feet to a point; running thence North 79 degrees 01 minutes 21 seconds West, a distance of 140.20 feet to a point located on the eastern right-of-way line of Pryor Street; running thence in a northerly direction along the eastern right-of-way line of Pryor Street, North 10 degrees 52 minutes 27 seconds East, a distance of 135.87 feet to a point located on the eastern right-of-way line of Pryor Street; thence leaving the eastern right-of-way line of Pryor Street and running South 79 degrees 17 minutes 20 seconds East, a distance of 140.35 feet to a point; running thence North 10 degrees 56 minutes 06 seconds East, a distance of 95.11 feet to a point located on the southern right-of-way line of Mitchell Street; running thence in a easterly direction along the southern right-of-way line of Mitchell Street South 79 degrees 06 minutes 48 seconds East, a distance of 230.67 feet to a point located at the intersection of the southern right-of-way line of Mitchell Street and the western right-of-way line of Central Avenue, and the POINT OF BEGINNING.

TOGETHER WITH all rights granted in the following documents:

> Easement for Light granted by deed dated April 15, 1911 to George W. Parrott conveyed in that deed recorded at Deed Book 274, Page 676, Fulton County, Georgia records; and

> Party Wall Agreement, dated November 22, 1923, recorded at Deed Book 798, Page 512, Fulton County, Georgia records.

The above-described real estate is depicted on that certain Survey prepared by John Baingerfield Roeser, Georgia Registered Land Surveyor No. 2073, for Atlanta West Block Redevelopment Company, L.L.C., Urban Residential Finance Authority of the City of Atlanta, Federal National Mortgage Association, AMI Capital, Inc., Old Republic National Title Insurance Company dated March 31, 1996, last revised December 18, 1998, and comprises approximately 3.125 acres according to said survey.



Atlanta Office
171 17th Street NW, Suite 2100
Atlanta, GA  30363-1031
Direct phone: 404.873.8122
Direct fax: 404.873.8123
E-mail: daniel.bradfield@agg.com

November 20, 2014


Lemuel H. Ward, Esq.
Charles T. Sharbaugh, Esq.
City of Atlanta
City Hall Tower
55 Trinity Avenue, S.W.
Atlanta, Georgia 30303

   Re: City Plaza, Atlanta, Georgia

Gentlemen:

  We represent CG Investments, LLC (the **"Prospective Purchaser"**), which is presently under contract to purchase the sublease interest held by Blue Valley Apartments, Inc. (the **"Seller"**) in that certain Ground Sublease Agreement dated May 12, 1995 with respect to the project commonly known as City Plaza.  In connection with the anticipated sale, the Seller has requested that we present the City of Atlanta (the **"City"**) and Urban Residential Finance Authority of the City of Atlanta (**"URFA"**) with the following documents (collectively, the **"Documents"**), which are necessary to complete the contemplated transaction:

  1. Estoppel Certificate from the City of Atlanta;

  2. Estoppel Certificate from URFA;

  3. Consent to Assignment and Assumption of interest in Ground Sublease Agreement from URFA;

  4. Consent to Assignment and Assumption of interest in Ground Sublease Agreement from the City of Atlanta;

  5. Non-Disturbance Recognition and Attornment Agreement.

  We would appreciate your review and comment to the Documents on or before December 3, 2014.



7000617v1


**Arnall
Golden
Gregory** LLP

Please let me know if you have any questions or concerns.

Sincerely,

Daniel J. Bradfield

cc:   Mr. Gidi Cohen (via electronic mail)
      Mr. Adrian Goldstein (via electronic mail)

_____, 2014

CG Investments, LLC,
its lenders and affiliates, and
their successors and assigns
6301 Owensmouth Avenue, Suite 730
Woodland Hills, California 91367

      Ladies and Gentlemen:

      The undersigned (the **"Ground Lessor"**) certifies to CG Investments, LLC (the **"Purchaser"**), its lenders and affiliates, and their successors and assigns, as of the date hereof as follows:

      1.    The Ground Lessor is the "Lessor" under that certain Ground Lease Agreement between the City of Atlanta and Urban Residential Finance Authority of the City of Atlanta (the **"Ground Lessee"**), as "Lessee" (the **"Ground Lease"**). The Ground Lease is dated as of May 12, 1995, and demises certain real property as more particularly described therein (the **"Leased Property"**), and is comprised of the development commonly known as "City Plaza". All capitalized terms not otherwise defined herein shall have the meanings provided in the Ground Lease.

      2.    The Ground Lease is in full force and effect. The Ground Lease has not been amended, modified or supplemented. There are no other agreements or understandings, whether written or oral, between the Ground Lessor and the Ground Lessee with respect to the Ground Lease or the Leased Property.

      3.    The term of the Ground Lease commenced on May 12, 1995, and expires on May 7, 2045, subject to certain rights of the parties as set forth in Section 1.3 thereof.

      4.    The Ground Lessee currently pays Ground Rent in the amount of One Dollar ($1) per year, which amount has been paid current. The next payment of Ground Rent is due **May 1, 2015**. There are no other amounts due to Ground Lessor under the terms of Ground Lease. Ground Lessor hereby acknowledges and agrees that, by the conveyance of the Sublessee's Estate (as defined in Section 1.2 of that certain Ground Sublease Agreement dated May 12, 1995 by and between Ground Lessee and Blue Valley Apartments, Inc., a Florida corporation (the **"Ground Sublessee"**))[1] by that certain Deed Under Power dated July 5, 2011, recorded at Deed Book 50203, Page 540 in the records of the Clerk of Superior Court Fulton County, Georgia, and subsequent conveyance of the Sublessee's Estate to Ground Sublessee by that certain Assignment and Assumption of Ground Sublease Agreement dated July 5, 2011, recorded at Deed Book 50207, Page 100 in the records of the Clerk of Superior Court Fulton County, Georgia, the requirement that Ground Lessee or its assigns pay Ground Lessor any portion of the Cash Flow (as defined in Section 3.1.1 of the Ground Lease) is null and void and of no further force or effect.

---

[1] Blue Valley Apartments, Inc.is the successor in interest to Atlanta West Block Redevelopment, L.L.C., the original sublessee under the Ground Sublease

5.      The Ground Lessor holds no security deposit related to the Ground Lease.

6.      To the best of the Ground Lessor's knowledge, **there are no existing defaults by the Ground Lessor or the Ground Lessee** under the Ground Lease; and Ground Lessor has no knowledge of any event which, with the giving of notice, the passage of time or both would constitute a default by Ground Lessee under the Ground Lease.

7.      To the best of the Ground Lessor's knowledge, **there are no existing defaults by the Ground Lessee, as "Sublessor" under the Ground Sublease, or the Ground Sublessee** under the Ground Sublease; and Ground Lessor has no knowledge of any event which, with the giving of notice, the passage of time or both would constitute a default by either the Ground Lessee, as "Sublessor" under the Ground Sublease, or the Ground Sublessee under the Ground Sublease.

8.      The Ground Lessor has no claim against the Ground Lessee and no offset or defense to enforcement of any of the terms of the Ground Lease. The Ground Lessor has not advanced any funds to, for or on behalf of the Ground Lessee that the Ground Lessor is entitled to recover from the Ground Lessee.

9.      The Ground Lessor has not assigned any of its rights under the Ground Lease.

10.     No voluntary actions or, to the Ground Lessor's best knowledge, involuntary actions are pending against the Ground Lessor under the bankruptcy laws of the United States or any state thereof.

11.     Attached hereto as Exhibit A is a true copy of the Ground Lease.

The undersigned individual hereby certifies that he or she is duly authorized to sign, acknowledge and deliver this letter on behalf of the Ground Lessor.

The Ground Lessor acknowledges that the Purchaser and its affiliates will rely on this letter to acquire the Ground Sublessee's interest in the Ground Sublease and Purchaser's lender will rely on this letter in making a loan or otherwise extending credit that is secured by the demised property under Ground Sublease. The information contained in this letter shall be for your benefit and for the benefit of your successors and assigns.

Very truly yours,

CITY OF ATLANTA

By: _____
Name: _____
Title: _____

## EXHIBIT A

## COPY OF GROUND SUBLEASE

_____, 2014

CG Investments, LLC,
its lenders and affiliates, and
their successors and assigns
6301 Owensmouth Avenue, Suite 730
Woodland Hills, California 91367

Ladies and Gentlemen:

The undersigned (the **"Ground Sublessor"**) certifies to CG Investments, LLC (the **"Purchaser"**), its lenders and affiliates, and their successors and assigns, as of the date hereof as follows:

1.      The Ground Sublessor is the "Sublessor" under that certain Ground Sublease Agreement between Urban Residential Finance Authority of the City of Atlanta and Blue Valley Apartments, Inc., a Florida corporation (the **"Ground Sublessee"**)[1], as "Sublessee" (the **"Ground Sublease"**).  The Ground Sublease is dated as of May 12, 1995, and demises certain real property as more particularly described therein (the **"Subleased Property"**) and is comprised of the development commonly known as "City Plaza".  All capitalized terms not otherwise defined herein shall have the meanings provided in the Ground Sublease.

2.      The Ground Sublease is in full force and effect.  The Ground Sublease has not been amended, modified or supplemented.  There are no other agreements or understandings, whether written or oral, between the Ground Sublessor and the Ground Sublessee with respect to the Ground Sublease or the Subleased Property.

3.      The term of the Ground Sublease commenced on May 12, 1995, and expires on May 6, 2045, subject to certain rights of the parties as set forth in Section 1.3 thereof.

4.      The Ground Sublessee currently pays Ground Rent in the amount of One Dollar ($1) per year, which amount has been paid current.  The next payment of Ground Rent is due **May 1, 2015**.  There are no other amounts due to Ground Sublesssor under the terms of Ground Sublease.  Ground Sublessor hereby acknowledges and agrees that, by the conveyance of the Sublessee's Estate (as defined in Section 1.2 of the Ground Sublease) by that certain Deed Under Power dated July 5, 2011, recorded at Deed Book 50203, Page 540 in the records of the Clerk of Superior Court Fulton County, Georgia, and subsequent conveyance of the Sublessee's Estate to Ground Sublessee by that certain Assignment and Assumption of Ground Sublease Agreement dated July 5, 2011, recorded at Deed Book 50207, Page 100 in the records of the Clerk of Superior Court Fulton County, Georgia, the requirement that Ground Sublessee or its assigns pay Ground Sublessor any portion of the Cash Flow (as defined in Section 3.1.1 of the Ground Sublease) is null and void and of no further force or effect.

---

[1] The Ground Sublessee is the successor in interest to Atlanta West Block Redevelopment, L.L.C.

6986783v1

5. The Ground Sublessor holds no security deposit related to the Ground Sublease.

6. To the best of the Ground Sublessor's knowledge, **there are no existing defaults by the Ground Sublessor or the Ground Sublessee** under the Ground Sublease; and Ground Sublessor has no knowledge of any event which, with the giving of notice, the passage of time or both would constitute a default by Ground Sublessee under the Ground Sublease.

7. To the best of the Ground Sublessor's knowledge, **there are no existing defaults by the Ground Sublessor or the City of Atlanta (the "Ground Lessor")** under that certain Ground Lease Agreement dated May 12, 1995 by and between Ground Lessor and Ground Sublessor (the **"Ground Lease"**); and Ground Sublessor has no knowledge of any event which, with the giving of notice, the passage of time or both would constitute a default by either the Ground Sublessee or the Ground Lessor under the Ground Lease.

8. The Ground Sublessor has no claim against the Ground Sublessee and no offset or defense to enforcement of any of the terms of the Ground Sublease. The Ground Sublessor has not advanced any funds to, for or on behalf of the Ground Sublessee that the Ground Sublessor is entitled to recover from the Ground Sublessee.

9. The Ground Sublessor has not assigned any of its rights under the Ground Sublease or the Ground Lease.

10. No voluntary actions or, to the Ground Sublessor's best knowledge, involuntary actions are pending against the Ground Sublessor under the bankruptcy laws of the United States or any state thereof.

11. Attached hereto as <u>Exhibit A</u> is a true copy of the Ground Sublease.

The undersigned individual hereby certifies that he or she is duly authorized to sign, acknowledge and deliver this letter on behalf of the Ground Sublessor.

The Ground Sublessor acknowledges that the Purchaser and its affiliates will rely on this letter to acquire the Ground Sublessee's interest in the Ground Sublease and Purchaser's lender will rely on this letter in making a loan or otherwise extending credit that is secured by the Subleased Property. The information contained in this letter shall be for your benefit and for the benefit of your successors and assigns.

Very truly yours,

URBAN RESIDENTIAL FINANCE AUTHORITY
OF THE CITY OF ATLANTA

By: _____
Name: _____
Title: _____

6986783v1

## EXHIBIT A

## COPY OF GROUND SUBLEASE

After recording return to:
Arnall Golden Gregory LLP
171 17th Street, NW, Suite 2100
Atlanta, Georgia 30363
Attention:  Daniel J. Bradfield, Esq.

## ASSIGNMENT AND ASSUMPTION OF INTEREST
## IN GROUND SUBLEASE AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION OF INTEREST IN GROUND SUBLEASE AGREEMENT (this "**Assignment**") is made and entered into as of the _____ day of _____, 2014, by and between BLUE VALLEY APARTMENTS, INC., a Florida corporation (the "**Assignor**"), and _____, LLC, a Georgia limited liability company (the "**Assignee**").

## W I T N E S S E T H

WHEREAS, Assignor is the "Sublessee" under the terms and provisions of that certain Ground Sublease Agreement (the "**Ground Sublease**") dated May 12, 1995, by and between Urban Residential Finance Authority of the City of Atlanta, as "Sublessor" ("**Sublandlord**"), and Atlanta West Block Redevelopment, L.L.C., predecessor-in-interest to Assignor, as "Sublessee" pursuant to which Sublandlord leases those certain premises described on **Exhibit A** attached hereto, and commonly known as "City Plaza";

WHEREAS, pursuant to that certain Agreement of Purchase and Sale and Escrow Instructions dated September 29, 2014, by and between Assignor and CG Investments, LLC, a California limited liability company, the predecessor-in-interest to Assignee (as amended and assigned, the "**Purchase and Sale Agreement**"), Assignor has agreed to assign all of its right, title and interest as "Sublessee" under the Ground Sublease to Assignee; and

WHEREAS, also pursuant to the Purchase and Sale Agreement, Assignee has agreed to accept Assignor's assignment of its right, title and interest as "Sublessee" under the Ground Sublease, and has further agreed that, upon the parties' execution of this Assignment, Assignee shall expressly assume all of the obligations of Assignor under the Ground Sublease from and after the date hereof.

6987365v1

NOW THEREFORE, for and in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each party hereto, Assignor and Assignee hereby agree as follows:

1.    **Transfer and Assignment.** Assignor hereby sells, transfers, assigns, delivers and conveys to Assignee, its successors and assigns, all right, title and interest of Assignor as "Sublessee" in, to and under the Ground Sublease.

2.    **Assumption of Obligations.** Assignee hereby accepts the assignment of Assignor's right, title and interest as "Sublessee" in, to and under the Ground Sublease and assumes all of the benefits and obligations of the Ground Sublease, and agrees to perform all of the covenants and obligations of Sublessee under the Ground Sublease from and after the date hereof. Assignee further agrees to indemnify, defend and hold Assignor harmless from and against any and all cost, loss, harm or damage which may arise under the Ground Sublease from and after the date hereof.

3.    **Governing Law.** This Assignment shall be construed and enforced in accordance with and governed by the laws of the State of Georgia.

4.    **Binding Effect.** This Assignment shall be binding upon the parties hereto and their respective successors and assigns and, except as otherwise set forth herein, shall inure to the benefit of only the parties hereto.

[SIGNATURES SET FORTH ON FOLLOWING PAGES]

6987365v1

**IN WITNESS WHEREOF**, Assignor and Assignee have caused this instrument to be executed as of the day and year first above written.

Signed, sealed and delivered
in the presence of:

**ASSIGNOR:**

BLUE VALLEY APARTMENTS, INC.,
a Florida corporation

_____
       Witness

By: _____
Name:_____

_____
     Notary Public

Title:_____

My Commission Expires:

_____

(NOTARIAL SEAL)

[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]

6987365v1

Signed, sealed and delivered
in the presence of:

**ASSIGNEE:**

_____, LLC,
a Georgia limited liability company

_____
      Witness

By: _____
Name:_____
Title:_____

_____
      Notary Public

My Commission Expires:

_____

(NOTARIAL SEAL)

## EXHIBIT A

All that tract or parcel of land lying and being in Land Lot 77, 14th District, City of Atlanta, Fulton County, Georgia, and being more particularly described as follows:

BEGINNING AT A POINT located at the intersection of the southern right-of-way line of Mitchell Street and the western right-of-way line of Central Avenue; running thence in a southerly direction along the western right-of-way line of Central Avenue, South 11 degrees 06 minutes 59 seconds West, a distance of 420.59 feet to a point located at the intersection of the western right-of-way line of Central Avenue and the northern right-of-way line of Trinity Avenue; running thence in a westerly direction along the northern right-of-way line of Trinity Avenue, North 79 degrees 13 minutes 32 seconds West, a distance of 369.34 feet to a point located at the intersection of the northern right-of-way line of Trinity Avenue and the eastern right-of-way line of Pryor Street; running thence in a northerly direction along the eastern right-of-way line of Pryor Street, North 10 degrees 52 minutes 27 seconds East, a distance of 144.76 feet to a point located on the eastern right-of-way line of Pryor Street; thence leaving the eastern right-of-way line of Pryor Street and running South 79 degrees 03 minutes 53 seconds East, a distance of 140.15 feet to a point; running thence North 10 degrees 56 minutes 07 seconds East, a distance of 45.04 feet to a point; running thence North 79 degrees 01 minutes 21 seconds West, a distance of 140.20 feet to a point located on the eastern right-of-way line of Pryor Street; running thence in a northerly direction along the eastern right-of-way line of Pryor Street, North 10 degrees 52 minutes 27 seconds East, a distance of 135.87 feet to a point located on the eastern right-of-way line of Pryor Street; thence leaving the eastern right-of-way line of Pryor Street and running South 79 degrees 17 minutes 20 seconds East, a distance of 140.35 feet to a point; running thence North 10 degrees 56 minutes 06 seconds East, a distance of 95.11 feet to a point located on the southern right-of-way line of Mitchell Street; running thence in a easterly direction along the southern right-of-way line of Mitchell Street South 79 degrees 06 minutes 48 seconds East, a distance of 230.67 feet to a point located at the intersection of the southern right-of-way line of Mitchell Street and the western right-of-way line of Central Avenue, and the POINT OF BEGINNING.

TOGETHER WITH all rights granted in the following documents:

> Easement for Light granted by deed dated April 15, 1911 to George W. Parrott conveyed in that deed recorded at Deed Book 274, Page 676, Fulton County, Georgia records; and
>
> Party Wall Agreement, dated November 22, 1923, recorded at Deed Book 798, Page 512, Fulton County, Georgia records.

The above-described real estate is depicted on that certain Survey prepared by John Baingerfield Roeser, Georgia Registered Land Surveyor No. 2073, for Atlanta West Block Redevelopment Company, L.L.C., Urban Residential Finance Authority of the City of Atlanta, Federal National Mortgage Association, AMI Capital, Inc., Old Republic National Title Insurance Company dated March 31, 1996, last revised December 18, 1998, and comprises approximately 3.125 acres according to said survey.

## CONSENT TO ASSIGNMENT AND ASSUMPTION OF INTEREST
## IN GROUND SUBLEASE AGREEMENT

The undersigned, "Sublessor" under the Ground Sublease, hereby acknowledges, agrees and consents to:  (A) the assignment of the Ground Sublease from Assignor to Assignee pursuant to the terms of the foregoing Assignment and Assumption of Interest in Ground Sublease Agreement (the **"Assignment"**); (B) the release of Assignor from all of the terms, covenants, conditions and obligations under the Ground Sublease arising or accruing from and after the date of the Assignment; and (C) notwithstanding anything to the contrary set forth in Section 6.7 of the Ground Sublease, Assignee is hereby authorized to encumber its interest in the Ground Sublease with a first priority leasehold deed to secure debt, subject to the terms and conditions of Article 6 of the Ground Sublease, Section 6.7 excepted; and, to the extent required by Assignee's lender, the undersigned shall enter into a non-disturbance and attornment agreement in accordance with Section 6.8 of the Ground Sublease.

Signed, sealed and delivered
in the presence of:

**GROUND SUBLESSOR:**

URBAN RESIDENTIAL FINANCE
AUTHORITY OF THE CITY OF ATLANTA

_____
Witness

By: _____
Name:_____
Title:_____

_____
Notary Public

My Commission Expires:

_____

(NOTARIAL SEAL)

6987365v1

## CONSENT TO ASSIGNMENT AND ASSUMPTION OF INTEREST
## IN GROUND SUBLEASE AGREEMENT

The undersigned, "Lessor" under that certain Ground Lease Agreement by and between the undersigned and Urban Residential Finance Authority of the City of Atlanta dated May 12, 1995 (the "**Ground Lease**"), hereby acknowledges, agrees and consents to:  (A) the assignment of the Ground Sublease from Assignor to Assignee pursuant to the terms of the foregoing Assignment and Assumption of Interest in Ground Sublease Agreement (the **"Assignment"**); (B) the release of Assignor from all of the terms, covenants, conditions and obligations under the Ground Sublease arising or accruing from and after the date of the Assignment; and (C) notwithstanding anything to the contrary set forth in Section 6.7 of the Ground Lease, Assignee is hereby authorized to encumber its interest in the Ground Sublease with a first priority leasehold deed to secure debt, subject to the terms and conditions of Article 6 of the Ground Lease, Section 6.7 excepted; and, to the extent required by Assignee's lender, the undersigned shall enter into a non-disturbance and attornment agreement in accordance with Section 6.8 of the Ground Lease.

Signed, sealed and delivered
in the presence of:

**GROUND LESSOR:**

CITY OF ATLANTA

_____
            Witness

By: _____
Name:_____
Title:_____

_____
          Notary Public

[CITY SEAL]

My Commission Expires:

_____

(NOTARIAL SEAL)

6987365v1

After recording return to:
Arnall Golden Gregory LLP
171 17th Street, NW, Suite 2100
Atlanta, Georgia 30363
Attention: Daniel J. Bradfield, Esq.

## NON-DISTURBANCE RECOGNITION AND ATTORNMENT AGREEMENT

THIS NON-DISTURBANCE RECOGNITION AND ATTORNMENT AGREEMENT (this "**Agreement**"), is made as of the _____ day of _____, 2014, by and among CITY OF ATLANTA, a Georgia municipal corporation ("**Ground Lessor**"), URBAN RESIDENTIAL FINANCE AUTHORITY OF THE CITY OF ATLANTA ("**Ground Sublessor**") and _____, a Georgia limited liability company ("**Ground Sublessee**"). Ground Lessor, Ground Sublessor and Ground Sublessee are sometimes hereinafter referred to as the "**Party(ies)**."

### RECITALS:

WHEREAS, Ground Lessor, as "Lessor," and Ground Sublessor, as "Lessee", entered into that certain Ground Lease Agreement dated May 12, 1995 (the "**Ground Lease**"), pursuant to which Ground Lessor leased to Ground Sublessor those certain premises described on **Exhibit A** attached hereto, and commonly known as "City Plaza" (the "**Premises**");

WHEREAS, Ground Sublessor, as "Sublessor", and Atlanta West Block Redevelopment, L.L.C. ("**Atlanta West**"), as "Sublessee", entered into that certain lease dated Ground Sublease Agreement dated May 12, 1995 (the "**Ground Sublease**"), pursuant to which Ground Sublessor leased to Atlanta West the Premises;

WHEREAS, Atlanta West conveyed all of its right, title and interest in the leasehold interest in the Premises under the Ground Sublease to Fannie Mae, a corporation organized and existing under the laws of the United States, by that certain Deed Under Power dated July 5, 2011, recorded at Deed Book 50203, Page 540 in the records of the Clerk of Superior Court Fulton County, Georgia ("**Fulton County Records**"), which in turn conveyed all of its right, title and interest in the leasehold interest in the Premises under the Ground Sublease to Blue Valley

Apartments, Inc. by that certain Assignment and Assumption of Ground Sublease Agreement dated July 5, 2011, recorded at Deed Book 50207, Page 100 in the Fulton County Records, which in turn conveyed all of its right, title and interest in the leasehold interest in the Premises under the Ground Sublease to Ground Sublessee by that certain Assignment and Assumption of Ground Sublease Agreement dated _____, 2014, recorded at Deed Book _____, Page _____ in the Fulton County Records;

WHEREAS, as an inducement to assuming the right, title and interest in the Premises under the Ground Sublease, Ground Sublessee's obligation to such assumption is conditioned upon Ground Sublessor obtaining this Agreement from Ground Lessor; and

WHEREAS, the Parties desire to satisfy the foregoing condition and to provide for the non-disturbance and recognition of Ground Sublessee by Ground Lessor or anyone claiming through Ground Lessor.

## AGREEMENTS:

In consideration of the foregoing Recitals, the mutual covenants, agreements and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.     Ground Lessor does hereby warrant and represent to Ground Sublessee that the Ground Lease has not been amended and is valid and in full force and effect as of the date hereof, that the term of the Ground Lease has heretofore commenced, that there are no defaults by either party thereunder, that Ground Sublessor is, as of the date hereof, the Ground Sublessee under the Ground Lease and that nothing contained in the Ground Lease prohibits or restricts the execution and delivery of the Ground Sublease or any term or condition contained in the Ground Sublease.

2.     Ground Lessor does hereby recognize the Ground Sublease and all of Ground Sublessee's rights thereunder. Ground Lessor does hereby agree that, if the term of the Ground Lease shall be canceled or shall terminate or expire prior to the expiration of the term of the Ground Sublease, or if Ground Lessor shall come into possession of all or any part of the Premises prior to the expiration of the term of the Ground Sublease, the Ground Sublease shall continue in full force and effect in accordance with its terms and Ground Sublessee's rights in the Premises and Ground Sublessee's rights under the Ground Sublease shall not be disturbed except for such cause as would entitle Ground Sublessor to terminate the Ground Sublease in accordance with the terms and conditions contained in the Ground Sublease. Ground Lessor shall take no action which shall in any way interfere with any right of Ground Sublessee under the Ground Sublease, and the Premises shall be and remain subject to the Ground Sublease.

3.     Upon the cancellation, termination or expiration of the term of the Ground Lease prior to the expiration of the term of the Ground Sublease as such term may be extended, whether the Ground Lease shall so terminate or expire, or be canceled, upon the expiration of its term as stated therein or on any other date, and whether upon the election of either Ground Lessor or Ground Sublessor thereunder, or in any other manner, Ground Lessor shall recognize

Ground Sublessee as ground sublessee of the Premises for the balance of the term of the Ground Sublease, as extended, in accordance with all of the provisions of the Ground Sublease and Ground Lessor shall then and thereafter perform and observe all of the agreements and conditions to be performed or observed on the part of Ground Sublessor, as the ground sublessor under the Ground Sublease.

      **4.**      Ground Sublessee does hereby agree that, if the term of the Ground Lease shall be canceled or terminated prior to the expiration of the Ground Sublease, Ground Sublessee shall recognize, and attorn to, Ground Lessor as the ground sublessor under the Ground Sublease in accordance with the terms and conditions contained in the Ground Sublease, provided that Ground Lessor shall then agree in writing to Ground Sublessee to thereafter assume, perform and observe all of the terms and conditions contained in the Ground Sublease to be performed or observed on the part of the ground sublessor thereunder.

      **5.**      References herein contained to the term of the Ground Lease and the term of the Ground Sublease shall mean the term thereof as then extended pursuant to the provisions thereof.

      **6.**      The agreements contained herein shall be self-executing without the requirement of any further instrument or act by any party referred to herein. This Agreement shall be binding upon, and inure to the benefit of, each of the parties hereto and its successors and assigns.

[SIGNATURES ON FOLLOWING PAGE]

IN TESTIMONY WHEREOF, the Parties have executed this Non-Disturbance Recognition and Attornment Agreement as of the date set forth above.

Signed, sealed and delivered
in the presence of:

**GROUND LESSOR:**

CITY OF ATLANTA

_____
          Witness

By: _____
Name:_____
Title:_____

_____
          Notary Public

[CITY SEAL]

My Commission Expires:

_____

(NOTARIAL SEAL)

[SIGNATURES CONTINUE ON NEXT PAGE]

6986911v1

Signed, sealed and delivered
in the presence of:

**GROUND SUBLESSOR:**

URBAN RESIDENTIAL FINANCE
AUTHORITY OF THE CITY OF ATLANTA

_____
Witness

By: _____
Name: _____
Title: _____

_____
Notary Public

My Commission Expires:

_____

(NOTARIAL SEAL)

[SIGNATURES CONTINUE ON NEXT PAGE]

Signed, sealed and delivered
in the presence of:

**GROUND SUBLESSEE:**

_____, a Georgia limited
liability company

_____
Witness

By: _____
Name:_____
Title:_____

_____
Notary Public

My Commission Expires:

_____

(NOTARIAL SEAL)

[END OF SIGNATURES]

## EXHIBIT A

All that tract or parcel of land lying and being in Land Lot 77, 14th District, City of Atlanta, Fulton County, Georgia, and being more particularly described as follows:

BEGINNING AT A POINT located at the intersection of the southern right-of-way line of Mitchell Street and the western right-of-way line of Central Avenue; running thence in a southerly direction along the western right-of-way line of Central Avenue, South 11 degrees 06 minutes 59 seconds West, a distance of 420.59 feet to a point located at the intersection of the western right-of-way line of Central Avenue and the northern right-of-way line of Trinity Avenue; running thence in a westerly direction along the northern right-of-way line of Trinity Avenue, North 79 degrees 13 minutes 32 seconds West, a distance of 369.34 feet to a point located at the intersection of the northern right-of-way line of Trinity Avenue and the eastern right-of-way line of Pryor Street; running thence in a northerly direction along the eastern right-of-way line of Pryor Street, North 10 degrees, 52 minutes 27 seconds E    . distance of 144.76 feet to a point located on the eastern right-of-way line of Pryor ?: :; thence leaving the eastern right-of-way line of Pryor Street and running South 79 degrees 03 minutes 53 seconds East, a distance of 140.15 feet to a point; running thence North 10 degrees 56 minute 07 seconds East, a distance of 45.04 feet to a point; running thence North 79 degrees 01 minutes 21 seconds West, a distance of 140.20 feet to a point located on the eastern right-of-way line of Pryor Street; running thence in a northerly direction along the eastern right-of-way line of Pryor Street, North 10 degrees 52 minutes 27 seconds East, a distance of 135.87 feet to a point located on the eastern right-of-way line of Pryor Street; thence leaving the eastern right-of-way line of Pryor Street and running South 79 degrees 17 minutes 20 seconds East, a distance of 140.35 feet to a point; running thence North 10 degrees 56 minutes 06 seconds East, a distance of 95.11 feet to a point located on the southern right-of-way line of Mitchell Street; running thence in a easterly direction along the southern right-of-way line of Mitchell Street South 79 degrees 06 minutes 48 seconds East, a distance of 230.67 feet to a point located at the intersection of the southern right-of-way line of Mitchell Street and the western right-of-way line of Central Avenue, and the POINT OF BEGINNING, all as more particularly shown on that Topographic and Boundary Survey prepared by John Evan North, Georgia Registered Land Surveyor No. 1848, for Atlanta West Block Redevelopment Company, dated December 21, 1994.



# CITY OF ATLANTA
### DEPARTMENT OF LAW
SUITE 5000 • CITY HALL
55 TRINITY AVENUE, S.W., ATLANTA, GEORGIA 30303-3520
(404) 546-4189 DIRECT DIAL

KASIM REED
MAYOR

CATHY HAMPTON
CITY ATTORNEY

December 9, 2014

Daniel J. Bradfield, Esq.
Arnall Golden Gregory LLP
171 17th Street, N.E. Suite 2100,
Atlanta, GA 30363-1031

> **Re: Request for Estoppel Letter** -- Ground Lease Agreement ("Ground Lease") between City of Atlanta ("City") as Lessor and Urban Residential Finance Authority of the City of Atlanta ("URFA") as lessee, as subsequently subleased by URFA to Atlanta West Block Redevelopment, L.L.C. ("Original Sublessee") under Ground Sublease Agreement ("Ground Sublease") dated May 12, 1995 as subsequently assigned to Fannie Mae by Deed Under Power dated July 5, 2011 ("Acquisition Date") and subsequently assigned to Blue Valley Apartments, Inc. ("Blue Valley") by Assignment and Assumption of Ground Sublease Agreement dated as of the Acquisition Date. All terms not otherwise defined herein shall have the meaning identified with that term in the Ground Sublease.

Dear Mr. Bradfield:

This letter responds to your November 20, 2014 request for Estoppel Certificates from the City and URFA with respect to the above described transaction. The City and URFA view the requirement to provide such Estoppel Certificate to arise from Section 6.5 of the Ground Lease and the Original Sublease. Except for acknowledging the relative positions of the City and URFA, the terms of Section 6.5 of the Ground Lease and the Original Sublease are substantially identical. As you are no doubt aware, the City and URFA are related parties; and, therefore, the discussion of their common interests protected by the Original Sublease is a more compact way to approach this issue. The City's rights arise from the Ground Lease but are affected by operation of certain terms of the Original Sublease cause this letter to primarily focus on the operation of Section 6.5 of the Original Sublease. No rights of the City under the Ground Lease are to be considered waived or modified by reference primarily to the operation of the Original Sublease or by any lack of discussion of the matters set forth in the Ground Lease.

728398v2

EXHIBIT
rubbies
6

Daniel J. Bradfield, Esq.
Re:    Request for Estoppel Letter
Page - 2 –

Using the November 20, 2014 date as the date of the request and your representation
that the request was made at the behest of Blue Valley, both the City and URFA have,
out of an abundance of caution, deemed the request to made by Blue Valley. The
obligation to respond to a request for an Estoppel Certificate is triggered by a request
from the Sublessee under the Original Sublease and from the Lessee under the Ground
Lease. The timing of the reply to such requests is twenty (20) days after the receipt of
written notice. Based on our review of the terms of Section 6.5, a response which is
made on the date of this letter is timely. Please note that neither the City nor URFA have
notice from Blue Valley that CGI Investments, LLC, ("CGI"), the entity to whom the
form of the proposed Estoppel Certificate was addressed, was authorized to act as Blue
Valley's agent in this matter but make this response assuming that as the "Prospective
Purchaser," it would be in CGI's interest to make a representation that the Estoppel
Certificate had been requested by Blue Valley. Therefore, the City and URFA make this
response based on a commercially reasonable interpretation of Section 6.5 and upon a
good faith belief that Blue Valley consented to the request being made by CGI.

The form of the Estoppel Certificates requested by CGI (the "CGI Estoppel Certificates")
exceeds the scope of Section 6.5. Neither the City nor URFA is of the opinion that they
would be required to make a representation concerning any terms which exceed the
scope of Section 6.5 in the Ground Lease or in the Original Sublease. Please note that
the enclosed letter dated September 2, 2014 sent on behalf of the City and URFA makes
it clear that Blue Valley was put on notice that there are "annual payments of the
Sublessor's Cash Flow due and payable for the years 2011 through 2013 and a payment
will be due for 2014 at the end of 2014." (September 2, 2014 letter from Charles
Sharbaugh, Esq. to Blue Valley Apartments, the "September 2 Letter"). A copy of the
September 2 Letter is enclosed for your convenience.

Based on a review of the CGI Estoppel Certificates and the position taken by the City
and URFA in the September 2 Letter, neither the City nor URFA is able to agree to
certain of the representations requested, even if such representations are reduced to the
scope of Section 6.5 of the Original Sublease. In order to keep the issues as simple as
possible, the representation required by Section 6.5(b) ("that the date to which the rent
has been paid") and Section 6.5(c) ("that so far as the certifier knows, if such be the case,
there is no default, set off, defense or other claim against Sublessor (or if so specify the
nature of same under the provisions of this Lease.")), cannot be reconciled with the
terms of the September 2 Letter.  Blue Valley has failed to cure its deficiencies with
respoect to Ground Rent and Cash Flow due and payable for the years 2011 through
2104. The terms of the CGI Estoppel Certificates far exceed the scope of Section 6.5 by
generally setting forth representations to which the City and URFA cannot agree and
still maintain their rights reserved in the September 2 Letter.

Please note that Blue Valley responded to the September 2 Letter with a letter from
Charles B. Waters, Jr. Esq. dated September 5, 2014 (the "September 5 Letter"). While
the September 5 Letter does not directly address all of the issues raised by the
September 2 Letter, it is clear that neither the City nor URFA can represent that they

Daniel J. Bradfield, Esq.
Re:    Request for Estoppel Letter
Page - 3 –

agree that the obligations of Section 6.5(a) are satisfied in that Blue Valley also clearly refutes certain of the terms of the Ground Sublease and thus contends that such Sublease has been modified. A copy of the September 5 Letter is enclosed for your convenience.

Based on the foregoing, the City and URFA decline to respond to the CGI Estoppel Certificates beyond the scope of those issues discussed above both because of their variance from the requirements of Sec. 6.5 and because the participation of Blue Valley in further negotiations with CGI may lead to additional facts and circumstances being brought to the attention of CGI that may allow CGI to reduce the scope of its requests.

The Non-Disturbance Recognition and Attornment Agreement (the "NDRAA") contains terms which apply to the issues raised in the September 2 Letter. Neither the City nor URFA is prepared to sign the NDRAA because the effect of such action diminishes the possibility for resolution of those issues in a manner that is in their best interest.

Finally, given the nature of the objections to the Estoppel Certificates set forth in this letter, neither the City nor URFA have executed the requested Consent to Assignment and Assumption of Interest in Ground Sublease. Neither the City nor URFA has been put on notice that there is a condition where their failure to do so would be considered to be "unreasonable" as required under Section 18.1 of the Original Sublease.

Please feel free to contact me at any time if I can be of further service in this matter.

Best regards,

Lemuel H. Ward
Chief Counsel

Enclosures: (1) September 2, 2014 letter from Charles Sharbaugh, Esq. to Blue Valley Apartments; (2) September 5, 2014 letter from Charles B. Waters, Jr. Esq. to Charles Sharbaugh, Esq.

cc:    Sharon A. Gay, Esq. w/enclosures

728398v2

**ATTORNEYS AT LAW**

**CARLTON FIELDS**
**JORDEN BURT**

One Atlantic Center
1201 W Peachtree Street | Suite 3000
Atlanta, Georgia 30309-3455
404.815.3400 | fax 404.815.3415
www.CFJBLaw com

Atlanta
Hartford
Los Angeles
Miami
New York
Orlando
St. Petersburg
Tallahassee
Tampa
Washington, DC
West Palm Beach

September 2, 2014

Blue Valley Apartments, Inc.                    *Via Overnight Mail and*
1661 Worthington Road                           *Certified Mail, Return Receipt*
West Palm Beach, Florida 33409
Attn: Corporate Secretary

     Re:  Ground Lease Agreement ("Ground Lease") between City of Atlanta ("City") as Lessor and Urban Residential Finance Authority of the City of Atlanta ("URFA") as lessee, as subsequently subleased by URFA to Atlanta West Block Redevelopment, L.L.C. ("Original Sublessee") under Ground Sublease Agreement ("Ground Sublease") dated May 12, 1995 as subsequently assigned to Fannie Mae by Deed Under Power dated July 5, 2011 ("Acquisition Date") and subsequently assigned to Blue Valley Apartments, Inc. ("Blue Valley") by Assignment and Assumption of Ground Sublease Agreement dated as of the Acquisition Date. All terms not otherwise defined herein shall have the meaning identified with that term in the Ground Sublease.

Ladies and Gentlemen:

     We represent the City in connection with the Ground Lease.

     Section 3.1.2 of the Ground Lease provides for a procedure to identify a mutually acceptable replacement of the Sublessor's Cash Flow component of the Ground Rent in the event that the Leasehold Mortgagee obtains title to the Premises. This section also provides for the Sublessor to terminate the Sublessor's Cash Flow payments upon the Leasehold Mortgagee acquiring the Premises. There is a companion provision in the Ground Sublease.

     There has not been an agreement as to the amount of the payment of the Sublessor's Cash Flow during the period of ownership of the Leasehold Mortgagee and the Sublessor has not terminated the obligation of Blue Valley, as successor to the Leasehold Mortgagee, to pay these amounts from and after the Acquisition Date. Blue Valley is, however, not only the successor and assign of the Original Sub-lessee but also the successor and assign of the original Leasehold Mortgagee. Accordingly, there are annual payments of the Sublessor's Cash Flow due and payable for the years 2011 through 2013 and a payment will be due for 2014 at the end of 2014.

36324334.1

We request that you, URFA and the City commence negotiations to identify the appropriate Lessor's Cash Flow annual payments for the remaining term of Ground Lease and the Ground Sublease. We would like to commence those negotiations as quickly as possible. Please contact Lemuel Ward at the City or me to identify a date convenient for a meeting. We request that this meeting occur on or before September 10, 2014 at City Hall. Both the City and URFA hereby inform you that it is each of their intent to enforce the original terms and conditions of the Ground Lease and the Ground Sublease and any deviation from those terms and conditions is hereby suspended.

We also understand that it is your intention to sell your interest under the Ground Sublease. We call your attention to the assignment provisions of the Ground Lease and the Ground Sublease. The approval of the City and URFA is required for any assignment of the Blue Valley interest. The City and URFA would like to conclude the negotiations for the Lessor's Cash Flow payments, and collect the payment for the Lessor's Cash Flow payments for 2011, 2012, and 2013, prior to a review of any application to approve the proposed assignment. The City cannot approve any transfers without resolution of this issue and the payment of the amounts now due and payable.

We appreciate your consideration of these issues. We look forward to working with you to attain a resolution in an expedient manner.

Carlton Fields Jordan Burt

By

Charles T. Sharbaugh

CC:    Peter J. Andrews, Esq.
       Lemuel Ward, Esq.

36324334.1

Page 1 of 1

From: (404) 815-2678
Kathy Spradlin
Carlton Fields
1291 West Peachtree Street
Suite 3000
Atlanta, GA 30309

Origin ID: QFEA



Ship Date: 03SEP14
ActWgt: 1.0 LB
CAD: 103370213/INET3550

Delivery Address Bar Code

J14201406190226

SHIP TO: (404) 815-2678        BILL SENDER
Attn: Secretary
Blue Valley Apartments, Inc.
1661 WORTHINGTON RD

WEST PALM BEACH, FL 33409

Ref #          City of Atlanta
Invoice #
PO #
Dept #

THU - 04 SEP 10:30A
PRIORITY OVERNIGHT



TRK#   7710 3053 1394
0201

33409
FL-US
PBI

**XH PBIA**



522G1KC0846AC9

**After printing this label:**
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning:** Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

# ALDRIDGE CONNORS
### LLP

Fifteen Piedmont Center, 3575 Piedmont Road, NE, Suite 500
Atlanta, Georgia 30305
(404) 994-7400 (main)
(888) 387-6828 (fax)

Charles B. Waters, Jr.
Direct: (404) 994-7426
cwaters@aclawllp.com

September 5, 2014

**VIA EMAIL (csharbaugh@cfjblaw.com)**
**AND VIA REGULAR MAIL**

Charles T. Sharbaugh, Esq.
Carlton Fields Jorden Burt
One Atlantic Center
1201 W. Peachtree Street, Suite 3000
Atlanta, Georgia 30309-3455

> **RE:** **Ground Sublease Agreement ("Ground Sublease") dated May 12, 1995, between Urban Residential Finance Authority of the City of Atlanta ("URFA") and Blue Valley Apartments, Inc. ("Blue Valley"), as successor in interest to Atlanta West Block Redevelopment, L.L.C. ("Original Sublessee")**

Dear Mr. Sharbaugh:

This firm and the undersigned represent Blue Valley in connection with the Ground Sublease. Please direct any future correspondence to Blue Valley to my attention. I am writing in response to your letter dated September 2, 2014.

Under Subsection 3.1.2 of the Ground Sublease, Original Sublessee agree that it would

contact [its] lender or lenders and request that such lender or lenders provide the City of Atlanta and Sublessor [URFA] with an ongoing participation interest in the income of the City Plaza Project which is mutually agreeable to such lender or lenders and the City of Atlanta or Sublessor, as the case may be, in the event any such lender shall acquire title to Sublessee's Estate in the Subleased Premises whether by foreclosure of the Permitted Mortgage, by assignment in lieu of foreclosure, under a new lease pursuant to Section 6.4 of this Sublease or otherwise

To our knowledge, Original Sublessee did not make such a request of any applicable lender or lenders and, also to our knowledge, no lender ever agreed or otherwise obligated itself to any such arrangement. If you have information to the contrary, please let me know. Your letter (and the City's letter of August 7, 2014, to Blue Valley) suggest that such an agreement is a condition precedent to the

Charles T. Sharbaugh, Esq.
September 5, 2014
Page 2

waiver of cash flow payments. Respectfully, that is not what Subsection 3.1.2 says. Certainly, the Ground Sublease contains no mandate that Blue Valley agree to any such arrangement.

Since Blue Valley became the owner of the sublessee's interest under the Ground Sublease, it has not been contacted in any respect (until the City's letter of August 7th) concerning Subsection 3.1.2. To the contrary, the City or URFA has accepted the tender of one dollar per year in each year since Blue Valley has owned the interest. Given these facts, and given no apparent agreement of any nature concerning any "ongoing participation interest", we respectfully disagree with the City's contention that any payments are due to the City.

While Blue Valley has no objection to meeting or speaking the with appropriate City or URFA representatives at the appropriate time, we think it is premature to arrange such a meeting at this time and, in any event, Blue Valley would be unable to participate in a meeting by the September 10th deadline in your letter.

Please do not hesitate to contact me (or, if appropriate, have Mr. Ward do so) should you have any questions.

Sincerely yours,

ALDRIDGE CONNORS, LLP

Charles B. Waters, Jr.

cc: Blue Valley Apartments, Inc.